# EXHIBIT 1
# Part 1 of 2

MC-275

REC'D CLS DOCKETING ~RORA~

Name    ISIDRO ROMERO

Address    SAN QUENTIN STATE PRISON 3-N-06

SAN QUENTIN, CA  94964

CDC or ID Number    D-07204

## IN THE SUPERIOR COURT OF CALIFORNIA

## IN AND FOR ORANGE COUNTY

(Court)

PETITION FOR WRIT OF HABEAS CORPUS

| Isidro Romero | |
|---|---|
| Petitioner | |
| vs. | No. _____ |
| | (To be supplied by the Clerk of the Court) |
| Board of Prison Hearings | |
| Respondent | |

### INSTRUCTIONS – READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies.

- If you are filing this petition in the California Supreme Court, file the original and thirteen copies.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rules 56.5 and 201(h)(1) of the California Rules of Court [as amended effective January 1, 1999]. Subsequent amendments to Rule 44(b) may change the number of copies to be furnished the Supreme Court and Court of Appeal.

Form Approved by the
Judicial Council of California
MC-275 [Rev. January 1, 1999]

PETITION FOR WRIT OF HABEAS CORPUS

Page one of six

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rules 56.5, 201(h)

This petition concerns:

| | | | |
|---|---|---|---|
| ☐ A conviction | | ☒ Parole | |
| ☐ A sentence | | ☐ Credits | |
| ☐ Jail or prison conditions | | ☐ Prison discipline | |
| ☐ Other (specify): _____ | | | |

1. Your name: __Isidro Romero__

2. Where are you incarcerated? __San Quentin State Prison__

3. Why are you in custody? ☒ Criminal Conviction ☐ Civil Commitment

   Answer subdivisions a. through i. to the best of your ability.

   a. State reasons for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   __Second Degree Murder__

   b. Penal or other code sections: __P.C. 187__

   c. Name and location of sentencing or committing court: __Orange County Superior Court__

   d. Case number: __ORA C54812__

   e. Date convicted or committed: __April 29, 1985__

   f. Date sentenced: __May 16, 1985__

   g. Length of sentence: __16 Years to life__

   h. When do you expect to be released? __Indeterminately Sentenced__

   i. Were you represented by counsel in the trial court? ☒ Yes. ☐ No. If yes, state the attorney's name and address:

   __Julian Bailey, Santa Ana Ca. 92701__

4. What was the LAST plea you entered? (check one)

   ☒ Not guilty ☐ Guilty ☐ Nolo Contendere ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   ☒ Jury ☐ Judge without a jury ☐ Submitted on transcript ☐ Awaiting trial

GROUNDS FOR RELIEF

Ground 1:  State briefly the ground on which you base your claim for relief.  For example, "the trial court imposed an illegal enhancement." (If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four.  For additional grounds, make copies of page four and number the additional grounds in order.)

<u>See Attached</u>

_____

_____

_____

_____

a.  Supporting facts:

Tell your story briefly without citing cases or law.  If you are challenging the legality of your conviction, describe the facts upon which your conviction is based.  If necessary, attach additional pages.  CAUTION:  You must state facts, not conclusions.  For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial.  Failure to allege sufficient facts will result in the denial of your petition.  (See In re Swain (1949) 34 Cal.2d 300, 304.)  A rule of thumb to follow is: who did exactly what to violate your rights at what time (when) or place (where). (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)

<u>See Attached</u>

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

b.  Supporting cases, rules, or other authority (optional):

(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim.  If necessary, attach an extra page.)

<u>See Attached</u>

_____

_____

_____

7. Ground 2 or Ground _____ (if applicable):

_____

_____

_____

_____

a. Supporting facts:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

b. Supporting cases, rules, or other authority:

_____

_____

_____

_____

_____

8. Did you appeal from the conviction, sentence, or commitment? [y] Yes. [ ] No. If yes, give the following information:

    a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

       Orange County Superior Court

    b. Result: __Denied__      c. Date of decision: __2-18-87__

    d. Case number or citation of opinion, if known: __Unknown__

    e. Issues raised: (1) __Inadequate Interpreter__

            (2) _____

            (3) _____

    f. Were you represented by counsel on appeal? [X] Yes. [ ] No. If yes, state the attorney's name and address, if known:

       Julian Bailey, Santa Ana Ca  92701

9. Did you seek review in the California Supreme Court? [ ] Yes. [X] No. If yes, give the following information:

    a. Result: _____   b. Date of decision: _____

    c. Case number or citation of opinion, if known: _____

    d. Issues raised: (1) _____

            (2) _____

            (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

          N/A

11. Administrative Review:

    a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal. App.3d 500 [125 Cal. Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

       No Administrative Available

    b. Did you seek the highest level of administrative review available? [ ] Yes. [X] No. N/A
       *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or issue in any court?   ☐ Yes. If yes, continue with number 13.   ☒ No. If no, skip to number 15.

13. a. (1) Name of court: _____

    (2) Nature of proceeding (for example, "habeas corpus petition"): _____

    (3) Issues raised: (a) _____

             (b) _____

    (4) Result (Attach order or explain why unavailable): _____

    (5) Date of decision: _____

  b. (1) Name of court: _____

    (2) Nature of proceeding: _____

    (3) Issues raised: (a) _____

             (b) _____

    (4) Result (Attach order or explain why unavailable): _____

    (5) Date of decision: _____

  c. For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (194? 34 Cal.2d 300, 304.)

        No Delay _____

_____

16. Are you presently represented by counsel?   ☐ Yes.   ☒ No. If yes, state the attorney's name and address, if known:

_____

17. Do you have any petition, appeal, or other matter pending in any court?   ☐ Yes.   ☒ No. If yes, explain:

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

        This is the appropriate Court _____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California th the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and to those matters, I believe them to be true.

Date: 6/28/07

▶ _Cedric Ramero_
(SIGNATURE OF PETITIONER)

## INTRODUCTION

On March 7, 2007 Petitioner Isidro Romero (Petitioner) appeared before a Board of Parole Hearings (Board) for consideration for parole. Petitioner was denied parole for one year.

On April 20, 2006 Petitioner appeared before a Board hearing panel for parole consideration and received a split decision. Because of a split decision, it went before the full Board for an Enbanc Hearing, and Petitioner was denied parole for one year. Petitioner filed a petition for Writ of Habeas Corpus and claimed that the Enbanc hearing did not comport with the California Code of Regulations Title 15 (CCR Title 15) §§ 2254 and 2255. This Court issued and Order to Show Cause, (Case Case No. M-10932) and ordered the Board to answer why it should not be required to hold a new Enbanc hearing in compliance with all applicable statutes and regulations including but not limited to §§ 2254, 2255. This Court's order stated: "The order to show cause is limited to the above issue, as the court cannot evaluate the merits of the matter without an adequate record." The Board conceited and again held a new Enbanc Hearing, in which Petitioner was again denied parole. It has been over 60 days and Petitioner has not yet received a copy of the Enbanc hearing transcripts. Petitioner has enquired to this Court's appointed counsel as to the status of the above mentioned case. (No. M-10932) Petitioner s counsel did not respond.

/////////////////
/////////////////

1

## CONTENTION

### I.

### PETITIONER'S STATE AND FEDERAL DUE PROCESS RIGHTS WERE VIOLATED WHEN THE BOARD DENIED PETITIONER PAROLE WITHOUT "SOME EVIDENCE"

Petitioner appeared before the Board for parole consideration on March 7, 2007, and was denied parole for one year. The Board stated that Petitioner was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. The Board stated:

> The Panel finds that the commitment offense was carried out in a very cruel, very cold and callous manner, in that this inmate along with his friends, his crime partners, decided to go over the victim, Mr. Gomez's house and basically crash the party...

> It was carried out in a manner that demonstrated a very callous disregard for human suffering. The victim sustained anywhere from four to eight, we're not exactly sure, but based on the Appellate decision I read, it stated eight.

> The motive of the crime was extremely trivial in relation to the offense and, actually based on everything that we have read, this Panel does not understand what motivated , what the true motivation for Mr. Gomez losing his life that evening truly was.

(Exhibit "A" p 1-2)

The overarching factor regarding parole suitability is whether a prisoner is a current threat to society. There is absolutely no evidence to support the Board's determination that Petitioner poses a current threat to public safety. On the contrary, the facts clearly prove that Petitioner does not pose a risk of dan[g]er to society.

The Board denied parole stating that the commitment

2

offense was carried out in a very cruel, very callous manner.
If the Board is going to rely on the commitment offense, than
the commitment offense must meet the standard set forth in In
re Rosenkrantrz, 29 Cal.4th 616, 683; 128 Cal.Rptr.2d 104, 161
(2002), which states that denial of parole based on the nature
of the offense could raise due process violations, if no
circumstances of the commitment offense was more than the
minimum necessary to commit the offense. In In re Dannenberg,
34 Cal.4th 1061, 1095; 23 Cal.Rptr.3d 417, 440 (2005), the
California Supreme Court further held that the Board could
deny parole if the crime is "more than the minimally necessary
to convict him of the offense for which he is confined." When
compared to this evolved standard set forth in these two
cases, Petitioner's offense does not even compare to either
one. Petitioner's commitment offense was a result of fight
between Petitioner and the victim. Petitioner did not use more
than the necessary force to sustain a conviction. Petitioner
was also stabbed (Exhibit "A" p. 16) during his fight with the
victim. Petitioner stabbed the victim 4 times. (See Exhibit
"B").

    Recently several state cases were decided where these
prisoners were ordered released, or ordered back to the Board
for a new suitability hearing because they did not meet   the
standard set forth in Rosenkrantz, or Dannenbereg.

    In In re Smith, (2003) 109 Cal.App.4th 489. that prisoner
was a drug dealer who was convicted for shooting, beating, and
drowning of another drug dealer 15 years before he was found
suitable for parole.

