# EXHIBIT 1
# Part 2 of 2

1      INMATE ROMERO THROUGH INTERPRETER:  All the

2  alcohol programs.  I am -- I want to attend any type of

3  program that will help me.

4      DEPUTY COMMISSIONER HERRON:  Is it necessary that

5  you have a sponsor?

6      INMATE ROMERO THROUGH INTERPRETER:  Well, here we

7  always have one.

8      DEPUTY COMMISSIONER HERRON:  And if you were

9  released to Mexico, is here such thing as NA/AA?

10      INMATE ROMERO THROUGH INTERPRETER:  Yes, they do

11  have it.  In fact, if you read my files, you will see

12  some letters that are there.  They came from Mexico.  I

13  talked to me about AA.

14      DEPUTY COMMISSIONER HERRON:  And I see that the

15  closest AA to you is about 15 miles away which is not

16  far.

17      INMATE ROMERO THROUGH INTERPRETER:  That's not

18  too far.

19      DEPUTY COMMISSIONER HERRON:  And do you have

20  transportation?

21      INMATE ROMERO THROUGH INTERPRETER:  Yeah, they

22  have buses.  Bus transportation.

23      DEPUTY COMMISSIONER HERRON:  So why would you

24  need a sponsor?

25      INMATE ROMERO THROUGH INTERPRETER:  I think it's

1    good and it's best for a person like me to have someone

2    that can talk to me and counsel me about that.  Someone

3    that can help me so I won't fall back into the same

4    things that I was doing before.

5        DEPUTY COMMISSIONER HERRON:  So when would you

6    call the sponsor?

7        INMATE ROMERO THROUGH INTERPRETER:  I would do it

8    any time I needed help so they could help me.

9        DEPUTY COMMISSIONER HERRON:  Before someone

10   relapses, before they take the drink, there is something

11   that goes on before then.  Before they take the drink.

12   The drink is the last thing one does to complete the

13   relapse.  So if I were your sponsor, what things should

14   I look for in you to tell me that you are about to

15   relapse and take that drink?

16       INMATE ROMERO THROUGH INTERPRETER:  It would

17   probably be according to the way I was conducting

18   myself, my conduct.  You would see me doing things that

19   I shouldn't be doing to stay on the right track.

20       DEPUTY COMMISSIONER HERRON:  Like give me an

21   example.

22       INMATE ROMERO THROUGH INTERPRETER:  If you saw me

23   getting together with friends who like to drink.  That

24   would be one form of attention that you could see that I

25   was starting to go on the wrong track, the wrong path.

1    DEPUTY COMMISSIONER HERRON: Okay. Very good.

2  Now you continue in AA/NA through today?

3    INMATE ROMERO THROUGH INTERPRETER: Yes.

4    DEPUTY COMMISSIONER HERRON: And you've been

5  doing it since 1988?

6    INMATE ROMERO THROUGH INTERPRETER: Yes.

7    DEPUTY COMMISSIONER HERRON: I just wanted to get

8  that in for the record. There are many, many chronos in

9  his C-File that indicate that he has been. And I'm not

10  going to go through each and every chrono because it

11  covers each and every quarter between 1988 and now.

12    PRESIDING COMMISSIONER ENG: Excuse me one

13  second. Can I just ask him something about that?

14    DEPUTY COMMISSIONER HERRON: Yes.

15    PRESIDING COMMISSIONER ENG: Sir, I saw here

16  though that what happened between basically the year

17  2000 up through 2006? In 2006, it looks like you picked

18  it back up again. But in the year 2000, I see there's

19  only one time that you went and then nothing in '01,

20  then in '02 you went twice, and '03, once. Nothing in

21  '04 and '05; is that true?

22    INMATE ROMERO THROUGH INTERPRETER: There was a

23  time when I was in a different type of class. A

24  different program. When I first came in they said I

25  could take some classes that were college oriented.

1    DEPUTY COMMISSIONER HERRON:  Yes, I do have that.

2    PRESIDING COMMISSIONER ENG:  But the AA, because,

3    you know, I looked a little closer because there's a

4    whole lot of dates in here.  But then I saw that it

5    looks more like it was sporadic.  This is in the Board

6    report.

7    DEPUTY COMMISSIONER HERRON:  I saw that.

8    PRESIDING COMMISSIONER ENG:  So if you, in fact,

9    have a severe alcohol history, okay, then why is your

10    attendance in AA that sporadic over the last five or so

11    years?

12    INMATE ROMERO THROUGH INTERPRETER:  I think I was

13    still attending, but I was having, taking other classes

14    and they conflict and I wasn't able to attend then.  And

15    I was trying to better myself and they were urging me to

16    take classes so I could better myself.

17    DEPUTY COMMISSIONER HERRON:  Is it more important

18    to make sure you always take the NA/AA class and have

19    everything else work around that center?

20    INMATE ROMERO THROUGH INTERPRETER:  I think it is

21    more important to keep your AA, but there were times

22    when I had to do other things.

23    DEPUTY COMMISSIONER HERRON:  I understand.  Do

24    you also understand that if you cannot take care of

25    yourself, you cannot take care of anybody else and AA/NA

1   is one way to assure that you take care of yourself

2   first.  Then that enables you to go out and do other

3   things.

4           INMATE ROMERO THROUGH INTERPRETER:  Yes, it's

5   true.  Well, I will take more responsibility of that in

6   the future.

7           PRESIDING COMMISSIONER ENG:  I have another

8   question I'm going to ask about the AA.

9           DEPUTY COMMISSIONER HERRON:  Sure, go right

10  ahead.

11          PRESIDING COMMISSIONER ENG:  Tell me when AA

12  started back in your hometown?

13          INMATE ROMERO THROUGH INTERPRETER:  Honestly, I

14  don't know when it started.

15          PRESIDING COMMISSIONER ENG:  Was that recent?

16          INMATE ROMERO THROUGH INTERPRETER:  When I was

17  informed here that I should have some type of

18  documentation or letters from my country, I contacted my

19  father.  He did research and then he found some

20  locations.

21          PRESIDING COMMISSIONER ENG:  So you're not really

22  sure if there's the same type of program that you're

23  used to here in prison, if that really exists back in

24  your home town in Mexico; is that true?

25          INMATE ROMERO THROUGH INTERPRETER:  I'm not sure

1  what it is over there compared to what we have here.

2  But my understanding is Alcoholics Anonymous is the same

3  no matter where you go.  It's the same process.

4      PRESIDING COMMISSIONER ENG:  Well, the only

5  reason I ask that is because I have also seen other

6  inmates, life inmates that are from Mexico where they

7  were hoping the bring the program back to Mexico because

8  it didn't exist.  So that's the reason why I asked you

9  this.  How long has your program been in existence in

10  Pueblo.

11      ATTORNEY CHRISTENSEN:  It really depends upon the

12  size of the town, too.  In fact, I've seen actual

13  booklets from Mexico explaining --

14      PRESIDING COMMISSIONER ENG:  I'm not asking you,

15  Counsel, I'm asking your client because it's his life

16  It's his responsibility.  It's your problem, okay?  But

17  thank you.  Okay, Commissioner Herron, go ahead.

18      DEPUTY COMMISSIONER HERRON:  Okay.  So like I

19  said, I'm not going to go through everything.  We're

20  just going back to his last hearing.  But I'd like to

21  put on the record that he has completed self-help

22  activities such as theology and the Center for

23  Spirituality, and academic programs, the San Quentin

24  College Program.

25      He's taken Spanish III, Astronomy, History,

1    numerous certificates that Ms. Christensen if you would

2    stipulate to this.  There's like three pages of

3    Certificates of Achievement.

4         **ATTORNEY CHRISTENSEN:**  Yes, I will stipulate.

5         **DEPUTY COMMISSIONER HERRON:**  Okay.  Now I will

6    look at your last psychological report evaluation.  And

7    the one that I have is dated for your last hearing.  And

8    so I will briefly go through it.  Page three, assessment

9    of dangerousness, risk for violence cannot be predicted

10   with any certainty.  Statistics and research in the area

11   of risk analysis have identified factors that make a

12   particular individual more likely to commit future acts

13   of violence than the average member of the non prison

14   population.

15        Within the controlled setting, you are at minimal

16   risk when compared to the general population.  If you

17   were released to the outside community, you have

18   statistically based static factors for increased

19   violence potential when compared to the average member

20   of the general population.  Those factors are number one

21   that you're a man.  Number two, you've committed

22   violence before.  It says her that you're single, but

23   you're married; right?

24        **INMATE ROMERO THROUGH INTERPRETER:**  I'm divorced

25   now.

1    **DEPUTY COMMISSIONER HERRON:**  So you're single.

2   And you have a history of alcohol abuse.  Factors that

3   are likely to lower your risk for violence still stand.

4   No history of childhood sociopathy, increased education,

5   violence risk drops after age 40.  He has no motivation

6   for violence and does not endorse any violent ideation

7   and temper plans.  He has remained alcohol free for 15

8   years, never used illegal narcotics.  Never?  Marijuana?

9    **INMATE ROMERO:**  No.

10    **DEPUTY COMMISSIONER HERRON:**  No?  How come?

11    **INMATE ROMERO THROUGH INTERPRETER:**  I've never

12   had interest in it.

13    **DEPUTY COMMISSIONER HERRON:**  Okay.  It says here

14   he's never used illegal narcotics.  No evidence of

15   paranoia, psychotic nature, and no personality disorder.

16   Notwithstanding the presence of risk factors, that Mr.

17   Romero is male, has a history of alcohol abuse and

18   violence, it seems that in his consistent efforts over

19   the many years that he has been in prison, he seems to

20   have rehabilitated himself while currently reducing his

21   risk potential to as minimal a level as is possible.

22       The foremost risk factors if released to the

23   community is the potential for alcoholic relapse.

24   There's a clear established link between Mr. Romero's

25   past consumption of alcohol and commission of violence.

54

```
 1  Were he to resume drinking, his violence potential
 2  significantly increases.
 3       Counterbalancing the risk for relapse are the
 4  additional protective factors, Mr. Romero's strong,
 5  apparently strong commitment to stay sober.  And he
 6  seems to fully accept that he is an alcoholic and must
 7  never drink.  He understands the link between drinking
 8  and his violent behavior.  He shows no sign of impending
 9  relapse such as the presence of cravings for alcohol.
10  And he now has coping skills.
11       Unlike the majority of lifers, he showed no signs
12  of self-pity, resentment or bitterness about being
13  locked up indefinitely even when he expressed that by
14  having gone to prison, the greatest loss of his life was
15  losing his family and feeling powerless to provide them
16  with anything more than a phone call, letter, or short
17  visits of an infrequent basis.
18       He indicated that if he is to live he rest of his
19  life in prison, he will simply continue his established
20  life of advancing his knowledge and skills, being of
21  service to others and continuing to practice his faith.
22  All of these things collectively appear to keep him
23  positive and confident that no matter what happens, he
24  will continue to make -- he will continue to make a life
25  for himself that is meaningful, productive, as happy as
```

1  is possible and of help to others.

2       There are no psychiatric reasons to retain him.

3  Mr. Romero poses minimal risk to the community and the

4  condition that he continue his alcohol recovery

5  activities.  Mr. Romero is a man who likely earned the

6  respect and positive regard of others in any community

7  he may live.  And that was done by Elizabeth R. Lewis,

8  L-E-W-I-S, Ph.D.

9       Counselor, did I leave anything out that you want

10 part of the record.

11      **ATTORNEY CHRISTENSEN:**  No, those words are fine.

12 Thank you.

13      **DEPUTY COMMISSIONER HERRON:**  All right.  Redirect

14 your attention to Commissioner Eng.

15      **PRESIDING COMMISSIONER ENG:**  Okay.  Let's go over

16 your parole plans, sir.  This new Board report that we

17 have dated March 2007 states that if you are allowed to

18 remain in the US, you would live with your brother

19 Adrian Romero in Orange, California.  And that this says

20 the letter received from your brother is dated November

21 2001; is that correct?

22      **INMATE ROMERO THROUGH INTERPRETER:**  What's the

23 date?