3

In <u>In re Scott</u>, (2005) 133 Cal.App.4th 572, 579, Scott drove to his wife's lover's house and shot the lover in the head with a rifle.

In <u>In re Wen Lee</u>, (2006) 143 Cal.App.4th 1400, 1404, Lee shot a man that owed him money after the man refused to pay him, wounding him and killing the debtor's wife.

In <u>In re Weider</u>, (2006) 145 Cal.App.4th 570, 575-576, Weider, another distraught husband, took a gun and shot the man who was living with his estranged wife, killing that man and wounding two others. The shooting took place in a restaurant.

In <u>In re Elkins</u>, (2006) 144 Cal.App.4th 475, (first degree murder) killed, a man he owed money to for drugs, so he could rob him. Elkins repeatedly beat his victim with a baseball bat. Elkins was on probation at the time.

Recently, just in the last month or so, a few other state court cases were decided.

In <u>In re SANDRA DAVIS LAWRENCE</u>, Case No. B190874, (5-22-07) (first degree murder) Lawrence killed her lover's wife because she was an obstacle in the way. Lawrence shot her victim 4 times, and than stabbed her victim with a potato peeling. That court ruled that the Governor's finding that Lawrence's offense was "shockingly vicious use of lethality" and exceptionally callous disregard for human suffering," was inconsistent with the evidence.(In re Lawrence, Case No. B190874 p 53)

~~In In re DAVID BARKER, Case No. A1 4686 (5-24-07), Barker~~ participated in the killing of his friend Barry Braeseke's parents and grandfather. Braseseke killed his parents and

4

Barker killed Braeseke' grandfather. The <u>Barker</u> court found
that Barker's murder of the grandfather did not involve any of
the characteristics of a first degree murder. Nor that
Barker's involvement in three murders made him a threat to
public safety. Barker was convicted of two second degree
murders and one first degree murder. (In re Barker Case No.
A114686 (5-24-07) p. 28-29).

The federal court found that the original case in which
the 'particularly egregious' standard was set did not fit that
criteria after a long period of time.

In <u>Rosenkrantz v. Marshall</u>, (C.D. 2006) 444 F.Supp.2d
1963, the Central District ordered Rosenkrantz released.
Rosenkrantz killed a young man after that man outed
him as a homosexual. Rosenkrantz bought a gun and practiced
with it and even planned his killing.

In <u>Martin v. Marshall</u>, (N.D. Cal. 2006) 431 F.Supp 2d
1038, 1040, Martin was ordered released. Martin was a drug
user who shot his drug dealer who he owed money to, and two
other restaurant patrons.

The <u>Lawrence</u> court stated:

> All of the above murders involved at least as
> shockingly vicious use of lethality" and
> "exceptionally callous disregard for human
> suffering" as did Lawrence's murder of her
> paramour's wife. Several resulted in the killing
> or wounding of multiple victims. several had
> economic as opposed to emotional motives, and
> several prisoners were involved in other criminal
> activities at the time of the offense. Yet the
> state appellate courts or federal courts found these
> earlier commitment offenses failed to provide some
> evidence" of the perpetrator's present dangerousness
> if released to the outside world.

(Lawrence, supra at p. 55)

5

## A. THE CONTINUED RELIANCE ON IMMUTABLE FACTORS TO DENY PAROLE VIOLATES DUE PROCESS

In In re Scott, supra, at pp. 594-595 that court found that held that the commitment offense is one of only two immutable factors that will never change. The Scott court further echoed a federal court finding that "[R]eliance on such an immutable factor 'without regard to or consideration of subsequent circumstances' may be unfair, and runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.' (See Biggs v. Terhune, (9th Cir. 2003) 334 F.3d 910, 915). The Scott court went on to hold that the predictive value of the commitment offense may be very questionable after a long period of time. "Thus, denial of release based solely on the basis of the gravity of the gravity of the commitment offense warrants especially close scrutiny." In Irons v. Carey, 358 F.Supp.2d 936 found that the Board had relied on the commitment offense four prior times,[1] and that under those circumstances continued reliance on those factors at his 2001 (4th

---

[1]. Recently the United States Ninth Circuit Court of Appeals held in Irons, supra, that the Board could rely on the commitment offense to deny parole. However, the Ninth Circuit noted: "All we held in those cases and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms." The Ninth Circuit's holding is based on an erroneous fact. A prisoner appears before parole suitability 13 month prior to their eligibility date. Irons had appeared to his forth hearing at the time of filing (seven years after his minimum term, 22 years with good time credit applied, which is how total time is calculated.)

suitability hearing) violated Irons due process. The Irons
Court further held that "continuous reliance on unchanging
circumstances transforms an offense for which California
law provides eligibility for parole into a de facto life
imprisonment without the possibility of parole." Irons, supra,
at 947. Petitioner fits this finding to a 'T', since
Petitioner has been to atleast 10 parole consideration
hearings on a fifteen years to life sentence.

## B. THE PREDICTIVE VALUE OF THE COMMITMENT OFFENSE AFTER 20 YEARS DISSIPATES.

In an unpublished opinion, the Sixth Appellate District
for California quoted in In re Wieder, 145 Cal.App.4th 470 The
court noted that Weider:

> "has served so much time that, with custody credits,
> he is within the matrix for first degree murder. .
> [I]t should be self evident that after an inmate has
> served the equivalent of 25 years, whether his actions
> were more than the minimally necessary for a second
> degree conviction... is no longer the appropriate
> question. [The Board's] position, that inmates who
> were convicted of second degree may forever be
> denied parole based on some modicum of evidence
> that their acts rose to the level of a first,
> without acknowledging the fact that they have
> already served the time for a first, should be
> seen as so ridiculous that simply to state it is
> to refute it."

(See In re Wieder, 145 Cal.App.4th 470  479 (2006).

Petitioner in this instant action is within the first
degree murder matrix. Petitioner has serve the equivalent of
29 years after good time is applied, which puts Petitioner
almost beyond the first degree murderer matrix. "Thus, denial
of release based solely on the basis of the gravity of the
gravity of the commitment offense warrants especially close
scrutiny." (In re Scott, supra at pp. 594-595)

7

CONTENTION

II.

THE DENIAL OF PAROLE BY THE BOARD OF PAROLE
HEARINGS WAS ARBITRARY AND CAPRICIOUS AND VIOLATES
PETITIONER'S STATE AND FEDERAL DUE PROCESS RIGHTS

Petitioner's March 7, 2007 parole consideration hearing
was an arbitrary and capricious decision by the Board. In In
re Rosenkrantz, 29 Cal.4th 616, 665 held that a parole
decision with no basis in fact and not supported by any
evidence in the record would be arbitrary and capricious, and
it would affect a liberty interest and violate principles of
due process of law.

Petitioner's claim is supported by when a historical
review of past parole hearings are considered. On April 20,
2006 Petitioner appeared before the Board for parole
consideration and received a split decision which was heard
Enbanc and Petitioner was denied parole. After the Orange
County Superior Court issued an Order to Show Cause regarding
CCR §§ 2254, 2255. (Case No. M- 0932) Respondent conceded and
Petitioner was again taken to another Enbanc hearing via
video-conference. Prior to the Respondent conceding Petitioner
also appeared before the Board for parole consideration as a
result of being found unsuitable by Enbanc on 6-20-06.

Petitioner has been to three hearings with in one year,
all regarding parole suitability, and the Board has relied on
the immutable factors, such as the commitment offense. Past
criminal history (escalating pattern of criminal conduct).
Although Petitioner's criminal record consisted of one arrest
for drunk driving, and one arrest for supposedly threatening

8

his ex-girlfriend with a knife. Other reasons the Board

pointed to were psychologist report, however, the psychologist

stated under **XIV Assessment of Dangerousness**:

> A. If _released to the outside community_:
> Mr. Romero has statistically based static factors for
> increased violence potential when compared to the
> average member of the general population. These
> factors still stand: 1) He is a man. 2) He has
> committed violence before 3) He is single 4) He has a
> history of alcohol abuse.

The psychologist further stated:

> **Factors that are likely to lower his risk for violence
> still stand as well.** These are 1) No history of childhood
> sociopathy. 2) Increased education. 3) violence risk
> drops after age forty. 4) He has no motivation for
> violence and does not endorse any violent ideation,
> intent or plans. 5) He has remained alcohol free for 15
> years and clearly understands that he cannot even drink
> alcohol. 6) he has never used illegal narcotics 7) There
> is no evidence of paranoia of a psychotic nature or as a
> result of a personality disorder.

The Dr. went on to state:

> There are no psychiatric reasons to retain him. [In
> prison] Mr Romero poses minimal risk to the community
> on the condition that he continue his alcohol recovery
> activities. Mr. Romero is man will likely earn the
> respect and positive regard of others in any community he
> may live.

(Compare Exhibit "C" p 4-5 and Exhibit "A" pp 52-55.)

The Board also questioned his parole plans in Mexico,

although Petitioner's father a farming business and has

offered Petitioner a place to stay and work. The Board's

findings regarding Petitioner's parole plans in Mexico, and

Petitioner having an Alcoholic Anonymous sponsor, Or the

Clinical Psychologist findings are erroneous and amounts to an

arbitrary and capricious decision. The Board makes it a point

to find reasons to not normally set a parole date, instead of

normally finding reasons for parole.

9

## A. PETITIONER'S 2007 PAROLE CONSIDERATION HEARING WAS ARBITRARY AND CAPRICIOUS BECAUSE IT WAS PRE-DETERMINED.

Concomitant to the guarantee against arbitrary and capricious state action is the right to a fact-finder who has not predetermined the outcome of a hearing. Withrow v. Larkin, 421 U.S. 35 (1975). A fair trial in a fair tribunal is a basic requirement of due process, and this rule applies to administrative agencies which adjudicate as well as to courts; Edward v. Balisok, 35 F.3d 318, 326 (7th Cir. 1994) a Decision-making body "that has prejudged the outcome cannot render a decision that comports with due process." A fair tribunal can not rule the opposite of its earlier ruling, unless it had new evidence than what it used in its first decision. A fair court could not go back and find someone guilty of a crime in a fair trial after it had previously rule that defendant innocent. To make a finding of unsuitability on the same evidence, or more evidence of exemplary conduct, by the same decision-making body can only mean that the unsuitability finding was pre-determined renders it arbitrary and capricious, therefore violating Petitioner's due process.