24      **PRESIDING COMMISSIONER ENG:**  2001.  But I'm

25 trying to see, we must have more current letters than

1 that.

2        INMATE ROMERO THROUGH INTERPRETER:  I think I

3 have more in there that are more recent.

4        PRESIDING COMMISSIONER ENG:  Yeah, all right.

5 And is that still your plan?  And then you also state

6 that if you're deported, which is highly likely, that

7 you would live back with your parents back in Puebla,

8 Mexico.

9        INMATE ROMERO THROUGH INTERPRETER:  That's

10 correct.

11        PRESIDING COMMISSIONER ENG:  Okay.  I'm trying to

12 see if there is a support letter.  Okay, so I do have a

13 letter in the packet dated October 20th, 2005.  And it

14 has been translated from Jesus Romero, who is your

15 father?

16        INMATE ROMERO THROUGH INTERPRETER:  Yes.

17        PRESIDING COMMISSIONER ENG:  Okay.  Just

18 checking.  And he states that he is there to tell us

19 that he will help you in everything that you need.  He

20 always had all of my help, and he always will.  He does

21 say that he has a place for you where you can live and

22 work because he owns farmland.  That is why I ask you if

23 immigration is going to send him back to our country.  I

24 will give him a place to live and also land to work.

25        Then there's what looks like it's a, it's to

1  attest and certify that Jesus Romero Juarez, native and

2  resident of the community of San Juan, I can't even

3  pronounce that, H-U-I-L-O-A-P-A-N, belonging to his

4  municipality is the legal owner of four homes, two made

5  of wood and two of masonry, and 20 hectares of arable

6  land which are cultivated, potatoes, corn, carrots, and

7  beans.  And he has six hectares on the foothills.  And

8  that is this -- This is a certification.  Okay.  So does

9  that mean your father owns a lot of land?

10         INMATE ROMERO THROUGH INTERPRETER:  Yes.

11         PRESIDING COMMISSIONER ENG:  The issue that the

12  Panel has is that your father has always been there

13  doing that, and yet you left it, okay?

14         INMATE ROMERO THROUGH INTERPRETER:  That's true.

15         PRESIDING COMMISSIONER ENG:  So what makes us

16  believe that you're going to go back and stay?

17         INMATE ROMERO THROUGH INTERPRETER:  Well, you

18  know the truth is that I wouldn't want to leave and go

19  back over there.

20         PRESIDING COMMISSIONER ENG:  Why?  Your children

21  and your grandchildren are here in the United States.

22         INMATE ROMERO THROUGH INTERPRETER:  But I know

23  they send me back to the country I won't be able to come

24  back.  I don't want to violate any more laws.

25         PRESIDING COMMISSIONER ENG:  Okay. Well, I'm not

1  saying this to attack you in any way, okay, but this is

2  how others are going to think.  Because it's not just

3  this Panel.  It's a decision review process which you

4  already found out about with a split decision.  It's the

5  rest of the Commissioners and the Governor's office.

6  There's a lot of people involved in the process, okay?

7  You disregarded all laws, okay?  Up until this date.

8       This is why you are in this prison.  You

9  disregarded the fact that you entered this country

10  illegally, probably not just once but quite a few times.

11  Because you stated that you have gone back and forth and

12  so have your family member; all right?  You did, you had

13  a few arrests, you had a life crime.

14       A lot of your family is here.  You left

15  originally all this land and the lifestyle that you had

16  in Mexico.  You left to come over here knowingly.  I

17  don't understand.  You need to convince this Panel.  I

18  don't understand what would stop you from coming back

19  illegally again even knowing -- you know it's illegal.

20  You knew it all along, but you still came.  So what's to

21  stop you if you're paroled from getting tired of working

22  on the farm and heading back northward again.

23       **INMATE ROMERO THROUGH INTERPRETER:**  I know if I

24  come back here and I violate the parole, they're going

25  to put me back in prison.  And I don't want to be in

*Capitol Electronic Reporting*

1    prison.  I would prefer to be there than to be in

2    prison.  The reality of what could be done, what would

3    happen if I came back?

4            PRESIDING COMMISSIONER ENG:  Do you understand

5    that for all of your actions, that there is some

6    accountability here?

7            INMATE ROMERO THROUGH INTERPRETER:  Yes, I know

8    that.

9            PRESIDING COMMISSIONER ENG:  We do have a letter

10   from a Jerman, J-E-R-M-A-N, Monte -- M-O-N-T-E-D-E-O-C-A.

11           INMATE ROMERO THROUGH INTERPRETER:  Montedeoca.

12           PRESIDING COMMISSIONER ENG:  Montedeoca.  Mr. --

13   okay.  Montedeoca.  And he states that he's been a

14   member of Alcoholics Anonymous for the past 25 years.

15   He says here in the town where I was born, San Antonio,

16   how do you pronounce that town?

17           INMATE ROMERO THROUGH INTERPRETER:  Atzitzintla.

18           PRESIDING COMMISSIONER ENG:  Ata?

19           INTERPRETER MARQUEZ:  Atzitzintla.

20           INMATE ROMERO:  Atzitzintla.

21           PRESIDING COMMISSIONER ENG:  Okay.  I'm not even

22   going to try that.  Okay, A-T-Z-I-T-Z-I-N-T-L-A.  Okay.

23   And that he met your father.  And had a conversation, so

24   this is what you were stating that your father took a

25   look as to what type of community support there might be

1  for your alcohol problem.

2        INMATE ROMERO THROUGH INTERPRETER:  That's

3  correct.

4        PRESIDING COMMISSIONER ENG:  Okay.  And that's

5  what this letter is.  And it's dated October 20th, 2005.

6  Okay.  Am I missing any other support letters?  I don't

7  have anything from your brother.

8        INMATE ROMERO THROUGH INTERPRETER:  They should

9  be in my file.

10        DEPUTY COMMISSIONER HERRON:  I didn't see any.

11        PRESIDING COMMISSIONER ENG:  But, sir, if there

12  was one and if it's dated 2001, that's not something

13  that I as a Panel member would even consider because

14  that's way too old.

15        INMATE ROMERO THROUGH INTERPRETER:  I think

16  there's one from last -- since the last hearing.

17        PRESIDING COMMISSIONER ENG:  Well, it wasn't

18  provided to us.  Did you bring copies?

19        INMATE ROMERO THROUGH INTERPRETER:  No, I give it

20  to my counselor, and she put it in the file.

21        PRESIDING COMMISSIONER ENG:  Without the letters,

22  there's nothing I can do.  I have to assume that it

23  doesn't exist because you don't have them.  That's why

24  oftentimes many inmates make sure that they have copies

25  of everything and they carry that with them, because

1   sometimes things disappear.  And, sir, didn't you review

2   your Central File?  I thought you reviewed that January

3   26th.

4           INMATE ROMERO THROUGH INTERPRETER:  I did a

5   cursory review, but I didn't review everything.

6           PRESIDING COMMISSIONER ENG:  Okay.

7           INMATE ROMERO THROUGH INTERPRETER:  It's a lot

8   for me to read.

9           PRESIDING COMMISSIONER ENG:  It is a lot, but

10  that is also your responsibility.  That's your life in

11  here, okay?  And you've been through a lot of different

12  hearings.  So you know that we have to rely on the

13  written documentation.  It's not enough to sit there and

14  say things to us.  Okay.  That's okay.  All right, is

15  there anything else that we need?  Let's talk about

16  employment.  So what would you be doing back in Mexico?

17          INMATE ROMERO THROUGH INTERPRETER:  I would work

18  the land that my father has if he gives me some.  And,

19  of course, the first thing that I would do when I got

20  there would be to find programs that would continue to

21  help me.

22          PRESIDING COMMISSIONER ENG:  Okay.  Before I go

23  any further, I want to make sure I don't forget.  We

24  also send out 3042 notices.  Those notices go to

25  agencies that have a direct interest in your case.  We

1  do have a representative from the District Attorney's

2  office from Orange County who will be making a

3  statement, I'm sure, prior to recess.

4       But I also want to put into the record that we

5  did receive a letter dated February 7th, 2007, from the

6  city of Anaheim Police Department.  This is from a

7  Sergeant Steve Marcin, M-A-R-C-I-N, with the Homicide

8  Detail.  And this is basically a letter in response to

9  our 3042 notice about your upcoming suitability for

10  parole hearing.  And he states he was not involved in

11  the original investigation, but he has reviewed the case

12  file.

13       And then he goes on to summarize the life crime.

14  And he states, "I do not believe Isedro Romero is a

15  candidate for parole.  He participated in the planned

16  attack of Gomez by going to Gomez's residence.  During

17  the assault Romero stabbed Gomez in front of his wife

18  and family members.  The citizens of this state should

19  not be put at such risk that Isedro Romero can now

20  maintain himself with the judgment and control of a

21  reasonable person.  On behalf of the citizens of the

22  city of Anaheim, I ask that Isedro Romero be denied

23  parole."

24       Okay, now I'm going to go back and talking about

25  your parole plans.  And I'm going back and again I'm

1  focusing more on your history of alcohol abuse.  And in

2  the last psychological evaluation, you know, you made a

3  statement, when I get drunk, I get violent.  Okay.  Now

4  I know that.

5       And then I think the psychologist, you did state

6  that I am an alcoholic.  And then the psychologist, how

7  do you understand that you became a problem drinker.

8  And you state I saw my father drink when I was a boy.  I

9  wanted to be like my father.  I think because I saw him

10 drinking, I wanted to do it.  Drinking was normal in my

11 culture.  Everybody drank all the time.  People got

12 drunk.

13            (Thereupon, the tapes were

14              changed off the record.)

15       DEPUTY COMMISSIONER HERRON:  Alrighty.  We're

16 back on the record.

17       PRESIDING COMMISSIONER ENG:  Okay.  I was going

18 to say that a concern is that you would be going back to

19 the same culture.

20       INMATE ROMERO THROUGH INTERPRETER:  I'm going

21 back to my same culture, but not with the same mentality

22 that I had when I was a child.  I know that alcohol for

23 me is a problem.  Whatever happens, I know that I have

24 to avoid that.

25       PRESIDING COMMISSIONER ENG:  But you'll be

64

1  surrounded by it.  And by your own words, when you

2  drink, you get violent.

3        INMATE ROMERO THROUGH INTERPRETER:  That's true.

4  But if I know that causes me harm, I'm never going to do

5  it again.  I'm going to try by all means available to

6  ensure that I avoid that.

7        PRESIDING COMMISSIONER ENG:  Okay.  The other

8  thing that I wanted to bring up, I knew I had read this

9  somewhere and I just found it.  Your prior arrest, what

10  was it, for battery?  And you said it had to do with

11  your girlfriend, and I asked if you had hit her or

12  shoved her?  Do you recall that earlier when we were

13  talking about that?

14        INMATE ROMERO THROUGH INTERPRETER:  Yes.

15        PRESIDING COMMISSIONER ENG:  Okay.  Well, in this

16  particular psychological report, it does state that in

17  another incident prior to the instant offense were you

18  claim that you were drunk and you ended up stabbing and

19  killing Mr. Gomez that you were also under the influence

20  of alcohol and you threatened an ex-girlfriend with a

21  knife.

22        INMATE ROMERO THROUGH INTERPRETER:  After my

23  girlfriend and I had that problem, I never tried to hurt

24  her with a knife.  If that happen, when I went to court,

25  the judge would not have released me.  He gave me five

*Capitol Electronic Reporting*

1  days for what happened.  I admit I had a problem with

2  her, but all we had was an argument

3      PRESIDING COMMISSIONER ENG:  But did you pull a

4  knife on her.  Because this was in your interview with a

5  psychologist.  This was not a court document.

6      INMATE ROMERO THROUGH INTERPRETER:  Well, in my

7  files, in my court files it was stated that I had

8  threatened her with a knife, but I never did threaten

9  her with a knife.  We did have problems and we argued.

10 I don't deny that.  That's true.

11     PRESIDING COMMISSIONER ENG:  Okay.  Any other

12 questions, Commissioner?