That is exactly what the Board did Petitioner by subjecting to appear before a parole consideration panel to determine his suitability for parole after having been found unsuitable for parole three times within one year, in light of the fact that Petitioner has continued positive programming. Especially after having been ordered by the court hold an new Enbanc Hearing and provide transcripts of that hearing, when the Board has never held that practice, nor have they yet

10

complieed with the Superior Court's Order to provide Enbanc transcripts.

For the aforementioned reasons this Court should grant Petitioner's prayer for relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Petitioner Respectfully Prays that this Court:

1. Order the Board to find Petitioner suitable for parole and calculate Petitioner's term, and apply any credit over the calculated term to his parole;

2. Order Petitioner immediately released forthwith;

3. Appoint Counsel;

4. Declare the rights and duties of the parties.

Dated this _28_, day of June 2007.

Isidro Romero
**In Pro Se**

11

## PROOF OF SERVICE

I declare that:

I am housed at San Quentin State Prison 3-N-2 , San

Quentin, CA 94964

On July 2, 2007, I served the attached "WRIT OF HABEAS
CORPUS" by placing a true copy thereof enclosed in a sealed
envelope with postage thereon fully paid, in the United States
mail, addressed as follows:

        OFFICE OF THE ATTORNEY GENERAL
        CORRECTIONAL LAW SECTION
        P.O. BOX 85266
        SAN DIEGO, CA 92186-5266


I declare under penalty of perjury under the laws of the
State of California that the foregoing is true and correct,
and that this declaration was executed on July 2, 2007. at
San Quentin State Prison, San Quentin CA 94974

                    Noel Valdivia Sr.
            (Signature of Declarant)

EXHIBIT "A"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life　)　　　CDC Number:　D-07204
Term Parole Consideration　)
Hearing of:　　　　　　　　　)
　　　　　　　　　　　　　　　)
ISEDRO ROMERO　　　　　　　　)　　　**INMATE COPY**
_____)

SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

MARCH 7, 2007

12:14 P.M.

PANEL PRESENT:

JANICE ENG, Presiding Commissioner
RONALD HERRON, Deputy Commissioner

OTHERS PRESENT:

ISEDRO ROMERO, Inmate
CANDICE CHRISTENSEN, Attorney for Inmate
MATT LOCKHART, Deputy District Attorney
JOHN MARQUEZ, Interpreter

CORRECTIONS TO THE DECISION HAVE BEEN MADE

　　　_____No　　　See Review of Hearing
　　　_____Yes　　　Transcript Memorandum

Sandra Tillman, Capitol Electronic Reporting

# I N D E X

Page

Proceedings......................................... 3

Case Factors....................................... 13

Pre-Commitment Factors............................. 23

Post-Commitment Factors............................ 42

Parole Plans....................................... 55

Closing Statements................................. 67

Recess............................................. 73

Decision........................................... 74

Adjournment........................................ 82

Transcript Certification........................... 83

1          **P R O C E E D I N G S**

2          **PRESIDING COMMISSIONER ENG:** Okay, we are on the

3  record.  Good afternoon.  This is a Subsequent Parole

4  Consideration Hearing for Isedro, I-S-E-D-R-O, Romero,

5  R-O-M-E-R-O, CDC number D-07204.  Today's date is

6  March 7th, 2007, and the time is 12:14 in the afternoon.

7  We are located at San Quentin State Prison.

8          The inmate was received on May 20th, 1985, from

9  Orange County.  The life term began on May 20th, 1985,

10  and the minimum eligible parole date is August 25th,

11  1991.  The controlling offense for which the inmate has

12  been committed is murder two, with use of a deadly

13  weapon, case number C54812.  Count One, Penal Code

14  Section 187 and Penal Code Section 12022(b).  The inmate

15  received a total term of 16 years to life.

16          This hearing is being tape recorded.  So for the

17  purpose of voice identification, each of us will be

18  required to state our first and last name, spelling out

19  our last name.  So when it comes to your turn, Mr.

20  Romero, after you spell your last name, please provide

21  us with your CDC number.  So I will begin and we'll move

22  around the room to my left.  So my name is Janice Eng,

23  E-N-G, Commissioner.

24          **DEPUTY COMMISSIONER HERRON:** My name is Ronald

25  Herron, H-E-R-R-O-N, Deputy Commissioner.

1    **DEPUTY DISTRICT ATTORNEY LOCKHART:**  My name is

2    Matt Lockhart, L-O-C-K-H-A-R-T.  I'm a Deputy District

3    Attorney in Orange County.

4    **ATTORNEY CHRISTENSEN:**  Candice Christensen,

5    C-H-R-I-S-T-E-N-S-E-N, Attorney for Mr. Romero.

6    **INMATE ROMERO:**  My name is Isedro Romero,

7    R-O-M-E-R-O.  My CDC number is D-07204.

8    **INTERPRETER MARQUEZ:**  My name is John Marquez.

9    I'm a certified interpreter representing Marquez and

10   Associates.

11   **PRESIDING COMMISSIONER ENG:**  Okay, thank you.  We

12   also have two correctional officers present for security

13   reasons and they will not be participating in the

14   hearing.  Before we go any further, Mr. Marquez, I have

15   to swear you in.

16   **INTERPRETER MARQUEZ:**  Yes.

17   **PRESIDING COMMISSIONER ENG:**  So please raise your

18   right hand.  Do you swear or affirm to translate

19   truthfully and accurately to the best of your ability

20   from English to Spanish and Spanish to English?

21   **INTERPRETER MARQUEZ:**  I do.

22   **PRESIDING COMMISSIONER ENG:**  Okay.  Thank you.

23   **INTERPRETER MARQUEZ:**  You're welcome.

24   **PRESIDING COMMISSIONER ENG:**  Okay.  Ms.

25   Christensen, because of the language barrier, do you

5

1    want to waive the reading of the ADA statement aloud?

2        ATTORNEY CHRISTENSEN:  We can do that.  I also

3    want to point out that Mr. Romero actually speaks

4    English reasonably well.  So I don't know as we

5    specifically need a verbatim translation.  Perhaps we

6    could best use Mr. Marquez's services by just Mr.

7    Romero's own discretion, if he feels that he needs some

8    assistance in that way.  I don't know how it was done at

9    the last hearing.  Did you have an interpreter give you

10   a verbatim translation?  You did.  All right then.

11       PRESIDING COMMISSIONER ENG:  Well, it's still at

12   your discretion.  Do you understand what I'm saying?

13       INMATE ROMERO THROUGH INTERPRETER:  Yes.

14       PRESIDING COMMISSIONER ENG:  Okay.  So it's up to

15   you.  Do you want Mr. Marquez to translate everything or

16   do you want to just refer to Mr. Marquez when you're not

17   sure that you understand and to have him explain it to

18   you in Spanish?

19       INMATE ROMERO THROUGH INTERPRETER:  It's better

20   for me if you do a simultaneous interpretation.

21       PRESIDING COMMISSIONER ENG:  Okay.

22       ATTORNEY CHRISTENSEN:  All right.

23       PRESIDING COMMISSIONER ENG:  That's fine.

24       ATTORNEY CHRISTENSEN:  That's fine.

25       PRESIDING COMMISSIONER ENG:  Okay.  So based on

1  that, Counsel, do you want to waive the reading of the

2  ADA?

3          **ATTORNEY CHRISTENSEN:**  Yes.

4          **PRESIDING COMMISSIONER ENG:**  Okay.  All right.

5  Sir, we did not, at least I did not have a current

6  signed form BPT Form 1073 in the file.  And that form is

7  a reasonable accommodation notice and request under the

8  provisions of the Americans With Disabilities Act, okay?

9  So the last one I have is dated in 2006.  Therefore,

10 your counsel met with you a little while ago and

11 reviewed the ADA rights; is that correct?

12         **INMATE ROMERO THROUGH INTERPRETER:**  Yes.

13         **PRESIDING COMMISSIONER ENG:**  Okay.  So you did

14 sign this today?

15         **INMATE ROMERO THROUGH INTERPRETER:**  Yes.

16         **PRESIDING COMMISSIONER ENG:**  Okay.  All right.

17 So do you understand what the accommodations and notice

18 is all about and your ADA rights are?

19         **INMATE ROMERO THROUGH INTERPRETER:**  Yes.

20         **PRESIDING COMMISSIONER ENG:**  Okay.  I still have

21 to go through some basic questions.  So do you have any

22 problems walking up or down stairs or for distances of a

23 hundred yards or more?

24         **INMATE ROMERO THROUGH INTERPRETER:**  No.

25         **PRESIDING COMMISSIONER ENG:**  Okay.  And do you

1   need glasses in order to read documents or to see

2   distances?

3          INMATE ROMERO THROUGH INTERPRETER:   To read, yes.

4          PRESIDING COMMISSIONER ENG:   To read, okay.   And

5   do you have those with you?

6          INMATE ROMERO THROUGH INTERPRETER:   Yes.

7          PRESIDING COMMISSIONER ENG:   Okay.   So you should

8   be fine to get through the hearing today?

9          INMATE ROMERO THROUGH INTERPRETER:   Yes.

10         PRESIDING COMMISSIONER ENG:   Okay.   Do you have

11  any hearing impairments?

12         INMATE ROMERO THROUGH INTERPRETER:   No.

13         PRESIDING COMMISSIONER ENG:   Okay.   Have you ever

14  been included in the CCCMS or EOP programs?