13     DEPUTY COMMISSIONER HERRON:  No, Ma'am.

14     PRESIDING COMMISSIONER ENG:  Okay.  So I'm going

15 to open it up to Mr. Lockhart.  Any questions you would

16 like posed to this inmate?

17     DEPUTY DISTRICT ATTORNEY LOCKHART:  No, thank

18 you, Commissioner.

19     PRESIDING COMMISSIONER ENG:  Okay.  Ms.

20 Christensen?

21     ATTORNEY CHRISTENSEN:  I do.  Now, this AA group

22 in Puebla, you mentioned that your father is an

23 alcoholic.  So do you know if he attends this group

24 also?

25     INMATE ROMERO THROUGH INTERPRETER:  I don't know.

1  I don't know if he's doing it or not.

2      ATTORNEY CHRISTENSEN:  What about the victim of

3  the crime, Jose Gomez, what are your feelings concerning

4  the effects of the crime on his family?

5      INMATE ROMERO THROUGH INTERPRETER:  The truth is

6  I committed a crime.  I understand that his family was

7  really bothered by it.  And again it was due to the

8  alcohol this happened, and that's why I'm going to avoid

9  all that.

10      ATTORNEY CHRISTENSEN:  Have you done anything to

11  make amends for this?

12      INMATE ROMERO THROUGH INTERPRETER:  Amends of

13  what?

14      ATTORNEY CHRISTENSEN:  Well, one of the 12 steps

15  talks about making amends.  Have you been able to work

16  those steps?

17      INMATE ROMERO THROUGH INTERPRETER:  On step

18  number eight, for example, states that we should

19  identify the persons that we have caused harm to and to

20  do some steps to make up for that.  What I've done

21  honestly is I've tried to put down everything negative

22  that I've done and everything positive that I've done

23  and try to balance it out.

24      ATTORNEY CHRISTENSEN:  Okay.  No more questions.

25      PRESIDING COMMISSIONER ENG:  Anything?  Okay,

1  final statements, Mr. Lockhart.

2       **DEPUTY DISTRICT ATTORNEY LOCKHART:**  Thank you.

3  I'm asking the Board to find the inmate unsuitable for

4  parole because he has failed the first step for

5  suitability, which is acceptance of an insight into the

6  murder for which he is incarcerated.

7       First the inmate says that he stabbed Jose Gomez

8  in self-defense.  Secondly he says he doesn't know how

9  he stabbed Jose Gomez but it must have been what he's

10  characterized as an accident all of these years.  His

11  self-defense claim is absurd for the following reasons.

12  He made the choice to go over there with his buddies to

13  the house belonging to Jose Gomez.  He made the choice

14  to engage in this macho confrontational behavior because

15  his buddy wanted to assert his dominance over Sofia, the

16  woman.  If you read the Appellate opinion which is part

17  of the file, the Court of Appeal said that this was an

18  unprovoked beating by the inmate and his friends.

19       Secondly, the inmate was armed.  Jose Gomez was

20  not.  That's also in the Appellate opinion.  You don't

21  get to bring a knife to a verbal confrontation that you

22  initiate, turn it into a violent confrontation and then

23  assert a self-defense claim.  You can't even bring a

24  knife to a fistfight and assert self-defense without

25  some circumstances indicating that the knife is

1  necessary to keep you from being harmed or killed.

2       What we have here is an initiation by the inmate

3  and his buddies. They go over there. They start

4  everything. They are armed or at least he's armed, and

5  now all of a sudden we claim it's self-defense. It

6  doesn't make sense. The testimony moreover from the

7  witnesses that's in various reports in the file, was

8  that the inmate himself grabbed Jose Gomez, pulling Jose

9  Gomez towards him and then stabbed him in the chest.

10      How is it self-defense? If you're running away

11 from someone who, he says he's crossing the street and

12 going on the other sidewalk. How -- why would he pull

13 the person from which he's running and afraid and stab

14 him if this is self-defense claim. It doesn't make

15 sense.

16      Additionally his claim that Jose Gomez, and this

17 is in the psych report, I believe it's in the Board

18 report as well, that Jose Gomez came after him and tried

19 to stab him in the head and he put up his hands and then

20 got the stab wound in the arm does not comport with the

21 evidence that was presented at trial which is that Jose

22 Gomez was unarmed. And again that's in the Appellate

23 opinion and you can't get around that.

24      The fact that he claims it's an accident is also

25 ridiculous. He says in the current Board report that it

1  was an accident. I accidentally stabbed him. Well, the

2  victim, Jose Gomez, was stabbed eight times, again in

3  the Appellate opinion. The Appellate opinion further

4  states that at least three of those stab wounds were

5  from the inmate, two of them in the chest. That's not

6  an accident. You don't accidentally stab someone at

7  least three times. Now he's claiming there weren't

8  eight stab wounds. And the Appellate opinion does say

9  that at least three of them were from him.

10      It might be more believable if the inmate were to

11  claim that he was too drunk to remember what happened,

12  but he can't even do that. Because he testified at his

13  first trial that he wasn't feeling the effects of

14  alcohol and he had no memory lapse and that's on page

15  two of the Appellate opinion. So his it's all due to

16  the alcohol excuse conflicts with his own testimony at

17  the first trial.

18      In fact that was the essence of his second appeal

19  was that he testified at the first trial, said I didn't

20  feel any of the effects of alcohol. I have a clear

21  memory of what happened. Then at the second trial, he

22  didn't testify and the DA introduced the prior

23  statements and that was the subject of the second appeal

24  was to say that that was in error and the Appellate

25  court said no it was not error and, in fact, made

1  reference to those statements in saying that the inmate

2  did not feel the effects of the alcohol, even though

3  he's a .16.

4       Apparently, at least if you believe his trial

5  testimony, he has a high tolerance for alcohol. He had

6  a clear memory of what happened. So he can't sit here

7  and say the alcohol, the alcohol, I don't know why it

8  was going on, how did this accident occur, self-defense,

9  I don't have a clear recollection, it doesn't comport.

10      It's all summed up in the final statement of the

11  Appellate opinion on page six and I'll read therefrom.

12  The court says, "The evidence here was that the unarmed

13  victim was the subject of an unprovoked beating by

14  Romero and his cohorts and that Romero personally

15  stabbed him at least three times, twice in the chest.

16  Romero's own previous testimony negated any claim that

17  his ability to reason was impaired by alcohol. What

18  more need be said. It was more than adequate to support

19  a conviction for murder."

20      Nevertheless, he continues after all these years

21  to say this is a self-defense claim. Obviously the jury

22  didn't buy that twice, and he continues to mislead this

23  Board. He minimizes his conduct. He propounds

24  ridiculous excuses that don't fit the evidence.

25      Frankly, I can't believe that anyone ever thought

1  he was suitable for parole given his total lack of

2  insight.  Nor do the previous one year denials

3  adequately reflect how truly unprepared he still is.

4  I'm urging the Board to render a multi year denial

5  thereby communicating to the inmate the seriousness of

6  his lack of insight and how much work he needs to do to

7  prepare himself for a finding of suitability.  Thank

8  you.

9          **PRESIDING COMMISSIONER ENG:**  Ms. Christensen.

10         **ATTORNEY CHRISTENSEN:**  Now that's just

11  ridiculous.  You've got a split decision last time and

12  he's very suitable for parole.  It's time for the

13  taxpayers of the State of California to stop paying for

14  the board and care of this inmate here and send him back

15  to Mexico where he will not attempt to enter California.

16  He has done a lot with his life since coming to prison.

17  He will certainly be leaving a far better person than he

18  was when he entered the institution.  Thanks again to

19  the taxpayers of State of California.

20       He has utilized all the resources available to

21  improve himself.  When he came here, he could not speak

22  English.  He speaks English quite well.  Of course, he

23  has the interpreter here today, but I was able to

24  communicate with him just fine, so he will be returning

25  to Mexico as a bilingual person, which is certainly a

1  feather in his cap.  He has marketable skills that he's

2  acquired.  He has taken numerous self-help groups and,

3  most importantly, since coming to prison, he has

4  discovered that he's an alcoholic and he has taken steps

5  to address that problem.

6       So armed with all of that, he will be returning

7  to Mexico hopefully where he has a loving family ready

8  to accept him back there.  He has land to work, farming,

9  which is the type of work that he did prior to coming to

10 the US.  Really, he is all set to return.  There's an AA

11 group all set up for him to attend as well.

12      Now the inmate has been doing an excellent job

13 here.  He has been behaving himself very well.  No 115s

14 ever, which is highly unusual.  That shows that he can

15 behavior responsibility.  That he certainly knows right

16 from wrong.  He really is a -- He is someone who can be

17 counted upon to make the right choice.  He is able to

18 cope with problems as they occur.  He has been able to

19 do that quite well here in prison.  Otherwise he would

20 have gotten 115s, but no, he's been disciplinary free.

21 So he's shown that he's able to cope with all the stress

22 here in the institution and not resort to alcohol.  And

23 there is no reason to think that when he is returned to

24 Mexico that he would once again revert to his prior

25 irresponsible behavior.  He's shown that he can be

1  responsible.

2      So, all in all, I think that his parole plans are

3  very viable.  I think that he is well prepared to

4  reenter society, back to Mexico and that is where he

5  should be allowed to go and live the rest of his life

6  rather than remain in here in prison.  But I certainly

7  do not think that a multi year denial is at all

8  appropriate in this case.  I think that would be a real

9  travesty.  Thank you.

10      PRESIDING COMMISSIONER ENG:  Okay.  Mr. Romero,

11  do you choose to make a final statement regarding your

12  parole suitability to this Panel?

13      INMATE ROMERO THROUGH INTERPRETER:  I would only

14  want to ask you one thing.  Give me another opportunity

15  and I will never disappoint you.

16      PRESIDING COMMISSIONER ENG:  Okay.  Okay, we'll

17  now recess for deliberations.  The time is 1:57.

18                    R E C E S S

19                    --o0o--

20

21

22

23

24

25

1    **CALIFORNIA BOARD OF PAROLE HEARINGS**

2    **D E C I S I O N**

3        **DEPUTY COMMISSIONER HERRON:**  We are on the

4    record.

5        **PRESIDING COMMISSIONER ENG:**  Okay.  The time is

6    2:12 and all parties that were present prior to our

7    recess have returned in the matter of Isedro Romero, R-

8    O-M-E-R-O, CDC number D-07204, the Panel has reviewed

9    all information received from the public and relied on

10   the following circumstances in concluding that the

11   prisoner is not suitable for parole and would pose an

12   unreasonable risk of danger to society or a threat to

13   public safety if released from prison.

14       The Panel finds that the commitment offense was

15   carried out in a very cruel, very cold and callous

16   manner, in that this inmate along with his friends, his

17   crime partners, decided to go over to the victim, Mr.

18   Gomez's house and basically crash a party.  They ended

19   up getting into an altercation whereby the inmate ended

20   up stabbing to death the host of the party, who was

21   unarmed.

22       It was carried out in a manner that demonstrated

23   a very callous disregard for human suffering.  The

24   victim sustained anywhere from four to eight, we're not

25   ISEDRO ROMERO     D-07204     DECISION PAGE 1     3/7/07

1  exactly sure, but based on the Appellate decision I

2  read, it stated eight. He was stabbed eight time. And

3  that basically after this altercation, the inmate and

4  his other crime partners just took off and left without

5  any regard for whether or not Mr. Gomez was dead or

6  alive.

7       The motive of the crime was extremely trivial in

8  relation to the offense and, actually based on

9  everything that we have read, this Panel does not

10  understand what motivated, what the true motivation for

11  Mr. Gomez losing his life that evening truly was. It

12  appears that the inmate and his friends were going over

13  to this party and they were trying to extricate one of

14  his friend's girlfriend who didn't want to leave and

15  somehow a brawl broke out. And this victim ended up

16  being stabbed to death.

17       However the versions somewhat differ from what I

18  really read out of the Statement of Facts. And again

19  the conclusions are drawn from the Statement of Facts

20  and where is on the -- in the early morning around one

21  a.m. on January 23rd, 1982, Mr. Romero, along with

22  Sergio Cruz, Arturo Cruz, and Mr. Gutierrez, and Mr.

23  Jimenez, went over to the residence of Jose Gomez where

24  a party was going on.