15         INMATE ROMERO THROUGH INTERPRETER:   No.

16         PRESIDING COMMISSIONER ENG:   Do you know what

17  those are?

18         INMATE ROMERO THROUGH INTERPRETER:   More or less,

19  yes.

20         PRESIDING COMMISSIONER ENG:   Well, give me an

21  idea what they are.

22         INMATE ROMERO THROUGH INTERPRETER:   They are many

23  in this building probably that need that.   Quite

24  frankly, I'm not sure what all that is for.

25         PRESIDING COMMISSIONER ENG:   Okay.   Need what?

1    INMATE ROMERO THROUGH INTERPRETER:  Well, you

2 know, I don't know whether, you know, the pills that

3 they are required to take for some of the illnesses.

4    PRESIDING COMMISSIONER ENG:  So you understand

5 that those programs are in the mental health area?

6    INMATE ROMERO THROUGH INTERPRETER:  Yes.

7    PRESIDING COMMISSIONER ENG:  You do understand

8 that?  Okay.

9    INMATE ROMERO THROUGH INTERPRETER:  Yes.

10    PRESIDING COMMISSIONER ENG:  Okay, all right.  So

11 you haven't been in either one of those.

12    INMATE ROMERO THROUGH INTERPRETER:  No.

13    PRESIDING COMMISSIONER ENG:  Have you ever taken

14 psychotropic medications either in prison or in the

15 streets?

16    INMATE ROMERO THROUGH INTERPRETER:  No.

17    PRESIDING COMMISSIONER ENG:  Okay.  And were you

18 ever enrolled in special education classes?

19    INMATE ROMERO THROUGH INTERPRETER:  I did attend

20 classes.

21    PRESIDING COMMISSIONER ENG:  Okay.  But you were

22 educated where?  You weren't educated in the United

23 States; correct?

24    INMATE ROMERO THROUGH INTERPRETER:  Well, it was

25 more here.  Because I only studied to the fifth grade in

1   my country.

2          PRESIDING COMMISSIONER ENG:  Okay.  That's what I

3   wanted to know.  Okay.  So do you suffer from any

4   disability that would prevent you from participating in

5   the hearing today?

6          INMATE ROMERO THROUGH INTERPRETER:  No.

7          PRESIDING COMMISSIONER ENG:  Okay.  Counsel, any

8   ADA issues that you feel need further discussion?

9          INMATE ROMERO THROUGH INTERPRETER:  No.

10          PRESIDING COMMISSIONER ENG:  Thank you.  Okay,

11  this hearing is being conducted pursuant to Penal Code

12  and the rules and regulations of the Board of Parole

13  Hearings governing parole consideration hearings for

14  life inmates.  The purpose of today's hearing is to,

15  once again, consider your suitability for parole.  And

16  in doing so, we'll consider the number and nature of the

17  crimes for which you were committed, your prior criminal

18  and social history, your behavior and programming since

19  your commitment, and your plans if released.

20          We've already had an opportunity to review your

21  Central File and you'll also have an opportunity to make

22  any corrections or to clarify the record.  We will

23  consider your progress since your commitment, your

24  counselor's reports and your mental health evaluations.

25  However, we will focus on your progress and any new

1  reports since your last hearing.  So any changes in

2  parole plans should be brought to our attention.

3      We will reach a decision today and inform you

4  whether or not we find you suitable for parole and the

5  reasons for our decision.  If you are found suitable for

6  parole, the length of your confinement will be explained

7  to you at that time.  So before we recess for

8  deliberations, the District Attorney's representative,

9  who is here, your Attorney, and you yourself will have

10  an opportunity to make a final statement regarding your

11  parole suitability.  If you choose to make a final

12  statement, you should focus on why you believe you're

13  suitable for parole.

14      We will then recess, clear the room, and

15  deliberate.  Once we're completed our deliberations,

16  we'll resume the hearing and announce our decision.

17  Okay, so the California Code of Regulations state that

18  regardless of time served, a life inmate shall be found

19  unsuitable for and denied parole if, in the judgment of

20  the Panel, the inmate would pose an unreasonable risk of

21  danger to society if released from prison.

22      You have certain rights.  Those rights include

23  the right to a timely notice of the hearing, the right

24  to review your Central File, and the right to present

25  relevant documents.  Counsel, so far have your client's

1  rights have been met?

2          ATTORNEY CHRISTENSEN:  Yes, they have.

3          PRESIDING COMMISSIONER ENG:  Thank you.  You have

4  the additional right to be heard by an impartial Panel.

5  So you've been introduced to this Panel.  Do you have

6  any objections?

7          INMATE ROMERO THROUGH INTERPRETER:  No.

8          PRESIDING COMMISSIONER ENG:  Okay.  Counsel, any

9  objections to the Panel?

10          ATTORNEY CHRISTENSEN:  No.

11          PRESIDING COMMISSIONER ENG:  Thank you.  You will

12  receive a copy of our written, tentative decision today.

13  That decision becomes final within 120 days.  So a copy

14  of the final decision and a copy of the transcript will

15  be sent to you.

16          On May 1st, 2004, the regulations regarding your

17  ability to appeal any decision made at this hearing were

18  repealed.  So basically you'll have to go to court.  If

19  you have any questions about that policy, you can

20  discuss it with your legal counsel or you can get a copy

21  of the policies from your prison law library.

22          INMATE ROMERO THROUGH INTERPRETER:  Very well.

23          PRESIDING COMMISSIONER ENG:  Okay.  Sir, you're

24  not required to admit to or discuss your offense.  But

25  this Panel does accept as true the findings of the

·12

1    court.  Do you understand what that means?

2          INMATE ROMERO THROUGH INTERPRETER:  Yes.

3          PRESIDING COMMISSIONER ENG:  Okay.  Commissioner

4    Herron, is there any confidential information in the

5    file and, if so, will we be using it today?

6          DEPUTY COMMISSIONER HERRON:  There is not.

7          PRESIDING COMMISSIONER ENG:  Okay.  Thank you.

8    I've already passed the hearing checklist around the

9    room to your legal counsel and to the representative

10   from the DA's office.  And they have initialed it.  And

11   this is to make sure that all of us are operating off

12   the same set of documents, okay.  So this is Exhibit

13   One.

14         Counsel, any additional documents to be submitted

15   to the Panel?

16         ATTORNEY CHRISTENSEN:  No, none.

17         PRESIDING COMMISSIONER ENG:  Okay.  Any

18   preliminary objections?

19         ATTORNEY CHRISTENSEN:  No objections.

20         PRESIDING COMMISSIONER ENG:  And will your client

21   be speaking with the Panel today?

22         ATTORNEY CHRISTENSEN:  Yes, he will as to all

23   matters.

24         PRESIDING COMMISSIONER ENG:  Okay.  I'll have to

25   swear you in, sir, so please raise your right hand.  Do

*Capitol Electronic Reporting*

1   you solemnly swear or affirm that the testimony you give

2   at this hearing will be the truth, the whole truth, and

3   nothing but the truth?

4       INMATE ROMERO THROUGH INTERPRETER:  Yes, I do.

5       PRESIDING COMMISSIONER ENG:  Okay.  Thank you.

6   Okay, so first of all what I'm going to do is read into

7   the record the Statement of Facts about the crime.  And

8   I'm going to take that from the Appellate decision page

9   two.  Okay.  So this states, and I'm just going to add a

10  little information.

11              "On January, I believe it's January 22nd,

12          1982, during a party, Sergio Cruz, a noninvitee

13          attempted to coax one of the guests Sofia in

14          parenthesis Rodriguez outside.  Although Cruz and

15          Sofia had previously dated, Sofia refused to

16          leave the house.  Cruz returned hours later

17          accompanied by Romero and others.  When Sofia

18          still refused to leave with Cruz, catcalls were

19          made until a fight erupted between those inside

20          the house and Cruz and his friends.

21              "During the brawl, witnesses identified

22          Romero as stabbing Jose Gomez, Sofia's cousin.

23          Romero Cruz and the others fled.  Gomez's autopsy

24          revealed he died from eight stab wounds.  Romero

25          was arrested at a hospital while being treated

```
 1              for cuts and bruises.  Blood tests showed

 2              Romero's blood alcohol level to be .16.  Romero

 3              admitted at trial he accompanied Cruz to the

 4              party and was involved in a fight, but denied

 5              stabbing anyone.  In addition, he admitted

 6              drinking beer but denied feeling its effects."

 7          Okay.  Sir, is that an accurate description of

 8   what occurred that night?

 9          INMATE ROMERO THROUGH INTERPRETER:  Yes, that's

10   correct.

11          PRESIDING COMMISSIONER ENG:  Okay.  So you did,

12   in fact, stab Mr. Gomez?

13          INMATE ROMERO THROUGH INTERPRETER:  Yes, I did

14   it.

15          PRESIDING COMMISSIONER ENG:  Okay.  So did you

16   have a knife on you in your pants?

17          INMATE ROMERO THROUGH INTERPRETER:  Yes, I one in

18   my pocket, in my pant pocket.

19          PRESIDING COMMISSIONER ENG:  Did you always carry

20   a knife?

21          INMATE ROMERO THROUGH INTERPRETER:  Yes, I always

22   carried it because I worked in a gardening area.

23          PRESIDING COMMISSIONER ENG:  Did you know Jose

24   Gomez prior to this night?

25          INMATE ROMERO THROUGH INTERPRETER:  Yes, I knew
```

1   him.

2          PRESIDING COMMISSIONER ENG:  You did know him,

3   okay.  How well did you know him?

4          INMATE ROMERO THROUGH INTERPRETER:  I had seen

5   him occasionally.  I also knew him from my father who

6   was a friend of his father.  We knew each other.  We had

7   seen each other, but we weren't very close friends.

8          PRESIDING COMMISSIONER ENG:  Okay.  So he had

9   eight stab wounds.