25  ISEDRO ROMERO    D-07204    DECISION PAGE 2    3/7/07

1      And they, again, reportedly went over to the

2  residence to pick up Sergio's girlfriend.  But almost

3  immediately upon their arrival at the party, a fight

4  ensued between Jose and the inmate, Mr. Romero.

5      And according to a lot of the readings of the

6  document that we have at our disposal, Romero was seen

7  by witnesses at the party grabbing Jose's hair and

8  pulling him forward and stabbing him in the chest area.

9  It also goes on to state that six members of the group

10  that arrived with Romero then left the area.  Three left

11  via a vehicle that they had arrived in and three left by

12  foot.  During this altercation, somehow Mr. Romero had

13  sustained a stab wound in his left forearm.

14      Regarding a previous record, this inmate does

15  have an escalating pattern of criminal conduct that led

16  up to this life crime.  And based on his prior record,

17  he has failed previous grants of probation.  He has

18  failed to profit from society's previous attempts to

19  correct his criminality.  And these attempts do include

20  adult probation.

21      And his prior criminality does include an arrest

22  in 1978 in Garden Grove from drunk driving where he

23  received probation.  And then in 1981, he was arrested

24  by the Orange Police Department for assault where he

25  **ISEDRO ROMERO      D-07204      DECISION PAGE 3      3/7/07**

1   received probation.

2        And regarding that assault, in the recent

3   psychological evaluation, it does state that even though

4   the inmate denies this, it states that he had threatened

5   his ex-girlfriend with a knife.  But again, the inmate

6   does deny that happening.

7        But all this led up to that night or the early

8   morning hours of January 23rd where this inmate who was

9   in the habit of walking around with a knife on him,

10  ended up pulling that knife out and murdering Mr. Gomez.

11       Regarding this inmate's institutional behavior,

12  we find that his misconduct while incarcerated include

13  two 128(a) counseling chronos, the last one being in

14  August of '93 for a positive skin test.

15       The psychological report dated June of 2005 and

16  authored by Dr. E. Lewis, L-E-W-I-S, this Panel finds it

17  somewhat inconclusive in that they do state that if

18  released to the outside community, Mr. Romero based

19  static factors for increased risk -- increased violence

20  potential when compared to the average member of the

21  general population, that he is at increased risk because

22  of the fact that he's a man, he's committed violence

23  before, he's single, and he has a history of alcohol

24  abuse.  But they go on to basically state that he's

25  ISEDRO ROMERO     D-07204        DECISION PAGE 4     3/7/07

1  likely to lower his risk for violence just by aging

2  alone.  The fact that he's over 40 and several other

3  things.

4        However, what's of great concern is that this

5  doctor does state that because of the established

6  actuarial and clinical risk factors in this case, Mr.

7  Romero will never pose as low a risk as the average

8  member of the general population.  And that according to

9  this particular psychologist, if Mr. Romero is released

10 back into the community, and if he were to remain free

11 of alcohol, he would pose a minimal risk of

12 dangerousness to others.

13       The minimal risk that he currently poses is

14 contingent upon Mr. Romero's commitment to lifelong

15 sobriety by continuing to attend Alcoholic's Anonymous

16 or participate in alternate alcohol recovery activities

17 in the United States or Mexico.  And that they go on to

18 state the foremost risk factor if released in the

19 community is again the potential for alcohol relapse.

20 And that there's a clear established link between Mr.

21 Romero's past consumption of alcohol and the commission

22 of violence.  Were he to resume drinking, his violence

23 potential significantly increases.

24       One of the alarming factor that this Panel sees

25 ISEDRO ROMERO     D-07204       DECISION PAGE 5      3/7/07

*Capitol Electronic Reporting*

1  is that coupled with what the psychological evaluation

2  states that really focuses on your high risk should you

3  ever return to substance abuse, one of the things that's

4. of great concern was that during the hearing we did

5  note, this Panel did note that it did not appear to us

6  that your attendance in the substance abuse program was

7  of the utmost priority in your life.

8       You stated that you had other things to do and a

9  conflict in your schedule that prohibited you from

10 attending some of your AA meetings.  And especially when

11 I specifically asked you what happened because you only

12 attended once in the year 2000, twice in the year 2002,

13 nothing in '01, once in '03, and nothing in '04, '05,

14 and then you picked it back up.

15      So of great concern, sir, is that if this were

16 the top priority in your life, that would never happen.

17 You would fully understand that continued support in

18 keeping you sober is the number one goal in your life to

19 survive.

20      We do note that this inmate did submit some

21 parole plans in his last country of legal residence in

22 Mexico.  It was a 2005 letter, and the Panel does

23 understand it's difficult to get the letters current

24 especially after one year and then translated.  But he

25 ISEDRO ROMERO       D-07204       DECISION PAGE 6       3/7/07

1   did provide some documentation referring to his parents

2   and his father specifically in the farm land that he

3   does own and the support that he was offering.

4        However, we're not sure about acceptable

5   employment plans back in Mexico except that what the

6   inmate stated that he would go back to farming.

7   However, again, the caveat, what leaves questions in

8   this Panel's mind about this is what you had before when

9   you chose to live initially and come to the United

10  States and now you're going back to that.

11       And the same thing with there's some discomfort

12  in this Panel knowing that what you had admitted that

13  the culture that you grew up with the fact that your

14  father was a heavy drinker and may be an alcoholic and

15  that the culture that's surrounding and the way you grew

16  up was that everybody drinks.

17       So it is of grave concern that you would be

18  returning back to that same culture of drinking when you

19  admitted that when you drink and you get drunk you do

20  get violent.  Okay.

21       Well, we do note that the District Attorney's

22  Office of Orange County, the representative was present

23  and stated their opposition to parole at this time.

24  What did I do with that letter?  We also note that we

25  ISEDRO ROMERO     D-07204     DECISION PAGE 7     3/7/07

*Capitol Electronic Reporting*

1   had a response to the 3042 notices that the city of

2   Anaheim Police Department also stated in writing their

3   opposition to parole at this time.

4        The Panel makes the following findings:  That the

5   prisoner does need to continue with all types of

6   documented self-help in order to face, discuss,

7   understand, and cope with stress in a nondestructive

8   manner.  Until progress is made, the prisoner continues

9   to be unpredictable and a threat to others.

10        And sir, it's not just stress.  It's really do

11   whatever you need to do to get a better understanding

12   and to be able to communicate with a future Panel as to

13   what brought you to make the decisions that you did that

14   evening.  There's a lot of questions and we ended up

15   leaving here with more questions than what we have

16   answers for.  And that to understand what functional

17   alcoholism is.  It appears that you have a very high

18   tolerance for a certain level of alcohol.  And we really

19   question whether or not, how inebriated you really were

20   during the life crime, okay.

21        So basically, sir, we're giving you another one

22   year denial.  And I highly recommend that you use that

23   time wisely to get additional self-help, to get a better

24   understanding of why you did the things you did.  We

25   ISEDRO ROMERO    D-07204      DECISION PAGE 8     3/7/07

1  recommend that you remain disciplinary free, and that if

2  available, you continue to upgrade vocationally and

3  educationally, and also participate in self-help.  And

4  update those support letters, okay?

5       That concludes the reading of -- the hearing.

6  Any comments, Commissioner.

7       **DEPUTY COMMISSIONER HERRON:**  No, Ma'am.

8       **PRESIDING COMMISSIONER ENG:**  Okay, the time is

9  2:25, thank you.

10                    --o0o--

11

12

13

14

15

16

17

18

19

20

21  PAROLE DENIED ONE YEAR

22  THIS DECISION WILL BE FINAL ON:_____JUL 0 5 2007_____

23  YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

24  DATE, THE DECISION IS MODIFIED.

25  ISEDRO ROMERO     D-07204        DECISION PAGE 9      3/7/07

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER


I, SANDRA TILLMAN, as the Official Transcriber,

hereby certify that the attached proceedings:

| | | |
|---|---|---|
| In the matter of the Life | ) | CDC Number:  D-07204 |
| Term Parole Consideration | ) | |
| Hearing of: | ) | |
| | ) | |
| ISEDRO ROMERO | ) | |
| | ) | |


SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

MARCH 7, 2007

12:14 P.M.

were held as herein appears.  Further, this transcript

is a true, complete, and accurate record, to the best of

my ability, of the recorded material provided for

transcription.


Sandra Tillman
April 25, 2007
Capitol Electronic Reporting

EXHIBIT "B"