10         INMATE ROMERO THROUGH INTERPRETER:  That's what I

11  wanted to ask.  Who did you get that information,

12  because the information that I received, the report that

13  I received from the doctor never indicated that there

14  were eight stab wounds.

15         PRESIDING COMMISSIONER ENG:  Well, sir, that's

16  what I just read into the record from the high court,

17  the Appellate court.  It's right in the transcript.

18         INMATE ROMERO THROUGH INTERPRETER:  I have a copy

19  of what the doctor said.  His testimony that he never

20  mentioned.  If you want to read this, I have it here for

21  you.  This is a transcript from the court that I

22  requested.

23         PRESIDING COMMISSIONER ENG:  Okay.  Well, that's

24  okay.  Because the same -- it doesn't matter if he had

25  four, eight, or 50, the man died as a result of being

1  stabbed; is that correct?

2       INMATE ROMERO THROUGH INTERPRETER:  Yes, yes,

3  that's correct.  I understand.

4       PRESIDING COMMISSIONER ENG:  And based on our

5  conversation, you admit that you did stab the man?

6       INMATE ROMERO THROUGH INTERPRETER:  Yes, I did.

7       PRESIDING COMMISSIONER ENG:  Okay.  So what

8  caused you to end up stabbing Mr. Gomez?

9       INMATE ROMERO THROUGH INTERPRETER:  Perhaps at

10 that point there were about two or three factors that

11 caused me to do that crime.  Number one, I was drunk.

12 Secondly, the fear that I had when he attacked me.  I

13 don't know whether it was the anger as a result of that

14 but I believe that's what caused me to commit that

15 crime.

16      PRESIDING COMMISSIONER ENG:  So you're stating

17 that Mr. Gomez attacked, did he attack you first?

18      INMATE ROMERO THROUGH INTERPRETER:  Yes.  Yes, in

19 fact, if you look at the files, you will find that he

20 cut me in the arm while I was on the ground.

21      PRESIDING COMMISSIONER ENG:  Well, I did read and

22 I just read that into the record, too, that I believe

23 you were at the hospital.  That's where you were

24 arrested because you were having your wounds attended

25 to.

1        INMATE ROMERO THROUGH INTERPRETER:  Yes.

2        PRESIDING COMMISSIONER ENG:  All right.  So what

3   caused, what was the reason for you and Mr. Gomez being

4   in a fight to the point where you were stabbed and he

5   ended up dying?

6        INMATE ROMERO THROUGH INTERPRETER:  When it

7   happened, when the fight was taking place, Mr. Jose

8   Gomez came by and he had a knife in his hand.  He came

9   towards me and I told him I did not want to fight with

10  him.  I started walking on the sidewalk perhaps about 50

11  feet.

12        My mistake was that I crossed the street to the

13  other side.  I was walking backwards between two cars.

14  Somebody jumped out and hit me.  I don't know who it

15  was.  I fell down on the sidewalk on one knee and that's

16  when he came towards me and he began to attack me.  And

17  that was at that moment when I reacted and what

18  happened, happened.

19        PRESIDING COMMISSIONER ENG:  Okay.  But you and

20  your friends were going to somebody else's house for a

21  party; correct?

22        INMATE ROMERO THROUGH INTERPRETER:  It wasn't

23  Jose Gomez's house.

24        PRESIDING COMMISSIONER ENG:  Right.

25        INMATE ROMERO THROUGH INTERPRETER:  But nowhere

1  else.

2         PRESIDING COMMISSIONER ENG:  The party.

3         INMATE ROMERO THROUGH INTERPRETER:  Yes, that's

4  correct.

5         PRESIDING COMMISSIONER ENG:  And you and your

6  friends, were you invited or not invited?

7         INMATE ROMERO THROUGH INTERPRETER:  I didn't even

8  know anything about the party.  Sergio arrived at a bar

9  where I was sitting drinking beer.  And he said come on,

10  I know where there's a party.  And I just went with him.

11         PRESIDING COMMISSIONER ENG:  So basically you and

12  your friends were not invited to this party?

13         INMATE ROMERO THROUGH INTERPRETER:  No.

14         PRESIDING COMMISSIONER ENG:  Okay.  So, and I

15  understand, I thought I read that one of your friends

16  was trying to get Sofia to leave; is that correct?

17         INMATE ROMERO THROUGH INTERPRETER:  Yes.

18         PRESIDING COMMISSIONER ENG:  Okay.  And Sofia was

19  Mr. Gomez's cousin; is that correct?

20         INMATE ROMERO THROUGH INTERPRETER:  Yes.

21         PRESIDING COMMISSIONER ENG:  So your friend

22  didn't like it that Sofia didn't want to leave; is that

23  true?

24         INMATE ROMERO THROUGH INTERPRETER:  I don't know

25  what the reason was.  I know they were boyfriend and

1  girlfriend.  I don't know what the reason was that she

2  didn't want to leave with him.

3       PRESIDING COMMISSIONER ENG:  Okay.  But what

4  words were exchanged to end up where you and your

5  friends ended up fighting with the host and his friends?

6       INMATE ROMERO THROUGH INTERPRETER:  When we

7  arrived at the house, Sergio Cruz got off and he went

8  towards the door.  Then there was a person, I believe he

9  was named Fausto came out.  They started talking.  We

10  were on the other side of the street, so we really

11  couldn't tell what they were talking about.  But then

12  more people came out of the house.

13       We got out of the car and walked towards the yard

14  to go to the house.  Then they started fighting.  The

15  truth is, we didn't even know what they were fighting

16  about.  It was later on that we became aware that it was

17  because a girl did not want to leave the house with

18  them.

19       DEPUTY COMMISSIONER HERRON:  Let me ask a

20  question.  The people that you were with, were they gang

21  members?

22       INMATE ROMERO THROUGH INTERPRETER:  Not that I'm

23  aware of.

24       DEPUTY COMMISSIONER HERRON:  Okay.  Were you ever

25  a gang member?

1       INMATE ROMERO THROUGH INTERPRETER:  No, never.

2       DEPUTY COMMISSIONER HERRON:  Were the people in

3   the house at the party gang members?

4       INMATE ROMERO THROUGH INTERPRETER:  I don't

5   believe so.

6       DEPUTY COMMISSIONER HERRON:  How many people were

7   fighting at one time?

8       INMATE ROMERO THROUGH INTERPRETER:  There were so

9   many people that I can't tell you.  There were a lot of

10  people that came out of the house.  There were six or

11  seven of them.  It was a party that they were having in

12  the house, and there were a lot of people there.

13      DEPUTY COMMISSIONER HERRON:  Okay.  Thank you.

14      PRESIDING COMMISSIONER ENG:  Well, what caused

15  you, you were across the street; is that true?  You said

16  you were across the street when this argument started to

17  happen.

18      INMATE ROMERO THROUGH INTERPRETER:  When we

19  arrived and the gentleman, first he got out of the car

20  and he went towards the door.  And we got out of the car

21  because we knew all the people at the party.  We started

22  walking over there, but we never knew that a fight was

23  going to start.  The fight started at the end of who was

24  involved.  It seemed like everybody was just fighting.

25      PRESIDING COMMISSIONER ENG:  Just I find that

1   hard to believe that some words were not exchanged to

2   get you people to start fighting.  I mean, I don't

3   understand that.  Especially with weapons.  Why would

4   you do that?

5       INMATE ROMERO THROUGH INTERPRETER:  The problem

6   was that the persons inside the house did not allow the

7   girl to go out with the guy and that's how the fight

8   started.

9       PRESIDING COMMISSIONER ENG:  So --

10      INMATE ROMERO THROUGH INTERPRETER:  When Jose

11  Gomez came out and he went towards me, I told him I

12  didn't want to fight with him.  I started walking on the

13  sidewalk.  But by that point, everybody was already

14  fighting.  The fighting was already ongoing.  And the

15  reason was because the girl did not want to leave the

16  party and that's what started the whole fight.

17      PRESIDING COMMISSIONER ENG:  So when you look at

18  it, does that make any sense because a girl didn't want

19  to leave the party, you, I believe several of your

20  friends, and then Mr. Gomez, you know, you and several

21  of your friends were injured and Mr. Gomez ended up

22  dying.

23      INMATE ROMERO THROUGH INTERPRETER:  This happened

24  and I really don't know why.  I just know that the fight

25  just started and everybody started fighting.

1      PRESIDING COMMISSIONER ENG:  You claim that you

2  were drunk.

3      INMATE ROMERO THROUGH INTERPRETER:  Yes, I was

4  drunk.

5      PRESIDING COMMISSIONER ENG:  How much had you

6  been drinking?

7      INMATE ROMERO THROUGH INTERPRETER:  I think I

8  started, I think I had drank about two to six.  I had

9  drank maybe two or three six-packs perhaps.  That much.

10 So perhaps, I don't even know how much more because I

11 was drunk.

12     PRESIDING COMMISSIONER ENG:  Two or three six-

13 packs over how long of a period of time?

14     INMATE ROMERO THROUGH INTERPRETER:  I arrived at

15 the bar I think perhaps about eight or nine o'clock in

16 the evening.  But I was drunk.

17     PRESIDING COMMISSIONER ENG:  So you were at the

18 bar at eight or nine in the evening, and what time did

19 this crime occur?

20     INMATE ROMERO THROUGH INTERPRETER:  One in the

21 morning.

22     PRESIDING COMMISSIONER ENG:  And you say that you

23 drank two or three six-packs?

24     INMATE ROMERO THROUGH INTERPRETER:  I'm just

25 saying that it's very possible it could have been more.

1  The truth is I don't know how much more.

2       PRESIDING COMMISSIONER ENG:  That's 12 to 18

3  bottles in the bar.  You drank that much in the bar.

4  How much money did you spend in the bar that day?

5       INMATE ROMERO THROUGH INTERPRETER:  I don't

6  recall.  It wasn't that much.  I don't think it was that

7  much money.  In those days beer was pretty cheap.