96

1          SANTA ANA, CALIFORNIA - THURSDAY, JULY 8, 1982

2                        MORNING SESSION

3               (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN

4     COURT IN THE PRESENCE OF THE JURY:)

5               MR. GOETHALS:  WITH THE COURT'S PERMISSION, WE HAVE

6     AGREED TO INTERRUPT THE PRESENT WITNESS FOR ANOTHER WITNESS

7     TO TESTIFY VERY BRIEFLY.

8               THE COURT:  THAT'S FINE.  CALL THAT WITNESS.

9               MR. GOETHALS:  PEOPLE CALL DR. ROBERT RICHARDS.

10                    ROBERT GEORGE RICHARDS,

11    CALLED AS A WITNESS BY THE PEOPLE, WAS DULY SWORN AND

12    TESTIFIED AS FOLLOWS:

13              THE CLERK:  DO YOU SOLEMNLY SWEAR THAT THE TESTIMONY

14    YOU ARE ABOUT TO GIVE IN THE CASE NOW PENDING BEFORE THIS

15    COURT SHALL BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT

16    THE TRUTH SO HELP YOU GOD?    :

17              THE WITNESS: I DO.

18              THE CLERK:  STATE YOUR FULL NAME AND SPELL YOUR

19    LAST NAME.

20              THE WITNESS:  ROBERT GEORGE RICHARDS,

21    R-I-C-H-A-R-D-S.

22                        DIRECT EXAMINATION

23         Q    BY MR. GOETHALS:  YOU'RE A MEDICAL DOCTOR;

24    IS THAT CORRECT, SIR?

25         A    YES.

26         Q    HOW LONG HAVE YOU BEEN AN M.D.?

97

1        A        SINCE 1948.

2        Q        WOULD YOU DESCRIBE YOUR MEDICAL BACKGROUND AND

3    EXPERIENCE?

4        A        FOUR YEARS OF MEDICAL SCHOOL, FOUR YEARS

5    OF RESIDENCY, AND MY PRACTICE IS LIMITED TO PATHOLOGY.

6             I'M LICENSED IN THE STATE OF CALIFORNIA AND

7    I'M CERTIFIED IN CLINICAL ANATOMIC AND FORENSIC --

8             MR. KIES: I WILL STIPULATE TO HIS QUALIFICATIONS.

9             THE COURT:  ACCEPTABLE?

10             MR. GOETHALS:  YES.

11             THE COURT: YOU WILL CONSIDER DR. RICHARDS AN EXPERT

12    IN ALL AREAS IN WHICH HE TESTIFIES.

13             ASK YOUR NEXT QUESTION.

14        Q        BY MR. GOETHALS:  WORKING AS A PATHOLOGIST,

15    ARE YOU CURRENTLY UNDER CONTRACT WITH THE COUNTY OF

16    ORANGE TO DO AUTOPSIES?

17        A        YES, I'VE BEEN DOING THAT FOR 25 YEARS.

18        Q        DIRECTING YOUR ATTENTION TO JANUARY 30, 1982

19    AT APPROXIMATELY 11:15 IN THE MORNING, DID YOU HAVE OCCASION

20    TO PERFORM AN AUTOPSY ON A DECEASED IDENTIFIED AS JOSE

21    GOMEZ?

22        A        YES, I DID.

23        Q        WHERE DID YOU PERFORM THAT AUTOPSY?

24        A        AT THE NEW FACILITY OVER HERE.

25        Q        THE ONE ADJACENT TO THE SHERIFF'S OFFICE AND

26    JAIL?

98

1      A    YES.

2      MR. GOETHALS:  MAY I APPROACH THE WITNESS, YOUR

3  HONOR?

4      THE COURT: YES.  WE MAY AS WELL DISPENSE WITH THE

5  REQUEST TO APPROACH THE WITNESS, CLERK, AND THE BOARD,

6  SINCE NOBODY COMPLIES WITH IT ANYWAY -- LITTLE HUMOR,

7  VERY LITTLE.

8      MR. KIES: MAY WE APPROACH?  I BELIEVE WE HAVE A

9  STIPULATION, YOUR HONOR.

10      THE COURT: FRAME IT.

11      MR. KIES:  THAT THE -- IT WOULD BE STIPULATED THAT

12  IF A RELATIVE -- WELL, THE BASIC STIPULATION IS, YOUR HONOR,

13  IS THAT JOSE GOMEZ THAT DR. RICHARDS DID THE AUTOPSY ON

14  IS THE SAME JOSE GOMEZ WHO WAS IDENTIFIED AS BEING IN THE

15  FIGHTING ON JANUARY 22, 1982 OUTSIDE OF 431 KODIAK.

16      THE COURT:  AND THAT, OF COURSE, HE WAS A  LIVE

17  HUMAN BEING PRIOR TO DR. RICHARDS' OBSERVING HIM DURING

18  THE AUTOPSY?

19      MR. KIES:  THAT'S CORRECT.

20      THE COURT:  SO STIPULATED?

21      MR. GOETHALS:  YES, YOUR HONOR.

22      THE COURT:  THAT STIPULATION IS ENTERED.

23      LADIES AND GENTLEMEN, THAT FACT IS

24  CONCLUSIVELY PROVED, THAT IT IS THE SAME INDIVIDUAL.

25      Q    BY MR. GOETHALS:  DR. RICHARDS, DURING THE

26  COURSE OF YOUR AUTOPSY ON JOSE GOMEZ, DID YOU FIND ANY

99

1   WOUNDS ON HIS BODY?

2           A       THERE WAS A FATAL STAB WOUND IN THE LEFT

3   CHEST THAT PENETRATED THE HEART.

4                   THERE WAS A STAB WOUND IN THE RIGHT CHEST

5   THAT DID NOT PENETRATE BEYOND THE BONE OF THE CHEST.

6                   THERE WAS A STAB WOUND IN THE HIP, RIGHT

7   HIP, THAT WAS ABOUT TWO AND A HALF INCHES DEEP.

8                   AND THERE WAS A VERY SUPERFICIAL SLICE TO

9   THE LEFT UPPER ARM.

10          Q       OF THE FOUR WOUNDS THAT YOU MENTIONED, FROM

11  WHAT YOU'VE MENTIONED, I WOULD ASSUME THAT IT WAS THE LEFT

12  CHEST WOUND THAT WAS THE MOST SERIOUS; IS THAT CORRECT?

13          A       THAT WAS THE FATAL ONE, YES.

14          Q       COULD YOU EXPLAIN TO THE JURY WHY THAT

15  PARTICULAR WOUND WAS A FATAL WOUND?

16          A       IT PENETRATED THE HEART.

17          Q       SO IT PUNCTURED THE HEART?

18          A       YES.

19          Q       HOW DID THAT CAUSE DEATH?

20          A       COULD BE LOSS OF BLOOD, PRIMARILY.

21                  THE BLEEDING INTO THE PERICARDIAC SAC --

22  THE HEART IS IN THE SAC AND FILLING THAT SAC WITH BLOOD

23  WOULD CERTAINLY MAKE IT A VERY POOR PUMP.  THAT IS, IT

24  WOULD NOT BE ABLE TO EXPAND AND TO TAKE BLOOD IN OR PUMP

25  BLOOD OUT EFFECTIVELY.

26          Q       FROM WHAT YOU'VE SAID, AND FROM ANY BASIC

100

1   UNDERSTANDING, I WOULD ASSUME IT'S A FAIRLY SERIOUS WOUND

2   AS SOON AS IT'S ADMINISTERED OR INFLICTED; IS THAT TRUE?

3        A    YES, IT'S FATAL FOR ALL INTENTS AND

4   PURPOSES.

5        Q    IS IT POSSIBLE THAT A PERSON WHO HAS BEEN

6   STABBED IN THE MANNER THAT YOU FOUND THAT OCCURRED TO

7   JOSE GOMEZ, IS IT POSSIBLE THAT SUCH A PERSON COULD REMAIN

8   UPRIGHT AND WALK AROUND FOR SOME PERIOD OF TIME AFTER

9   RECEIVING THAT TYPE OF WOUND?

10       A    IT'S POSSIBLE, YES.

11            I'VE SEEN CASES THAT WERE UP AND ACTIVE FOR

12  POSSIBLY TEN SECONDS, 12 SECONDS.

13       Q    WHEN YOU DID THE AUTOPSY ON JOSE GOMEZ DID

14  YOU SEE ANY INDICATION OF ANY RECENT MEDICAL TREATMENT OR

15  SURGERY?

16       A    YES.   THERE WAS QUITE A BIT.

17       Q    COULD YOU DISTINGUISH BETWEEN YOUR AUTOPSY,

18  THE SURGICAL INCISIONS, FROM WHAT YOU DESCRIBED AS THE

19  STAB WOUNDS?

20       A    YES.

21       Q    WAS THERE ANYTHING IN PARTICULAR THAT ALLOWED

22  YOU TO TELL ONE FROM THE OTHER?

23       A    MOST OF THE SURGERIES WERE SUTURED OR

24  CONTAINED DRAINS, YOU KNOW, THAT YOU WOULD ANTICIPATE THEN

25  WERE FOR THE BENEFIT OF THE INDIVIDUAL AND WERE SURGICALLY

26  INDUCED.

101

1        Q    SO THE FOUR WOUNDS YOU'VE TALKED ABOUT WITH

2    US WERE STAB WOUNDS RATHER THAN SURGICAL INCISIONS; IS

3    THAT RIGHT?

4        A    THAT'S RIGHT.

5        MR. GOETHALS:  THANK YOU.  I DON'T HAVE ANY

6    FURTHER QUESTIONS.  -- OH, EXCUSE ME, YOUR HONOR.

7    WE HAVE ENTERED INTO ANOTHER STIPULATION, I BELIEVE.

8            AND, THAT IS, DURING THE COURSE OF

9    DR. RICHARDS' AUTOPSY, BLOOD WAS REMOVED FROM THE DECEASED

10   JOSE GOMEZ, AND THAT IT WAS SUBSEQUENTLY EXAMINED BY A

11   PERSON QUALIFIED TO DO THAT, THAT THE BLOOD ALCOHOL LEVEL

12   WAS FOUND TO BE .12;

13           ADDITIONALLY SCREENED FOR DRUGS AND NO DRUGS

14   FOUND IN MR. GOMEZ'S SYSTEM.

15       THE COURT: SO STIPULATED?

16       MR. KIES:  YES, YOUR HONOR.

17           COULD I HAVE A DISCUSSION WITH THE

18   DISTRICT ATTORNEY FOR ONE BRIEF MOMENT?

19       THE COURT: YES.  GO AHEAD.

20           (DISCUSSION BETWEEN COUNSEL, OFF THE RECORD.)

21       MR. GOETHALS:  YOUR HONOR, COULD I APPROACH THE

22   WITNESS AND ASK HIM A QUESTION, JUST BETWEEN THE TWO OF US,

23   FOR THE PURPOSE OF CLARIFYING THE STIPULATION?

24       MR. KIES:  AND --

25       THE COURT: YES.

26       MR. KIES:  -- THAT'S AT MY REQUEST.

102

1           (DISCUSSION BETWEEN THE DISTRICT ATTORNEY AND

2   THE WITNESS, OFF THE RECORD.)

3           MR. GOETHALS:  THANK YOU, YOUR HONOR.

4               (DISCUSSION BETWEEN COUNSEL, OFF THE RECORD.)

5       MR. GOETHALS:  YOUR HONOR, I'D LIKE TO ALTER THE

6   STIPULATION SLIGHTLY, IF I COULD.

7           THE STIPULATION WOULD BE AS FOLLOWS:

8           BLOOD WAS DRAWN FROM JOSE GOMEZ WHEN HE WAS

9   TAKEN TO THE HOSPITAL BY THE PARAMEDICS SHORTLY AFTER THE

10  TIME HE WAS STABBED, AND THAT BLOOD WAS ANALYZED AND FOUND

11  TO CONTAIN .12 PERCENT ALCOHOL AND NO DRUGS.

12      MR. KIES: SO STIPULATED.

13      THE COURT: THAT STIPULATION IS ENTERED AND IT IS

14  CONCLUSIVELY PROVED.

15      MR. GOETHALS:  THANK YOU, YOUR HONOR.  NO FURTHER

16  QUESTIONS.

17      THE COURT: YOU MAY CROSS-EXAMINE.

18              CROSS-EXAMINATION

19      Q    BY MR. KIES: WERE YOU ABLE TO TELL WHETHER

20  THE STAB WOUND ON THE HIP WAS INFLICTED FIRST, AS OPPOSED

21  TO THE STAB WOUNDS IN THE CHEST AREA, OR VICE VERSA?

22      A    NO, I WOULDN'T BE ABLE TO TELL THAT.

23      Q    NOW, YOU'VE LIMITED THE ACTIVE PERIOD THAT

24  YOU BELIEVE IT'S POSSIBLE FOR A PERSON RECEIVING SUCH A

25  WOUND TO TEN OR 12 SECONDS.

26          WOULD YOU BELIEVE IT POSSIBLE FOR SUCH A

103

1  PERSON TO, IN A SENSE, REMAIN IN COMBAT; IN OTHER WORDS,

2  MOVE TO DEFEND SOMEONE FOR, LET'S SAY, A PERIOD OF HALF A

3  MINUTE?

4         A    I THINK THE BEST WAY TO ANSWER THAT IS THAT

5  A YEAR AGO I USED TO FEEL THAT IF YOU HAD A HEART INJURY

6  YOU FELL LIKE A STONE, NO MORE ACTIVITY.

7             HOWEVER, DURING THAT PERIOD OF TIME CERTAIN

8  CASES HAVE OCCURRED THAT HAD TIME DURATION, THAT IS, FATAL

9  HEART INJURY STAB WOUNDS, GUNSHOT, THAT HAD AS MUCH AS

10  10 OR 12 SECONDS.  THEREFORE, I FEEL IT'S REASONABLE TO

11  ASSUME THAT ON AN OCCASION THIS CAN OCCUR.

12             I DON'T RECALL EVER HAVING ONE, YOU KNOW, FOR

13  30 SECONDS.