8       PRESIDING COMMISSIONER ENG:  It must have been.

9  Okay.  Okay, well, we'll ask some more questions about

10 this.  Let me take a look at your, let me see if it's in

11 here.  If you had any priors.  Sir, when did you come to

12 the United States?

13      INMATE ROMERO THROUGH INTERPRETER:  In 1976.

14      PRESIDING COMMISSIONER ENG:  How old were you?

15      INMATE ROMERO THROUGH INTERPRETER:  About 23, 21

16 or 23 years old, I can't recall.

17      PRESIDING COMMISSIONER ENG:  Okay.  So you

18 wouldn't have a juvenile record here in the United

19 States because you weren't here; correct?

20      INMATE ROMERO THROUGH INTERPRETER:  No.

21      PRESIDING COMMISSIONER ENG:  Okay.  So we take a

22 look as an adult since you came to the United States

23 some of your arrests.  And right now, I'm going to, I'm

24 going to go off of what I have in the March 2007 Board

25 report.  This states here that in 1978, drunk driving in

24

1    Garden Grove.  Do you remember that?

2          INMATE ROMERO THROUGH INTERPRETER:  Yes.

3          PRESIDING COMMISSIONER ENG:  And then three years

4    later by the Orange P.D., assault.  So what happened

5    with that?  What was that about?

6          INMATE ROMERO THROUGH INTERPRETER:  I had a

7    girlfriend.  We had an argument.  She called the police.

8    And reported to the police that I had assaulted her, and

9    they took me to the county jail.

10         PRESIDING COMMISSIONER ENG:  Did you hit her?

11         INMATE ROMERO THROUGH INTERPRETER:  No.

12         PRESIDING COMMISSIONER ENG:  Did you shove her?

13         INMATE ROMERO THROUGH INTERPRETER:  No.  We just

14   had an argument.

15         PRESIDING COMMISSIONER ENG:  So you never put

16   your hands on her?

17         INMATE ROMERO THROUGH INTERPRETER:  No.

18         PRESIDING COMMISSIONER ENG:  Okay.  And then we

19   have the life crime; right?  In 1982 you were arrested

20   for the murder?

21         INMATE ROMERO THROUGH INTERPRETER:  Yes.

22         PRESIDING COMMISSIONER ENG:  So when did you

23   start drinking?  How old were you?

24         INMATE ROMERO THROUGH INTERPRETER:  I think I was

25   about 15 years old when I drank the first time.  But I

1  didn't drink anymore until I was about 18 years old.  I

2  drank again, and then I didn't drink.  When I came here,

3  I started drinking again.

4      PRESIDING COMMISSIONER ENG:  When you were

5  growing up, was it the custom for people in the family

6  and everybody around to drink?

7      INMATE ROMERO THROUGH INTERPRETER:  Yes, my

8  father was an alcoholic.

9      PRESIDING COMMISSIONER ENG:  He was an alcoholic.

10  Tell me why you say he was an alcoholic?

11      INMATE ROMERO THROUGH INTERPRETER:  Because he

12  drank a lot.

13      PRESIDING COMMISSIONER ENG:  Well, explain.  What

14  did you see?

15      INMATE ROMERO THROUGH INTERPRETER:  He would

16  drink and he would get together with his friends and

17  they would get drunk.

18      PRESIDING COMMISSIONER ENG:  How often?

19      INMATE ROMERO THROUGH INTERPRETER:  Almost every

20  weekend.

21      PRESIDING COMMISSIONER ENG:  Did he ever get, do

22  you understand abusive?

23      INMATE ROMERO THROUGH INTERPRETER:  Well, I

24  understand the terms, so I'm assuming that he was

25  abusive himself.

1       **PRESIDING COMMISSIONER ENG:** Okay. Well, would

2 he hit you or hit your mother or yell and scream or get

3 into fights?

4       **INMATE ROMERO THROUGH INTERPRETER:** That was one

5 thing that I never, never saw him argue with my mother.

6 I never saw him turn against any of us.

7       **PRESIDING COMMISSIONER ENG:** Okay. So that was

8 it in terms of your history with law enforcement here in

9 the United States; correct?

10       **INMATE ROMERO THROUGH INTERPRETER:** Yes.

11       **PRESIDING COMMISSIONER ENG:** Did you ever get in

12 trouble back in Mexico?

13       **INMATE ROMERO THROUGH INTERPRETER:** No, never.

14       **PRESIDING COMMISSIONER ENG:** Okay. If I take a

15 look at your personal history. You were born May 15th,

16 1954.

17       **INMATE ROMERO THROUGH INTERPRETER:** Yes.

18       **PRESIDING COMMISSIONER ENG:** Okay. No, did I get

19 that? May 15th? I had down January 6th. What's your

20 birthday, January 6 or May 15?

21       **INMATE ROMERO:** May 15.

22       **PRESIDING COMMISSIONER ENG:** May 15?

23       **INMATE ROMERO:** Yeah.

24       **PRESIDING COMMISSIONER ENG:** Something else said

25 that you were born January 6, 1954. Okay, so I must

1    have copied that down from the wrong place.

2        DEPUTY DISTRICT ATTORNEY LOCKHART:  The notice

3    for the hearing says January 6th. .

4        PRESIDING COMMISSIONER ENG:  I didn't look at

5    that.

6        DEPUTY COMMISSIONER HERRON:  The correct birth

7    date is May 15th.

8        PRESIDING COMMISSIONER ENG:  May 15th.  You know

9    where I got it?  I got it from the CI and I because

10   that's what I usually go to.  It says "DOB: 1/6/54."

11   That's what this says.

12       ATTORNEY CHRISTENSEN:  Do you have more than one

13   social security card?

14       INMATE ROMERO THROUGH INTERPRETER:  No.

15       PRESIDING COMMISSIONER ENG:  Everybody can take a

16   look.  So that's, sir, this is an official document and

17   this is what we generally use.  Because I can see a lot

18   of different birth dates, but generally speaking, I go

19   according to this record.  We have quite a few names

20   that you have used that was on this.

21       INMATE ROMERO THROUGH INTERPRETER:  That's true.

22       PRESIDING COMMISSIONER ENG:  Okay.  But your

23   actual birth date is May 16th.

24       DEPUTY COMMISSIONER HERRON:  May 15th.

25       PRESIDING COMMISSIONER ENG:  Fifteenth?  I'm

1    sorry.

2         DEPUTY COMMISSIONER HERRON:  May 15th.

3         INMATE ROMERO THROUGH INTERPRETER:  The 15th of

4    May.

5         INMATE ROMERO:  1953.

6         PRESIDING COMMISSIONER ENG:  '53?

7         INMATE ROMERO:  Yeah.

8         PRESIDING COMMISSIONER ENG:  Not '54?  See, even.

9    Okay.  Go over that again.  Okay, so it's May 15th,

10   1953.

11        DEPUTY DISTRICT ATTORNEY LOCKHART:  Commissioner,

12   that's one of his alternative DOBs on the rap sheet.  If

13   you look further down under miscellaneous.

14        PRESIDING COMMISSIONER ENG:  Yeah, I see January

15   15th.  Yes, you're right.  We have 12 -- sir?  Sir, on

16   this official document, this shows four different birth

17   dates for you.  Why is that?

18        INMATE ROMERO THROUGH INTERPRETER:  Is that when

19   they arrested me when I was drunk or what are they

20   exactly?  What one is that for?

21        PRESIDING COMMISSIONER ENG:  I can't really say

22   how they accumulate this information.  But, sir, okay.

23   It's May 15th, '53, okay.  So we don't understand all

24   these other times, the other times that you have been

25   arrested that you have lied about possibly your name and

```
1   your date of birth.

2        INMATE ROMERO THROUGH INTERPRETER:  Probably if I

3   lied about my name, I also lied about my birth date.

4        PRESIDING COMMISSIONER ENG:  Probably.  Okay.

5   Okay.  All right.  So all right so May 15th, 1953.

6   Okay.  So you were what, 28?

7        INMATE ROMERO THROUGH INTERPRETER:  Yes.

8        PRESIDING COMMISSIONER ENG:  Twenty-eight when

9   you did the life crime?

10        INMATE ROMERO THROUGH INTERPRETER:  Yes.

11        PRESIDING COMMISSIONER ENG:  Okay.  And you're

12   how old now?  Are you 53?

13        INMATE ROMERO THROUGH INTERPRETER:  I'm 53.

14        PRESIDING COMMISSIONER ENG:  Okay.  But you were

15   born in San Juan, Mexico?

16        INMATE ROMERO THROUGH INTERPRETER:  Yes.

17        PRESIDING COMMISSIONER ENG:  Okay.  Your father

18   is a farmer?

19        INMATE ROMERO THROUGH INTERPRETER:  Yes.  He

20   still is.

21        PRESIDING COMMISSIONER ENG:  He still is.  And

22   your mother is a housewife?

23        INMATE ROMERO THROUGH INTERPRETER:  Yes.

24        PRESIDING COMMISSIONER ENG:  You come from, it

25   may not be that different in Mexico, but according to
```

30

1   the US standards a very large family.

2           INMATE ROMERO THROUGH INTERPRETER:   Yes.

3           PRESIDING COMMISSIONER ENG:   You're number two

4   out of 15 children.

5           INMATE ROMERO THROUGH INTERPRETER:   That's

6   correct.

7           PRESIDING COMMISSIONER ENG:   Was that very

8   typical in Mexico, the size of the family?

9           INMATE ROMERO THROUGH INTERPRETER:   In those

10  days, yes.   I don't think it's that way any more.

11          PRESIDING COMMISSIONER ENG:   Right.   Okay.   So

12  you're number two out of 15.   You yourself have three

13  children; is that correct?

14          INMATE ROMERO THROUGH INTERPRETER:   Yes.

15          PRESIDING COMMISSIONER ENG:   Okay.   Are you

16  married?