14         Q    WOULD THE AGE AND THE HEALTH OF THE PERSON

15  RECEIVING THE WOUND BE A FACTOR IN DETERMINING HOW SUCH A

16  PERSON COULD REMAIN ACTIVE?

17         A    YES, AND POSSIBLY WILL WOULD ALSO BE A

18  FACTOR.

19         Q    SO IF THE INJURED PERSON WITH AN INJURY IN

20  THE HEART HAD BEEN STIMULATED, LET'S SAY, VERY STRONGLY

21  STIMULATED IN COMBAT OF SOME SORT, IT WOULD BE MORE LIKELY

22  THAT THAT PERSON COULD REMAIN ACTIVE FOR A LONGER PERIOD?

23         A    IT'S POSSIBLE.

24         Q    WERE YOU ABLE TO DETERMINE WHETHER THERE WAS

25  ANY OTHER PRE-EXISTING BRUISING ON THE BODY OF MR. GOMEZ?

26             MR. GOETHALS:  I'D OBJECT.  IT'S VAGUE AS TO WHAT

104

1    CONSTITUTES PRE-EXISTING.

2            THE COURT:  SUSTAINED.

3            Q    BY MR. KIES:  WELL, CALL IT BRUISING CAUSED

4    BY STRIKING OF SOME SORT, OTHER THAN BRUISING CAUSED BY

5    HOSPITAL PROCEDURES, MEDICAL PROCEDURES.

6            A    THERE WAS A BRUISE ON THE UPPER LIP AND A

7    CRUSTING, HEALING TYPE OF PROCESS ON THE LOWER LIP.

8            Q    DID YOU NOTICE ANY OTHER, LET'S SAY, MINOR

9    ABRASIONS OR CUTS?

10           A    I'D HAVE TO REFRESH MY MEMORY.

11           Q    PLEASE DO, DOCTOR, OTHER THAN WHAT MAY HAVE

12   BEEN CAUSED BY MEDICAL PROCEDURES.

13           A    I HAVE NO RECORDS.  PERHAPS THE PHOTOGRAPHS

14   MIGHT SHOW MORE.

15           Q    NOW, IF WITNESSES INDICATED THAT THEY SAW

16   VERY LITTLE BLOOD ON THE OUTSIDE OF THE BODY OF THIS

17   MR. GOMEZ, AT LEAST INITIALLY WHILE HE WAS STILL, LET'S

18   SAY, MOVING, WOULD THAT INDICATE TO YOU THAT POSSIBLY

19   BLOOD PRESSURE WAS BEING MAINTAINED IN MR. GOMEZ'S SYSTEM

20   BY EITHER A SLOWER LEAKAGE THROUGH THE HEART OR BY THE

21   HEART STABBING -- I FORGET THE EXACT WORD YOU USE FOR THE

22   HEART STABBING -- WOULD THAT MAINTAIN PRESSURE FOR A PERIOD

23   OF TIME?

24           A    IT WOULD -- THERE WOULDN'T BE ANYTHING IN THE

25   PROCESS THAT WOULD GO ON THAT WOULD AID OR ABET BLOOD

26   PRESSURE.

105

1        THE STAB WOUND EXTENDED FROM THE -- RIGHT

2   THROUGH THE SEPTUM INTO THE LEFT HEART, SO THE PRESSURE

3   THAT YOU'RE REALLY WORKING UNDER WOULD BE NORMAL BLOOD

4   PRESSURE, THAT IS, YOU KNOW, SAY 120 OVER 80 OR SOMETHING

5   OF THAT SORT, AND THAT'S EXPRESSED IN MILLIMETERS OF

6   MERCURY.

7        IT'S A GOOD HEAD OF PRESSURE SO THAT THAT

8   BLOOD UNDER THAT PRESSURE WOULD BE LEAKING OUT.

9        OF COURSE, FIRST IT WOULD FILL UP THE SAC

10  WHICH PROBABLY WOULDN'T TAKE A VERY LONG PERIOD OF TIME.

11  I THINK THE ONLY REASON THAT YOU PROBABLY WOULDN'T GET

12  BLOOD SHOWN RIGHT AWAY WOULD BE THAT A STAB WOUND WOULD

13  CLOSE, TEND TO APPROXIMATE THE EDGES, AND MIGHT RETAIN THE

14  BLOOD INSIDE FOR A PERIOD OF TIME.

15        Q    WELL, THE BASIC CAUSE OF DEATH IS THAT

16  ULTIMATELY THE BLOOD CIRCULATION SYSTEM RUNS OUT OF BLOOD;

17  IS THAT CORRECT?

18        A    YES. IT'S THE BLEEDING, LOSS OF CIRCULATING

19  VOLUME AND, AS I MENTIONED BEFORE, IT WOULD ALSO -- EXCUSE

20  ME -- ALSO BE THE LOSS OF FUNCTION TO THE HEART BY FILLING

21  THE PERICARDIAL SAC WITH BLOOD;

22        IN OTHER WORDS, IT'S LIKE YOUR ARMS.  YOU

23  HAVE PRETTY STRONG FLEXERS BUT WEAKER EXTENDERS, SO THAT

24  THE HEART HAS VERY GOOD CONTRACTING MUSCLE, BUT IT DOESN'T

25  HAVE ANYTHING TO EXPAND IT.

26        THAT'S DONE BY GRAVITY SO AS THE HEART SAC

106

1  FILLS UP IT WOULD PUSH THE HEART MORE AND MORE, IT WOULD

2  CONTRACT LESS, IT WOULD CONTRACT POORER.

3          LET'S SAY THE TRAUMA TO THE HEART ITSELF

4  THAT CAUSES THE HEART TO STOP; IN OTHER WORDS, THE HEART,

5  IN A SENSE, KEEPS ON BEATING BUT IN A WEAKER MANNER.

6          THE CONDUCTION SYSTEM COULD BE INVOLVED AND,

7  AS SUCH, THERE MIGHT BE A FACTOR.

8          THE STAB WOUND WENT THROUGH THE SEPTUM AND

9  THE SEPTUM IS WHERE THE CONDUCTION SYSTEM FLOWS, IN OTHER

10  WORDS, THE ELECTRICAL  IMPULSE TO THE HEART WOULD BE IN

11  THAT REGION.

12          Q    BUT IF THAT OCCURRED YOU WOULD EXPECT THAT

13  THE DECEASED WOULD IMMEDIATELY FALL ON HIS FACE IF THE

14  HEART STOPPED IMMEDIATELY?

15          A    YES, I WOULD.

16      MR. KIES:  ALL RIGHT. I HAVE NOTHING FURTHER.

17      THE COURT:  ANY REDIRECT?

18      MR. GOETHALS:  YES, YOUR HONOR.

19              REDIRECT EXAMINATION

20          Q    BY MR. GOETHALS:  DOCTOR, YOU SAY IN RESPONSE

21  TO COUNSEL'S QUESTION, I THINK THAT AT ONE TIME IN YOUR

22  MEDICAL CAREER YOU FELT THAT IF SOMEONE RECEIVED A FATAL

23  HEART WOUND THEY SHOULD FALL LIKE A STONE; IS THAT RIGHT?

24          A    YES.

25          Q    DURING THE COURSE OF YOUR CAREER, HAVE YOU

26  SEEN THINGS OR HAD DISCUSSIONS WITH PEOPLE CONCERNING PEOPLE

107

1    WHO ARE DECEASED THAT YOU PERFORMED AUTOPSIES THAT HAVE

2    CAUSED YOU TO CHANGE THAT OPINION?

3        A    YES.

4        Q    CAN YOU GIVE AN EXAMPLE OF THE TYPE OF THING

5    THAT YOU HAVE EXPERIENCED THAT'S CAUSED YOU TO CHANGE YOUR

6    OPINION?

7        A    WELL, THERE WAS A PAWN SHOP HOLD-UP AND THE

8    OWNER SHOT THE ROBBER AT THE DOOR AND, OF COURSE, THE

9    ROBBER SHOT THE OWNER.  HE FELL DOWN BEHIND THE CABINET.

10        AND THE ASSAILANT MADE IT A DISTANCE OF

11    10 OR 12 FEET FROM THE DOOR TO THE CABINET AND WAS, YOU

12    KNOW, TRYING TO FINISH OFF THE OWNER WHEN HE DIED, WHICH

13    AT THAT TIME I FELT WAS, YOU KNOW, IMPOSSIBLE PRACTICALLY.

14        AND THEN THERE WAS ANOTHER INSTANCE WHERE IT

15    WAS WITNESSED THAT THIS MAN WAS SHOT IN THE MIDDLE OF THE

16    BLOCK AND HE RAN THE BALANCE OF THE BLOCK, ACROSS THE

17    STREET, AND COLLAPSED IN A PARKING LOT, WHICH WAS A DISTANCE

18    OF MORE THAN A HUNDRED YARDS.  SO HE MUST HAVE BEEN A VERY

19    GOOD RUNNER AND THAT WOULD BE, YOU KNOW, 10, 12 SECONDS,

20    PROBABLY, WHICH WOULD BE THE MAXIMUM TIME THAT I'M REALLY

21    AWARE OF.

22        Q    AND HAD BOTH OF THOSE PEOPLE THAT YOU'RE

23    TALKING ABOUT RECEIVED WOUNDS DIRECTLY TO THE HEART?

24        A    THEY WERE BOTH WOUNDS TO  THE HEART.

25        Q    THE TYPE THAT YOU HAD PREVIOUSLY EXPECTED A

26    PERSON TO FALL LIKE A STONE?

108

1          A     THAT'S CORRECT.

2          Q     IN THIS CASE WHEN YOU DID THE AUTOPSY ON

3    JOSE GOMEZ, COULD YOU CHARACTERIZE FOR THE JURY WHAT HIS

4    HEALTH WAS EXCEPT FOR THE STAB WOUNDS; IN OTHER WORDS, DID

5    YOU FIND THAT HE HAD ANY OTHER MEDICAL PROBLEM OR WAS HE

6    IN GOOD HEALTH?

7          A     HE WAS IN GOOD HEALTH.

8          MR. GOETHALS:  THANK YOU.  I DON'T HAVE ANY

9    FURTHER QUESTIONS.

10         THE COURT:  RECROSS?

11                RECROSS-EXAMINATION

12         Q     BY MR. KIES:  DR. RICHARDS, THERE IS A

13   SUBSTANTIAL DIFFERENCE BETWEEN A WOUND CAUSED BY A BULLET

14   AS OPPOSED TO A WOUND CAUSED BY A SHARP KNIFE; IS THAT

15   CORRECT?

16         A     I THINK YOU CAN IDENTIFY THE DIFFERENCE.

17   I DON'T UNDERSTAND WHAT --

18         Q     WELL, A BULLET CAUSES SEVERE TRAUMA NOT ONLY

19   AS FAR AS THE HOLE GOING IN, BUT IT ALSO, TO A WIDER AREA,

20   BESIDES THE, CALL IT THE CIRCUMFERENCE OF THE BULLET,

21   BECAUSE OF COMPACTION OF THE MEMBRANES?

22         A     YES.

23         Q     NOW, FOR EXAMPLE, IN THIS PARTICULAR CASE

24   WE HAVE A KNIFE WOUND; IS THAT CORRECT?

25         A     YES.

26         Q     FROM LOOKING AT THE WOUND, I BELIEVE IT --

109

1  WAS IT YOUR MEDICAL DECISION THAT THIS WAS A SHARP KNIFE?

2          A     YES.

3          Q     ALL RIGHT.

4                AND THUS THE WOUND WAS A VERY, ONE, A VERY

5  NARROW WOUND AS FAR AS WIDTH?

6          A     YES.

7          Q     AND A VERY CLEAN WOUND AS FAR AS THE AREA?

8  OR, LET'S SAY, A VERY SMALL WOUND AS FAR AS THE AREA IN

9  WHICH IT CAUSED IMMEDIATE DAMAGE?

10         A     COMPARED TO A BULLET, YES.

11         Q     IN FACT, A BULLET WOULD HAVE CAUSED A TRAUMA

12  TO THAT PARTICULAR AREA, LET'S SAY, AS FAR AS AREA GOES,

13  A HUNDREDFOLD WORSE?

14         A     I DON'T KNOW IF I CAN GO THAT FAR.

15                OF COURSE, THE INJURY THAT THE BULLET WOULD

16  PRODUCE WOULD DEPEND ON THE VELOCITY AND THE TYPE OF SLUG.

17                I THINK THE ONLY THING THAT THEY WOULD SHARE,

18  THAT IS, THE SLOW, SMALL SLUG OR A FAST, LARGER SLUG, WOULD

19  BE WHAT APPEARS TO BE AN ERUPTION.

20                WELL, IT'S LIKE WHEN YOU POP A BALLOON OR A

21  BALLOON FULL OF WATER, YOU HAVE THE MOVEMENT OF THE BULLET

22  AND THEN YOU HAVE THE EXPANSIVE MOVEMENT OF THE FLUID AS