17          INMATE ROMERO THROUGH INTERPRETER:   I'm divorced

18  now.

19          PRESIDING COMMISSIONER ENG:   You're divorced,

20  okay.   At the time, when did you get married?

21          INMATE ROMERO THROUGH INTERPRETER:   I married in

22  '74.

23          PRESIDING COMMISSIONER ENG:   In '74, okay.   When

24  did you say you came to the United States?   So you were

25  married before you came to the United States?   So why

1  did you -- so, all right.  You got married.  Did you

2  have these three children before you left?

3        INMATE ROMERO THROUGH INTERPRETER:  I only had

4  one at the time.

5        PRESIDING COMMISSIONER ENG:  You had one at the

6  time.  So you left.  You came to the U.S.

7        INMATE ROMERO THROUGH INTERPRETER:  Yes.

8        PRESIDING COMMISSIONER ENG:  Why?

9        INMATE ROMERO THROUGH INTERPRETER:  To look for a

10 job.

11       PRESIDING COMMISSIONER ENG:  What were you doing

12 down in Mexico?

13       INMATE ROMERO THROUGH INTERPRETER:  I worked in

14 the ranch and agriculture with my father.

15       PRESIDING COMMISSIONER ENG:  Okay.  So why would

16 you want to leave your young wife and your young child

17 to look for a job in another country?

18       INMATE ROMERO THROUGH INTERPRETER:  Quite a few

19 had come here and they were telling us that there were a

20 lot of opportunities to here to earn more money.  And

21 that was one of the reasons why I came, to look for

22 work.

23       PRESIDING COMMISSIONER ENG:  And, sir, did you

24 come over illegally or legally?

25       INMATE ROMERO THROUGH INTERPRETER:  Illegally.

*Capitol Electronic Reporting*

1        PRESIDING COMMISSIONER ENG:  And did you

2   understand what that meant back then?

3        INMATE ROMERO THROUGH INTERPRETER:  No.

4        PRESIDING COMMISSIONER ENG:  You thought it was

5   okay just to?

6        INMATE ROMERO THROUGH INTERPRETER:  I thought it

7   was because everybody else was doing it.

8        DEPUTY COMMISSIONER HERRON:  Exactly.

9        PRESIDING COMMISSIONER ENG:  All right.  So you

10  came over.  So you must have gone back.  How many times

11  did you go back home?

12       INMATE ROMERO THROUGH INTERPRETER:  I only went

13  back one time.

14       PRESIDING COMMISSIONER ENG:  One time.  How did

15  you end up with three children?

16       INMATE ROMERO THROUGH INTERPRETER:  Later I

17  brought my wife here and the other children were born

18  here.

19       PRESIDING COMMISSIONER ENG:  So when did you

20  bring your wife and child over?

21       INMATE ROMERO THROUGH INTERPRETER:  She came here

22  in '79.

23       PRESIDING COMMISSIONER ENG:  Okay.  Okay.  So was

24  she still here and your children too?

25       INMATE ROMERO THROUGH INTERPRETER:  Yes.

1    PRESIDING COMMISSIONER ENG:  And where do they

2  live?

3    INMATE ROMERO THROUGH INTERPRETER:  They live in

4  Riverside.

5    PRESIDING COMMISSIONER ENG:  Okay.  All right.

6  So were two of your children born in the US?

7    INMATE ROMERO THROUGH INTERPRETER:  Yes.

8    PRESIDING COMMISSIONER ENG:  So the oldest was

9  born down in Mexico and then came over.  Okay.  All

10  right.  So when this happened, when this life crime

11  happened, you were married.

12    INMATE ROMERO THROUGH INTERPRETER:  Yes.

13    PRESIDING COMMISSIONER ENG:  With kids at home.

14    INMATE ROMERO THROUGH INTERPRETER:  That's

15  correct.

16    PRESIDING COMMISSIONER ENG:  And what was your

17  job?

18    INMATE ROMERO THROUGH INTERPRETER:  I was a

19  gardener.

20    PRESIDING COMMISSIONER ENG:  You were a gardener.

21  Okay.  And yet, all right, and during all this time,

22  when did you start drinking heavily?

23    INMATE ROMERO THROUGH INTERPRETER:  I used to

24  drink on weekends.  I started out around '78 and '79

25  drinking only on weekends.

1    **PRESIDING COMMISSIONER ENG:**  Drinking on

2   weekends?  And about how much?  Was it always beer?

3    **INMATE ROMERO THROUGH INTERPRETER:**  Yes, that's

4   all I drink, beer.

5    **PRESIDING COMMISSIONER ENG:**  And about how much

6   on average would you say that you would drink per night?

7    **INMATE ROMERO THROUGH INTERPRETER:**  Maybe two

8   six-packs.  I don't know.  I never paid attention to how

9   much I drank so I couldn't tell you.

10    **PRESIDING COMMISSIONER ENG:**  Well, it gives us an

11   idea.  I don't know if you're talking about one or two

12   beers or one or, you know, or one or two six-packs or

13   cases.  So about --

14    **INMATE ROMERO THROUGH INTERPRETER:**  Two six-

15   packs.

16    **PRESIDING COMMISSIONER ENG:**  Two six-packs, each

17   time.  Okay.  So that was sort of normal for you?  A

18   normal amount to drink?

19    **INMATE ROMERO THROUGH INTERPRETER:**  The truth is,

20   yes.

21    **PRESIDING COMMISSIONER ENG:**  Okay.  All right.

22   Go ahead.

23    **DEPUTY COMMISSIONER HERRON:**  Maybe they were 40s.

24    **PRESIDING COMMISSIONER ENG:**  Go ahead and ask.

25    **DEPUTY COMMISSIONER HERRON:**  This is a 12-ounce

1  can of beer or 40s?

2       INMATE ROMERO THROUGH INTERPRETER:  They were the

3  small ones.

4       DEPUTY COMMISSIONER HERRON:  I'm going to change

5  the tape.

6       PRESIDING COMMISSIONER ENG:  All right.

7             (Thereupon, the tapes were

8             changed off the record.)

9       DEPUTY COMMISSIONER HERRON:  And we're back on

10  the record.

11       PRESIDING COMMISSIONER ENG:  Okay.  Thank you.

12  So all this -- so am I to understand that while you were

13  in the US, your job was in landscaping; correct?

14       INMATE ROMERO THROUGH INTERPRETER:  Yes.

15       PRESIDING COMMISSIONER ENG:  Okay.  Do you -- Did

16  you think that you have a drinking problem or no?

17       INMATE ROMERO THROUGH INTERPRETER:  At that time,

18  I never thought about that.  But since I've been in

19  prison and I've joined Alcoholic Anonymous and I realize

20  now that I did have a problem.

21       PRESIDING COMMISSIONER ENG:  Okay.  What do you

22  children think about what happened to you?

23       INMATE ROMERO THROUGH INTERPRETER:  I don't know

24  what they think.

25       PRESIDING COMMISSIONER ENG:  Do you ever talk to

1  them about it?

2        INMATE ROMERO THROUGH INTERPRETER:  We never talk

3  about that.

4        PRESIDING COMMISSIONER ENG:  Don't you think they

5  wonder why their father is sitting in prison?

6        INMATE ROMERO THROUGH INTERPRETER:  I'm sure that

7  they have an idea and information as to what happened

8  because a lot of the members of my family were going to

9  court during the time I was in court.  My wife was going

10 to court and no doubt she told them.

11       PRESIDING COMMISSIONER ENG:  So have any of your

12 children gotten into any trouble?

13       INMATE ROMERO THROUGH INTERPRETER:  Not that I'm

14 aware of.

15       PRESIDING COMMISSIONER ENG:  No trouble with the

16 law?

17       INMATE ROMERO THROUGH INTERPRETER:  No.

18       PRESIDING COMMISSIONER ENG:  Do you have any idea

19 if any of them have trouble, problems with drinking?

20       INMATE ROMERO THROUGH INTERPRETER:  No.

21       PRESIDING COMMISSIONER ENG:  Do you speak with

22 them often?

23       INMATE ROMERO THROUGH INTERPRETER:  Yes.  Yes, I

24 talk with them frequently.

25       PRESIDING COMMISSIONER ENG:  Do you ever get to

1  see them?

2       INMATE ROMERO THROUGH INTERPRETER:  Yes, they

3  come to visit me.

4       PRESIDING COMMISSIONER ENG:  Do you have any

5  grandchildren?

6       INMATE ROMERO THROUGH INTERPRETER:  Yes.

7       PRESIDING COMMISSIONER ENG:  How many?

8       INMATE ROMERO THROUGH INTERPRETER:  All three of

9  them are married already.  I have six grandchildren.

10       PRESIDING COMMISSIONER ENG:  Okay.  Parents are

11  still alive?

12       INMATE ROMERO THROUGH INTERPRETER:  Yes.

13       PRESIDING COMMISSIONER ENG:  Okay.  How about

14  your 14 other siblings?

15       INMATE ROMERO THROUGH INTERPRETER:  There are

16  only 12 that are alive now.

17       PRESIDING COMMISSIONER ENG:  Only 12 including

18  you?  And where are they? Are they all back in Mexico?

19       INMATE ROMERO THROUGH INTERPRETER:  No, they're

20  here.

21       PRESIDING COMMISSIONER ENG:  All of them are in

22  the US?

23       INMATE ROMERO THROUGH INTERPRETER:  I only have

24  one sister left in Mexico.

25       PRESIDING COMMISSIONER ENG:  Okay.  But your

1    parents, are they still in Mexico?

2         INMATE ROMERO THROUGH INTERPRETER: Yes, they're

3    there. They live in Mexico, but they come. They come

4    here and they go back.

5         PRESIDING COMMISSIONER ENG: Okay. Is there

6    anything that you would like me to add into the record

7    that I may have missed based on your personal history or

8    prior crimes?