23  WELL THAT PRODUCES A GREATER TEARING.

24         Q     AND THIS DOES NOT OCCUR WHEN YOU HAVE A SHARP

25  KNIFE INVOLVED?

26         A     THAT'S TRUE.

110

1          Q       WERE YOU ABLE TO DETERMINE THE MEASUREMENTS

2   OF THE WOUND AT THE ENTRY POINT IN THE HEART?

3          A       MAY I?

4          Q       YES, PLEASE.

5          A       THE REPORT HAS NO MEASUREMENT.

6                  AS I RECALL, THEY WERE ABOUT A HALF AN INCH.

7   THEY WERE SMALL.

8          Q       HALF AN INCH IN LENGTH, FOR EXAMPLE?

9          A       YES.

10         Q       WHATEVER  YOU WANT TO CALL IT, LIKE, SAY, A

11  SIXTEENTH OF AN INCH IN WIDTH?   IN OTHER WORDS, WHAT I'M

12  TRYING TO DIFFERENTIATE, WHAT IS BETWEEN LIKEA CIRCULAR

13  WOUND AND LIKE A VERY FLAT TYPE WOUND.

14                 NOW, IT WOULD HAVE BEEN A VERY FLAT TYPE WOUND?

15         A       YES, IT WOULD.

16         Q       NOW, THE HEART IS ALL MUSCLE AND THERE WOULD

17  BE A TENDENCY FOR THE HEART TO CLOSE AROUND A WOUND ONCE

18  THIS OBJECT, LET'S SAY THE KNIFE, WAS WITHDRAWN?

19         A       IN THE CONTRACTING PHASE, YES, IT WOULD.

20         Q       AS THE HEART CONTRACTS, IT WOULD DEFINITELY

21  TEND TO CLOSE OFF THAT WOUND TO THE BEST OF ITS ABILITY?

22         A       YES.

23         Q       FOR EXAMPLE, THERE WOULD BE A MAJOR DIFFERENCE

24  BETWEEN A WOUND IN THE HEART IN THAT RESPECT, OR A WOUND IN

25  THE ARTERY IN WHICH THE ARTERY DOES NOT HAVE THE SAME

26  MUSCULAR STRUCTURE AS THE HEART DOES?

111

1    A    THAT'S TRUE.

2    Q    NOW, WHEN GIVING EXAMPLES, HAVE YOU HAD ANY

3  EXPERIENCE WITH PERSONS WHO HAVE BEEN STABBED IN THE HEART

4  AND HAVE REMAINED ACTIVE?

5    A    WE HAD ONE HERE RECENTLY WHERE THE VICTIM WAS

6  STABBED IN THE HEART IN THE MIDDLE OF THE STREET, LEFT

7  TURN LANE, AND HE WALKED ACROSS THE BALANCE OF THE STREET

8  AND COLLAPSED ON THE SIDE.

9    Q    AND DO YOU HAVE A RECOLLECTION AS TO HOW

10  LONG THAT PERSON REMAINED ACTIVE?

11    A    NO.  NO, IT WOULD BE JUST THE TIME IT WOULD

12  TAKE TO CROSS HALF THE STREET.

13    Q    AND IS THAT THE ONLY EXAMPLE THAT YOU

14  PERSONALLY KNOW OF OR HAVE READ ABOUT WHERE A PERSON HAS

15  MAINTAINED HIMSELF ACTIVE FOR A PERIOD OF TIME WITH A STAB

16  WOUND IN THE HEART?

17    A    THAT'S THE ONLY ONE I CAN RECALL OFFHAND.

18    Q    IF YOU WERE INFORMED BY AN ALLEGED EYEWITNESS

19  THAT THE VICTIM -- STRIKE THAT -- NOT VICTIM -- THAT THE

20  INJURED PERSON WITH THE STAB WOUND, MAINTAINED HIMSELF

21  ACTIVE TO THE POINT OF ACTUALLY GOING TO THE DEFENSE OF

22  ANOTHER PERSON FOR A RELATIVELY SHORT PERIOD OF TIME,

23  BUT A PERIOD OF TIME AND THEN WALKED ACROSS THE STREET,

24  WOULD YOU CONSIDER THAT AN EXCEPTION TO YOUR BASIC EARLIER

25  PREMISE, THAT IS, THAT A PERSON FALLS LIKE A STONE ONCE

26  STABBED?

112

1      A    I'VE ALREADY SAID THAT I MODIFIED THAT WITH

2 EXPERIENCE AND THAT THAT EXPERIENCE WOULD EXTEND TO, YOU

3 KNOW, 10, 12 SECONDS, MAYBE 15 SECONDS.

4        EXPERIENCE DOESN'T SAY IT CAN GO BEYOND THAT,

5 BUT I SEE NO REASON WHY IT COULDN'T GO BEYOND THAT IF THE

6 WOUND WERE SUCH AND THE HEALTH OF THE INDIVIDUAL WAS SUCH

7 AND THE WILL WERE SUCH THAT THE INDIVIDUAL COULD USE THAT

8 LAST EFFORT.

9      MR. KIES:  ALL RIGHT.  FAIR ENOUGH.  THANK YOU VERY

10 MUCH, DOCTOR.

11      THE COURT:  MR. GOETHALS?

12      MR. GOETHALS:  COUPLE MORE, YOUR HONOR.  SORRY.

13        FURTHER REDIRECT EXAMINATION

14      Q    BY MR. GOETHALS:  DOCTOR, IN DESCRIBING THE

15 WOUND THAT YOU SAW IN THE CHEST AREA, WOULD YOU SAY THAT

16 THOSE WOUNDS AS YOU SAW THEM, AND AS YOU'VE DESCRIBED THEM,

17 AND AS YOU RECALL THEM, WERE CONSISTENT WITH A THRUSTING

18 TYPE MOTION INTO THE CHEST WITH A KNIFE?

19      A    YES.

20      Q    A QUICK THRUSTING AND THEN PULLING THE KNIFE

21 RIGHT OUT, THAT TYPE OF WOUND, RIGHT?

22      A    YES.

23      Q    RATHER THAN STICKING THE KNIFE IN AND TWISTING

24 IT AROUND OR ANYTHING LIKE THAT; IS THAT CORRECT?

25      A    WELL, THEY WOULD BE JUST DIRECT STAB WOUNDS,

26 THAT IS, THE ONE TO THE LEFT CHEST, THE FATAL ONE, THERE WAS

113

1  NOTHING IN THE WAY OF TWISTING OR TURNING. THE ONE TO THE

2  RIGHT CHEST IS SO SUPERFICIAL THAT THERE'S VERY LITTLE

3  DIFFERENCE BETWEEN THE SKIN AND THE BREASTPLATE, MAYBE A

4  HALF INCH, SO THERE REALLY WOULDN'T BE ANY INDICATION OR

5  POSSIBLE INDICATION OF TWISTING OR TURNING ON THAT.

6         THE ONE IN THE HIP STOPPED AT THE BONE. SO,

7  AGAIN, THERE WASN'T ANY INDICATION THERE OF ANY TWISTING OR

8  TURNING.

9         Q    JUST SO WE'RE ALL CLEAR ON ONE AREA, YOU

10 JUST HAD A DISCUSSION WITH MR. KIES ABOUT BULLET WOUNDS

11 VERSUS STAB WOUNDS, RIGHT, AND THE DIFFERENCE IN HOW THEY

12 MIGHT AFFECT SOMEONE, RIGHT?

13        A    YES.

14        Q    WOULD YOU EXPECT THE PERSON WITH THE TYPE

15 OF STAB WOUND THAT YOU SAW IN THIS CASE TO BE ABLE TO REMAIN

16 ACTIVE LONGER OR SHORTER THAN A PERSON WHO, SAY, WAS SHOT

17 IN THE SAME PLACE WITH A .38?  CAN YOU SAY?

18        A    POSSIBLY LONGER FOR THE REASONS OUTLINED,

19 THAT THE WOUND WOULD BE NARROWER, WOULD BE A BETTER

20 OPPORTUNITY TO CLOSE THE WOUND ANATOMICALLY, WHEREAS A HOLE,

21 AND USUALLY A BULLET WOUND, WILL HAVE SOME DEGREE OF

22 TEARING.  THE HEART WOULD NOT BE ABLE TO CLOSE INJURIES

23 LIKE THAT AS WELL AS A STAB WOUND, SO THEY COULD BE

24 ACTIVE LONGER.

25        Q    SO WHEN YOU DESCRIBED THE PREVIOUS EXAMPLES

26 YOU COULD OF THE PAWN SHOP ROBBER SHOT IN THE HEART OR THE

114

1    OTHER MAN WHO WAS SHOT IN THE HEART AND THEN RAN A HUNDRED

2    YARDS BEFORE HE COLLAPSED.  IS THERE ANY REASON WHY A

3    STAB WOUND VICTIM WOULD NOT FALL WITHIN THOSE TYPE OF

4    SITUATIONS?

5            DO YOU UNDERSTAND THAT QUESTION?

6        A    I'M NOT SURE I DO.

7        Q    LET ME CLARIFY, IF I CAN.

8            YOU USE THOSE TWO EXAMPLES AS EXAMPLES THAT

9    CAUSED YOU TO CHANGE YOUR OPINION AS TO WHETHER OR NOT

10   SOMEONE WITH A HEART INJURY WOULD FALL RIGHT OVER LIKE A

11   STONE, RIGHT?

12       A    YES.

13       Q    DO YOU FEEL THAT THOSE EXAMPLES ARE

14   INAPPLICABLE TO YOUR OPINION CONCERNING SOMEONE WHO WAS

15   STABBED IN THE HEART?

16       A    THEY'RE APPLICABLE ONLY IN THAT IT IS

17   POSSIBLE FOR SOMEONE WITH A HEART INJURY TO REMAIN UPRIGHT

18   AND ACTIVE FOR A PERIOD OF TIME, A SHORT PERIOD OF TIME

19   AFTER THE INJURY OCCURS.

20       Q    AND FROM WHAT YOU JUST SAID, YOU WOULD

21   EXPECT A PERSON WITH A STAB WOUND AS OPPOSED TO A GUNSHOT

22   WOUND, TO BE ABLE TO REMAIN UP AND ACTIVE FOR AT LEAST

23   AS LONG, AND MAYBE A LITTLE LONGER?

24       A    THAT'S CORRECT.

25       MR. GOETHALS:  THANK YOU.  I DON'T HAVE ANY

26   FURTHER QUESTIONS.

115

1          THE COURT: MR. KIES.

2          MR. KIES:  NO, I DON'T HAVE ANYTHING FURTHER.

3          THE COURT: THANK YOU, DOCTOR.  YOU'RE EXCUSED.

4    HAVE A GOOD DAY.

5                    NEXT WITNESS.

6          MR. GOETHALS:  PEOPLE RECALL GLORIA GOMEZ.

7               (WHEREUPON BIANCA MONTOYA, OFFICIAL COURT

8    INTERPRETER, HAVING BEEN PREVIOUSLY DULY SWORN,  AND WHO

9    HAD BEEN SEATED NEXT TO THE DEFENDANT THROUGHOUT THE

10   PROCEEDINGS, CAME FORWARD TO INTERPRET THE PROCEEDINGS

11   FOR THE WITNESS.)

12               GLORIA DE ROSAS GOMEZ SANCHEZ,

13   RECALLED AS A WITNESS BY THE PEOPLE, HAVING BEEN PREVIOUSLY

14   DULY SWORN, WAS EXAMINED AND TESTIFIED, THROUGH THE

15   INTERPRETER, AS FOLLOWS:

16          THE COURT:  THE WITNESS IS STILL UNDER OATH.

17               YOU MAY INQUIRE.

18               DIRECT EXAMINATION (CONTINUED)

19          Q     BY MR. GOETHALS:  MS. GOMEZ, I THINK WE

20   STOPPED YESTERDAY AT ABOUT THE TIME THAT YOU SAW THE

21   CRUZ BROTHERS LEAVE THE AREA ON KODIAK IN A YELLOW CAR.

22               DO YOU REMEMBER THAT CAR, MA'AM?

23          A     YES.

24          Q     DID YOU SEE APPROXIMATELY HOW MANY PEOPLE

25   LEFT THE AREA IN THAT YELLOW CAR?

26          A     FOUR.

EXHIBIT "C"

Romero, Isidro  D-07204
June, 2005

## PSYCHOLOGICAL EVALUATION
## FOR THE BOARD OF PRISON TERMS
## SUMMER 2005 LIFER HEARING
## SAN QUENTIN STATE PRISON

1. Identifying Information:  Isidro Romero is a 52 year-old native Mexican male who is serving a 16 year to life sentence for the 1982 murder of Jose Gomez.  He has been denied parole nine times thus far.  For a thorough review of background information see the previous psychological evaluations of September, 2004 and June, 2002.