9         INMATE ROMERO THROUGH INTERPRETER: I think, the

10   only thing I wanted to kind of correct is I think when I

11   heard you correctly when you started out you said that I

12   had been in prison since the seventh of June of '85.

13        PRESIDING COMMISSIONER ENG: Did I say that or

14   did I say May 20th, 1985?

15        INMATE ROMERO THROUGH INTERPRETER: I thought it

16   was either May or June of '85 you said.

17        PRESIDING COMMISSIONER ENG: Okay.

18        INMATE ROMERO THROUGH INTERPRETER: But I been

19   incarcerated due to this crime since 1982.

20        PRESIDING COMMISSIONER ENG: Not according to the

21   records that I have. I have the date that you were

22   received. The date that you were received as May 20th,

23   1985.

24        INMATE ROMERO THROUGH INTERPRETER: This was

25   after an appeal that I had.

*Capitol Electronic Reporting*

1      PRESIDING COMMISSIONER ENG:  Wait a minute.

2      DEPUTY COMMISSIONER HERRON:  He had an appeal.

3   And then he had a --

4      INMATE ROMERO:  I went back to the county jail

5   and --

6      PRESIDING COMMISSIONER ENG:  Was your sentenced

7   changed?

8      INMATE ROMERO:  No, that's, the only thing

9   changed it was my CDC number.  But I got an appeal. . I

10  went back to the county jail, and they found me guilty

11  and the gave me the same sentence.

12     DEPUTY DISTRICT ATTORNEY LOCKHART:  They reversed

13  his first conviction.

14     PRESIDING COMMISSIONER ENG:  His first

15  conviction.  That's right.

16     DEPUTY DISTRICT ATTORNEY LOCKHART:  Because there

17  was an issue with the interpreter.

18     PRESIDING COMMISSIONER ENG:  That's right.

19  That's right.  I do recall that.  But what we do and did

20  you have another trial?  You had another trial; correct.

21     INMATE ROMERO THROUGH INTERPRETER:  Yes.

22     PRESIDING COMMISSIONER ENG:  So from what I read

23  in all the paperwork, you were given full credit for

24  everything else.  So for this particular, for the case

25  number that I read, this was a whole new case number.

1  You were given a new CDC number.  And you were convicted

2  for murder two.  And that's why I stated that for this

3  particular offense that you were convicted of, you were

4  received in May of 1985.  For this murder two.  Do you

5  understand that.

6          INMATE ROMERO:  Yes.

7          PRESIDING COMMISSIONER ENG:  I don't go back to

8  the original because that's you had a different number

9  and everything.  So this was based on the case that I

10  have the documents for.  Okay?

11          INMATE ROMERO:  Okay.

12          PRESIDING COMMISSIONER ENG:  I thought maybe I

13  really just misread the things that I had written here.

14  I thought, maybe I did say June with all the confusion

15  about your birth dates, too.  It's easy to understand

16  that I could have confused those months also.  Okay.

17  Okay so nothing else to add into your background?

18          INMATE ROMERO THROUGH INTERPRETER:  No.

19          PRESIDING COMMISSIONER ENG:  Sir, you are on a US

20  INS hold though.  And you do understand that?

21          INMATE ROMERO THROUGH INTERPRETER:  Yes, that's

22  correct.

23          PRESIDING COMMISSIONER ENG:  Okay.  I do have

24  something to ask you about though.  You stated that you

25  didn't think anything of entering another country

1 illegally because everybody else was doing that. And

2 then, you know, you came here and you violated several,

3 you know, the laws of this country. So. how do you

4 explain that? That you come into a country illegally

5 and then you violate, did you -- is it that you really

6 didn't care about any laws in this country? How do you

7 explain your behavior?

8      **INMATE ROMERO THROUGH INTERPRETER:** My intentions

9 when I decided to come to this country was to come and

10 work. I never had intentions of coming to this country

11 to violate the laws. And they happened and there's not

12 very much I can do about that.

13      **PRESIDING COMMISSIONER ENG:** You're right. But

14 the first instance that you were arrested for driving

15 under the influence, okay? What did you think about

16 that?

17      **INMATE ROMERO THROUGH INTERPRETER:** The truth is

18 that at that time, I didn't pay attention to those

19 things.

20      **PRESIDING COMMISSIONER ENG:** Do you understand

21 that you're lucky that you didn't kill anybody driving

22 drunk?

23      **INMATE ROMERO THROUGH INTERPRETER:** Yes, I'm

24 aware of that. Now that I've been in here and I've had

25 a lot of time to think about it, I realize now that I

```
 1    was lucky that I didn't kill somebody else in doing the
 2    things that I do.
 3         PRESIDING COMMISSIONER ENG:  Well, you ended up
 4    killing somebody because you continued to drink, and
 5    then you ended up in an altercation.
 6         INMATE ROMERO THROUGH INTERPRETER:  That's true.
 7         PRESIDING COMMISSIONER ENG:  Okay.  Okay.
 8    Commissioner Herron is going to go over what you've been
 9    doing post-conviction and bring us up to date.
10         DEPUTY COMMISSIONER HERRON:  Thank you.  Okay,
11    I'm going to cover the period since your last hearing
12    before the Board, which was on April 20th, 2006.  At
13    that time, the  Board had a split decision.  One person
14    voted in favor of you receiving a parole date and the
15    other person voted that you not receive a parole date.
16    It went to the full board en banc, and on June 29th of
17    2006, the full board en banc denied your parole.  Are
18    you aware of that?
19         INMATE ROMERO THROUGH INTERPRETER:  Yes.
20         DEPUTY COMMISSIONER HERRON:  You have been given
21    parole on two other occasions you've been given a parole
22    date?
23         INMATE ROMERO THROUGH INTERPRETER:  No.
24         DEPUTY COMMISSIONER HERRON:  No?  Have you ever
25    been given a parole date?
```

1       INMATE ROMERO THROUGH INTERPRETER:  No.

2       DEPUTY COMMISSIONER HERRON:  Just a moment.

3       PRESIDING COMMISSIONER ENG:  He's had a lot of

4   postponements.  Like four in a row.

5       DEPUTY COMMISSIONER HERRON:  Perhaps it's mixed

6   up.  But it seems to me --

7       PRESIDING COMMISSIONER ENG:  But I didn't see any

8   prior dates given.

9       DEPUTY COMMISSIONER HERRON:  Okay.  All right.

10  Perhaps I'm mixing it up with another one.  Okay.  Very

11  good.  You arrived at San Quentin on August 22nd, 1996.

12      INMATE ROMERO THROUGH INTERPRETER:  Yes.

13      DEPUTY COMMISSIONER HERRON:  Your current

14  classification score is 19.

15      INMATE ROMERO THROUGH INTERPRETER:  Yes.

16      DEPUTY COMMISSIONER HERRON:  You have never

17  received a 115 since you've been incarcerated?

18      INMATE ROMERO THROUGH INTERPRETER:  No, never.

19      DEPUTY COMMISSIONER HERRON:  How did you manage

20  to do that?

21      INMATE ROMERO THROUGH INTERPRETER:  What I try to

22  do is do everything that I'm supposed to do and not

23  going out and getting things that are bad because I know

24  there are consequences to all that.  So I stay away from

25  all of the bad things.

1    DEPUTY COMMISSIONER HERRON:  Since your last

2  hearing, you haven't, you have received one 128(a).  And

3  that was on September the 20th, 2006, and it was for

4  disrupting lockup.  Do you remember?

5    INMATE ROMERO THROUGH INTERPRETER:  They never

6  told me anything about that.

7    DEPUTY COMMISSIONER HERRON:  No?

8    INMATE ROMERO THROUGH INTERPRETER:  No.

9    DEPUTY COMMISSIONER HERRON:  It says 9/19/86.

10    INMATE ROMERO:  That's in 1986.

11    INTERPRETER MARQUEZ:  It's '86.

12    PRESIDING COMMISSIONER ENG:  You know what, they

13  did a typo.

14    DEPUTY COMMISSIONER HERRON:  I see.  Okay.

15    PRESIDING COMMISSIONER ENG:  I was wondering

16  about that.

17    DEPUTY COMMISSIONER HERRON:  All right.

18    PRESIDING COMMISSIONER ENG:  They did a typo.  It

19  was '86, not '06.

20    DEPUTY COMMISSIONER HERRON:  Well, get it

21  together here.  We'll get it together eventually.

22    PRESIDING COMMISSIONER ENG:  Mr. Romero and

23  numbers, dates.

24    DEPUTY COMMISSIONER HERRON:  It shows that you're

25  still assigned to the vocational dry-cleaning unit.

1          INMATE ROMERO THROUGH INTERPRETER:  Yes.

2          DEPUTY COMMISSIONER HERRON:  And how long have

3    you been there?

4          INMATE ROMERO THROUGH INTERPRETER:  I think I've

5    been there about 10 years.

6          DEPUTY COMMISSIONER HERRON:  What do you do

7    there?

8          INMATE ROMERO THROUGH INTERPRETER:  I'm a clerk.

9          DEPUTY COMMISSIONER HERRON:  Okay.  Now you've

10   been attending AA/NA since 1988.

11         INMATE ROMERO THROUGH INTERPRETER:  Yes.

12         DEPUTY COMMISSIONER HERRON:  Are you an

13   alcoholic?

14         INMATE ROMERO THROUGH INTERPRETER:  Yes.

15         DEPUTY COMMISSIONER HERRON:  And what is your

16   plan to stay clean and sober?

17         INMATE ROMERO THROUGH INTERPRETER:  My plans are

18   not to drink again.  And just to stay away from anything

19   that has alcohol.

20         DEPUTY COMMISSIONER HERRON:  And what else do you

21   need to do?

22         INMATE ROMERO THROUGH INTERPRETER:  Continue all

23   the programs.

24         DEPUTY COMMISSIONER HERRON:  Okay.  Anything

25   else?