This report is based on a 2 ½ hour interview occurring on June 23, 2005.  The medical records and central file were reviewed for 3.0 hours.

Please note that the request for this current evaluation was due to objections raised by the inmate's attorney to the risk assessment section of the previous psychological evaluation of December, 2004.  The objection pertained to a statement in the 12/04 evaluation, that Mr. Romero was statistically more likely to commit violence again when compared to the average member of the non-prison population for the reasons that "he is a man; he has a history of violence; he is single and he has a history of alcohol abuse."

### CLINICAL ASSESSMENT

XII.  Current Mental Status
    A.  Mental Status evaluation:

Mr. Romero presented as a short, slim but physically strong Latino male with neatly groomed, graying hair and brown eyes.  His physical movement was fluid and natural while he wore standard prison issue clothing.  He spoke accented English of sufficient fluency to the task at hand.  His speech was of normal flow while content was logical and sequential with no evidence of thought disturbance.  Mr. Romero was very polite and humble in his demeanor, while he related to the interviewer in a non-defensive and particularly forth right manner.  He was cooperative and engaged throughout, making good eye contact and spontaneously disclosing of personal information when appropriate.  Mr. Romero's mood was good with congruent and broad affect.  There were no signs of psychosis nor evidence of homicidal or suicidal ideation, intent or plan.  Mr. Romero was oriented to person, place, time and reason for the interview.  There was no evidence of psycho-neurological deficits.  Mr. Romero denied symptoms of mental illness.

    B.  Clinical Diagnosis and Level of Functioning:

        Axis I:   Alcohol Abuse in full institutional remission
        Axis II:  None
        Axis III: None acute
        Axis IV:  Stressors: Incarceration with Life Term
        Axis V:  Global Assessment of Functioning (GAF) = 85

Romero, Isidro  D-07204
June, 2005

    C. <u>Treatment Activities:</u>  None.  Mr. Romero absent of psychiatric illness.

XIII:  <u>Review of Life Crime:</u>
    A.  Inmates version and view of offense and attitude toward victim; assessment of causative factors.

Mr. Romero recalled the evening of the crime, " I was in a bar with some friends..we were invited to a party in Anaheim..the guys I was with in the car went out to the house...Sergio went...and Fausto came out and they started to fight..alot of people came out of the house... I do not know why they were fighting but I found out later that Sergio and his brother had 2 girl friends in the house and they came to pick them up but Fausto objected and they started to fight..I was in the yard and he (the victim) came out and confronted me, he was holding a knife and I said ""hold on"" because our fathers were friends – I don't want to fight...I walked backwards and went 50 feet from the house...my mistake was crossing the street because there were cars..I had my back to the cars..someone came up behind me and hit me in the neck...I drop to the ground on one knee, it was totally dark.  He (the victim) came over and tried to stab me in the head...I put one arm up and he cut my arm...something happened like this, I don't know how I got the knife out...don't recall.  Gomez (the victim) came to attack a second time..I think I was afraid..as he came, I ducked and shoved the knife at Gomez and thought I stabbed him in the stomach but it was in his chest.  After that, Gomez turned and walked away and me and my friends went to the hospital.  I did not intend to kill him..I tried to stop him..I was not that worried about him because he walked away..I thought he was not that injured...**[Reaction to the death of victim?]**  I was arrested for the stabbing..he (the victim) was in the hospital..My wife visited me in jail and I find out I stabbed him in the chest...She said maybe he would die – it was terrible. **[What was terrible?]**  I didn't want him to die, he's a human being, he's a man.  There were no problems, why did this have to happen?..We (he and the victim) had nothing to do with the conflict (between Fausto and Mr. Romero's friends) but he died and I went to prison." **[How do you feel about what you did?]**  I had to pay for it..what I did...I took a life and I did that..I can't bring him (the victim) back..I feel bad about the crime I committed.  I hurt his family.  I hurt my own family.  Society does not want me back..I have no right to kill a human being..I have no right to do that." **[How do you understand that you killed the victim that evening?]**  "When I get drunk I get violent, now I know that.  I'm an alcoholic, I was an alcoholic but now all these years – I won't do it (drink) again.  Alcohol was a problem for me so I stay away from that... in here (prison) I don't drink..I don't want to do that. **[How do you know that you can stay away permanently from alcohol if you were paroled?]**  I go to AA every week since 1988.  I had to accept that I am an alcoholic.  I heard a lot of stories of going back (returning to alcohol)..when I heard it I realize I can't drink because the people who go back, all their problems from before come back with drinking.  If I have a problem in my life, I don't go to bar to drink, instead I can talk to people now..better to talk to friend or family for help or advice...I have no desire to drink.  I don't wish to do it..I don't want problems so I stay away from booze." **[How do you understand that you became a problem drinker?]**  I saw my father drink when I was a boy. ~~I wanted to be like my father...I think because I saw him drinking I wanted to~~ do it.  Drinking was normal in my culture..everybody drink all the time...people got

Romero, Isidro D-07204
June, 2005

drunk. It was normal. **[If you are deported to Mexico how are you going to get support to stay sober there?]** I want to be more involved in AA if I get out...there are AA meetings in the city 15 miles from my village.. I want to do more service...I can drive there, it's not far. I only want to work on my family farm, make enough to eat and sell for my family. I want simple life, to work and be with my family. **[Will family members in Mexico respect and support your choice to abstain from alcohol?]** Yes, they know I don't drink..they don't bother me, they leave it alone."

Mr. Romero appears to feel genuine remorse and takes full responsibility for the murder. He does not evidence any signs of resentment or self pity for receiving a life sentence and spending the past 23 years in prison.

B.  Relevance of mental condition to life crime/criminal behavior.

Mr. Romero was intoxicated at the time of the crime. His blood alcohol level was 0.16. In another incident prior to the instant offense and also under the influence of alcohol, he threatened an ex-girlfriend with a knife. He was also arrested for drunk driving.

XIV:  Assessment of Dangerousness:
        Risk for violence cannot be predicted with any certainty but statistics and research in the area of risk analysis have identified factors that make a particular individual more likely to commit future acts of violence than the average member of the non-prison population.

    A.  Within controlled setting:
        Mr. Romero has remained discipline free and violence free for the entire time of his 23 year incarceration.. Therefore he is of minimal risk when compared to the general prison population.

    B.  If released to the outside community:
        Mr. Romero has statistically based static factors for increased violence potential when compared to the average member of the general population. These factors still stand: 1) He is a man. 2) He has committed violence before. 3) He is single. 4) He has a history of alcohol abuse.

Factors that are likely to lower his risk for violence still stand as well. These are: 1) No history of childhood sociopathy. 2) Increased education. 3) Violence risk drops after age forty. 4) He has no motivation for violence and does not endorse any violent ideation, intent or plans. 5) He has remained alcohol free for 15 years and clearly understands that he cannot ever drink alcohol. 6) He has never used illegal narcotics. 7) There is no evidence of paranoia of a psychotic nature or as a result of a personality disorder.

Not withstanding the presence of immutable risk factors in that Mr. Romero is male and has a history of alcohol abuse and violence, it seems that in his consistent efforts over the many years that he has been in prison he seems to have rehabilitated himself while

3

Romero, Isidro  D-07204
June, 2005

concurrently reducing his risk potential to as minimal a level as is possible. However because of the established actuarial and clinical risk factors in his case, Mr. Romero will never pose as low a risk as the average member of the general population. At present, in this examiner's judgment, were Mr. Romero released back into the community and to remain alcohol free, he would pose minimal risk of dangerousness to others  The minimal risk that he currently poses is contingent upon Mr. Romero's commitment to life-long sobriety by continuing to attend Alcoholics Anonymous or participate in alternate alcohol recovery activities in the United States or Mexico. Mr. Romero is has bought into AA; and by all appearances is an active and enthusiastic member of the AA community. He seems to have internalized the tools that AA taught him so that will always know he is an alcoholic and must never drink. Achieving life-long sobriety hinges on continuos AA involvement that typically includes performing charitable activities and going to AA meetings no matter how much time has passed since the last drink.

C. Significant risk factors/precursors to violence:

The foremost risk factor if released into the community is the potential for alcoholic relapse. There is a clearly established link between Mr. Romero's past consumption of alcohol and the commission of violence. Were he to resume drinking his violence potential significantly increases. Therefore it is imperative that Mr. Romero if released,he continous to participate regularly in relapse prevention activities  If he is granted parole and deported back to Mexico, there are AA meetings available there, making it realistic for him to maintain his minimal risk status so as to he is not a danger to the people there..

Counter balancing the risk for relapse are the additional protective factors:  Mr. Romero's apparent strong commitment to stay sober and that he seems to fully accept that he is an alcoholic and must never drink. That he shows he is invested in recovery activities and the sober community evidenced by his 15 year active involvement in Alcoholics Anonymous. That he also clearly demonstrates that he understands the link between his drinking and likely subsequent violent behavior. That he knows if he drinks he will likely cause himself serious problems. That he also shows no signs of impending relapse such as the presence of cravings for alcohol. That Mr. Romero now possesses coping skills to effectively handle his problems, wherein in the past, when confronted with difficulties he coped by drinking, avoiding his problems and making them even worse. Another factor militating against relapse is that he is firmly established in a busy lifestyle including regular and meaningful contact with others. It is commonly known that inactivity and isolation from others can make alcoholics vulnerable to distorted thinking and rationalizations that lead to relapse. This makes him less vulnerable to return to alcohol. Finally, Mr. Romero has achieved 15 years of uninterrupted sobriety. That he has not relapsed for such a length of time makes it more probable that he will not relapse in the future.

XV. Clinician Observations/Comments/Recommendation:

Per the previous evaluations reviewed for this report, Mr. Romero, if released, he plans to live with his brother in Los Angeles and work in his brother's landscaping business,

Romero, Isidro D-07204
June, 2005

which his brother has confirmed as an ongoing option. Because Mr. Romero is an illegal alien in the U.S., he may be deported to Mexico upon release. Mr. Romero's family owns arable land in Mexico where he plans to farm support himself. He maintains that he has significant family in Mexico. Mr. Romero claims that he has a letter now, verifying that the land exists, which the Parole Board previously requested of him. Mr. Romero is prosocial and without mental illness. He is flexible and seems to have the capacity to adapt relatively easily to changing situations. This bodes well for successful re-entry into free scoiety were he paroled. He possesses the assets of sociability and has the capacity to emotionally and attach to others making him less of risk and more likely to quickly gain the support and positve regard of members of the community he may live in people enhancing his chances to continue the meaningful and productive life style he established while in prison. Mr. Romero impressed this examiner and distinguished himself from the more typical inmate due to the genuineness and candor that he projected throughout all the entire interview. He responded openly and completely to the questions and concerns presented him. He also demonstrated an unusual maturity wherein he seems to have already fully prepared himself and accepted that he may be denied parole again and more likel than not will spend the rest of his life in prison. He shows that he feels that the punishment he has been given is deserved because he took someone's life. Unlike the majority of lifers he showed no signs of self-pity, resentment or bitterness about being locked up indefinitely,even when he expressed that by having gone to prison the greatest loss of his life was losing his family and feeling powerless to provide them with anything more than a phone call, letter or short visits on an infrequent basis. He indicated that if he is to live the rest of his life in prison, he will simply continue his established life of advancing his knowledge and skills, being of service to others and continue to practice his faith. All of these things collectively appear to keep him positive and confident that no matter what happens he will continueto make a life for himself that is meaningful, productive, as happy as is possible and of help to others.

There are no psychiatric reasons to retain him. Mr. Romero poses minimal risk to the community on the condition that he continue his alcohol recovery activities. Mr. Romero is man will likely earn the respect and positive regard of others in any community he may live.

*Elizabeth R. Lewis, PhD*
Elizabeth R. Lewis, Ph.D.
Contract Psychologist
San Quentin State Prison

5

ATTORNEY GENERAL
SAN DIEGO

2007 JUL -5 AM 9: 07