# EXHIBIT 3
# Part 2 of 2

1    days for what happened.  I admit I had a problem with

2    her, but all we had was an argument

3          PRESIDING COMMISSIONER ENG:  But did you pull a

4    knife on her.  Because this was in your interview with a

5    psychologist.  This was not a court document.

6          INMATE ROMERO THROUGH INTERPRETER:  Well, in my

7    files, in my court files it was stated that I had

8    threatened her with a knife, but I never did threaten

9    her with a knife.  We did have problems and we argued.

10   I don't deny that.  That's true.

11         PRESIDING COMMISSIONER ENG:  Okay.  Any other

12   questions, Commissioner?

13         DEPUTY COMMISSIONER HERRON:  No, Ma'am.

14         PRESIDING COMMISSIONER ENG:  Okay.  So I'm going

15   to open it up to Mr. Lockhart.  Any questions you would

16   like posed to this inmate?

17         DEPUTY DISTRICT ATTORNEY LOCKHART:  No, thank

18   you, Commissioner.

19         PRESIDING COMMISSIONER ENG:  Okay.  Ms.

20   Christensen?

21         ATTORNEY CHRISTENSEN:  I do.  Now, this AA group

22   in Puebla, you mentioned that your father is an

23   alcoholic.  So do you know if he attends this group

24   also?

25         INMATE ROMERO THROUGH INTERPRETER:  I don't know.

1    I don't know if he's doing it or not.

2        ATTORNEY CHRISTENSEN:  What about the victim of

3    the crime, Jose Gomez, what are your feelings concerning

4    the effects of the crime on his family?

5        INMATE ROMERO THROUGH INTERPRETER:  The truth is

6    I committed a crime.  I understand that his family was

7    really bothered by it.  And again it was due to the

8    alcohol this happened, and that's why I'm going to avoid

9    all that.

10        ATTORNEY CHRISTENSEN:  Have you done anything to

11    make amends for this?

12        INMATE ROMERO THROUGH INTERPRETER:  Amends of

13    what?

14        ATTORNEY CHRISTENSEN:  Well, one of the 12 steps

15    talks about making amends.  Have you been able to work

16    those steps?

17        INMATE ROMERO THROUGH INTERPRETER:  On step

18    number eight, for example, states that we should

19    identify the persons that we have caused harm to and to

20    do some steps to make up for that.  What I've done

21    honestly is I've tried to put down everything negative

22    that I've done and everything positive that I've done

23    and try to balance it out.

24        ATTORNEY CHRISTENSEN:  Okay.  No more questions.

25        PRESIDING COMMISSIONER ENG:  Anything?  Okay,

1  final statements, Mr. Lockhart.

2      **DEPUTY DISTRICT ATTORNEY LOCKHART:**  Thank you.

3  I'm asking the Board to find the inmate unsuitable for

4  parole because he has failed the first step for

5  suitability, which is acceptance of an insight into the

6  murder for which he is incarcerated.

7      First the inmate says that he stabbed Jose Gomez

8  in self-defense.  Secondly he says he doesn't know how

9  he stabbed Jose Gomez but it must have been what he's

10 characterized as an accident all of these years.  His

11 self-defense claim is absurd for the following reasons.

12 He made the choice to go over there with his buddies to

13 the house belonging to Jose Gomez.  He made the choice

14 to engage in this macho confrontational behavior because

15 his buddy wanted to assert his dominance over Sofia, the

16 woman.  If you read the Appellate opinion which is part

17 of the file, the Court of Appeal said that this was an

18 unprovoked beating by the inmate and his friends.

19      Secondly, the inmate was armed.  Jose Gomez was

20 not.  That's also in the Appellate opinion.  You don't

21 get to bring a knife to a verbal confrontation that you

22 initiate, turn it into a violent confrontation and then

23 assert a self-defense claim.  You can't even bring a

24 knife to a fistfight and assert self-defense without

25 some circumstances indicating that the knife is

1    necessary to keep you from being harmed or killed.

2         What we have here is an initiation by the inmate

3    and his buddies.  They go over there.  They start

4    everything.  They are armed or at least he's armed, and

5    now all of a sudden we claim it's self-defense.  It

6    doesn't make sense.  The testimony moreover from the

7    witnesses that's in various reports in the file, was

8    that the inmate himself grabbed Jose Gomez, pulling Jose

9    Gomez towards him and then stabbed him in the chest.

10        How is it self-defense?  If you're running away

11   from someone who, he says he's crossing the street and

12   going on the other sidewalk.  How -- why would he pull

13   the person from which he's running and afraid and stab

14   him if this is self-defense claim.  It doesn't make

15   sense.

16        Additionally his claim that Jose Gomez, and this

17   is in the psych report, I believe it's in the Board

18   report as well, that Jose Gomez came after him and tried

19   to stab him in the head and he put up his hands and then

20   got the stab wound in the arm does not comport with the

21   evidence that was presented at trial which is that Jose

22   Gomez was unarmed.  And again that's in the Appellate

23   opinion and you can't get around that.

24        The fact that he claims it's an accident is also

25   ridiculous.  He says in the current Board report that it

1    was an accident.  I accidentally stabbed him.  Well, the

2    victim, Jose Gomez, was stabbed eight times, again in

3    the Appellate opinion.  The Appellate opinion further

4    states that at least three of those stab wounds were

5    from the inmate, two of them in the chest.  That's not

6    an accident.  You don't accidentally stab someone at

7    least three times.  Now he's claiming there weren't

8    eight stab wounds.  And the Appellate opinion does say

9    that at least three of them were from him.

10        It might be more believable if the inmate were to

11   claim that he was too drunk to remember what happened,

12   but he can't even do that.  Because he testified at his

13   first trial that he wasn't feeling the effects of

14   alcohol and he had no memory lapse and that's on page

15   two of the Appellate opinion.  So his it's all due to

16   the alcohol excuse conflicts with his own testimony at

17   the first trial.

18        In fact that was the essence of his second appeal

19   was that he testified at the first trial, said I didn't

20   feel any of the effects of alcohol.  I have a clear

21   memory of what happened.  Then at the second trial, he

22   didn't testify and the DA introduced the prior

23   statements and that was the subject of the second appeal

24   was to say that that was in error and the Appellate

25   court said no it was not error and, in fact, made

1  reference to those statements in saying that the inmate

2  did not feel the effects of the alcohol, even though

3  he's a .16.

4       Apparently, at least if you believe his trial

5  testimony, he has a high tolerance for alcohol.  He had

6  a clear memory of what happened.  So he can't sit here

7  and say the alcohol, the alcohol, I don't know why it

8  was going on, how did this accident occur, self-defense,

9  I don't have a clear recollection, it doesn't comport.

10      It's all summed up in the final statement of the

11 Appellate opinion on page six and I'll read therefrom.

12 The court says, "The evidence here was that the unarmed

13 victim was the subject of an unprovoked beating by

14 Romero and his cohorts and that Romero personally

15 stabbed him at least three times, twice in the chest.

16 Romero's own previous testimony negated any claim that

17 his ability to reason was impaired by alcohol.  What

18 more need be said.  It was more than adequate to support

19 a conviction for murder."

20      Nevertheless, he continues after all these years

21 to say this is a self-defense claim.  Obviously the jury

22 didn't buy that twice, and he continues to mislead this

23 Board.  He minimizes his conduct.  He propounds

24 ridiculous excuses that don't fit the evidence.

25      Frankly, I can't believe that anyone ever thought

1  he was suitable for parole given his total lack of

2  insight.  Nor do the previous one year denials

3  adequately reflect how truly unprepared he still is.

4  I'm urging the Board to render a multi year denial

5  thereby communicating to the inmate the seriousness of

6  his lack of insight and how much work he needs to do to

7  prepare himself for a finding of suitability.  Thank

8  you.

9         **PRESIDING COMMISSIONER ENG:**  Ms. Christensen.

10        **ATTORNEY CHRISTENSEN:**  Now that's just

11  ridiculous.  You've got a split decision last time and

12  he's very suitable for parole.  It's time for the

13  taxpayers of the State of California to stop paying for

14  the board and care of this inmate here and send him back

15  to Mexico where he will not attempt to enter California.

16  He has done a lot with his life since coming to prison.

17  He will certainly be leaving a far better person than he

18  was when he entered the institution.  Thanks again to

19  the taxpayers of State of California.

20         He has utilized all the resources available to

21  improve himself.  When he came here, he could not speak

22  English.  He speaks English quite well.  Of course, he

23  has the interpreter here today, but I was able to

24  communicate with him just fine, so he will be returning

25  to Mexico as a bilingual person, which is certainly a

1    feather in his cap.  He has marketable skills that he's

2    acquired.  He has taken numerous self-help groups and,

3    most importantly, since coming to prison, he has

4    discovered that he's an alcoholic and he has taken steps

5    to address that problem.

6        So armed with all of that, he will be returning

7    to Mexico hopefully where he has a loving family ready

8    to accept him back there.  He has land to work, farming,

9    which is the type of work that he did prior to coming to

10   the US.  Really, he is all set to return.  There's an AA

11   group all set up for him to attend as well.

12       Now the inmate has been doing an excellent job

13   here.  He has been behaving himself very well.  No 115s

14   ever, which is highly unusual.  That shows that he can

15   behavior responsibility.  That he certainly knows right

16   from wrong.  He really is a -- He is someone who can be

17   counted upon to make the right choice.  He is able to

18   cope with problems as they occur.  He has been able to

19   do that quite well here in prison.  Otherwise he would

20   have gotten 115s, but no, he's been disciplinary free.

21   So he's shown that he's able to cope with all the stress

22   here in the institution and not resort to alcohol.  And

23   there is no reason to think that when he is returned to

24   Mexico that he would once again revert to his prior

25   irresponsible behavior.  He's shown that he can be

1   responsible.

2        So, all in all, I think that his parole plans are

3   very viable.  I think that he is well prepared to

4   reenter society, back to Mexico and that is where he

5   should be allowed to go and live the rest of his life

6   rather than remain in here in prison.  But I certainly

7   do not think that a multi year denial is at all

8   appropriate in this case.  I think that would be a real

9   travesty.  Thank you.

10       **PRESIDING COMMISSIONER ENG:**  Okay.  Mr. Romero,

11  do you choose to make a final statement regarding your

12  parole suitability to this Panel?

13       **INMATE ROMERO THROUGH INTERPRETER:**  I would only

14  want to ask you one thing.  Give me another opportunity

15  and I will never disappoint you.

16       **PRESIDING COMMISSIONER ENG:**  Okay.  Okay, we'll

17  now recess for deliberations.  The time is 1:57.

18                         R E C E S S

19                          --oOo--

20

21

22

23

24

25

1        CALIFORNIA BOARD OF PAROLE HEARINGS

2                D E C I S I O N

3        **DEPUTY COMMISSIONER HERRON:**  We are on the

4   record.

5        **PRESIDING COMMISSIONER ENG:**  Okay.  The time is

6   2:12 and all parties that were present prior to our

7   recess have returned in the matter of Isedro Romero, R-

8   O-M-E-R-O, CDC number D-07204, the Panel has reviewed

9   all information received from the public and relied on

10  the following circumstances in concluding that the

11  prisoner is not suitable for parole and would pose an

12  unreasonable risk of danger to society or a threat to

13  public safety if released from prison.

14        The Panel finds that the commitment offense was

15  carried out in a very cruel, very cold and callous

16  manner, in that this inmate along with his friends, his

17  crime partners, decided to go over to the victim, Mr.

18  Gomez's house and basically crash a party.  They ended

19  up getting into an altercation whereby the inmate ended

20  up stabbing to death the host of the party, who was

21  unarmed.

22        It was carried out in a manner that demonstrated

23  a very callous disregard for human suffering.  The

24  victim sustained anywhere from four to eight, we're not

25  ISEDRO ROMERO      D-07204      DECISION PAGE 1      3/7/07

75

```
 1   exactly sure, but based on the Appellate decision I
 2   read, it stated eight.  He was stabbed eight time.  And
 3   that basically after this altercation, the inmate and
 4   his other crime partners just took off and left without
 5   any regard for whether or not Mr. Gomez was dead or
 6   alive.
 7        The motive of the crime was extremely trivial in
 8   relation to the offense and, actually based on
 9   everything that we have read, this Panel does not
10   understand what motivated, what the true motivation for
11   Mr. Gomez losing his life that evening truly was.  It
12   appears that the inmate and his friends were going over
13   to this party and they were trying to extricate one of
14   his friend's girlfriend who didn't want to leave and
15   somehow a brawl broke out.  And this victim ended up
16   being stabbed to death.
17        However the versions somewhat differ from what I
18   really read out of the Statement of Facts.  And again
19   the conclusions are drawn from the Statement of Facts
20   and where is on the -- in the early morning around one
21   a.m. on January 23rd, 1982, Mr. Romero, along with
22   Sergio Cruz, Arturo Cruz, and Mr. Gutierrez, and  Mr.
23   Jimenez, went over to the residence of Jose Gomez where
24   a party was going on.
25   ISEDRO ROMERO     D-07204        DECISION PAGE 2     3/7/07
```

1        And they, again, reportedly went over to the

2   residence to pick up Sergio's girlfriend.  But almost

3   immediately upon their arrival at the party, a fight

4   ensued between Jose and the inmate, Mr. Romero.

5        And according to a lot of the readings of the

6   document that we have at our disposal, Romero was seen

7   by witnesses at the party grabbing Jose's hair and

8   pulling him forward and stabbing him in the chest area.

9   It also goes on to state that six members of the group

10  that arrived with Romero then left the area.  Three left

11  via a vehicle that they had arrived in and three left by

12  foot.  During this altercation, somehow Mr. Romero had

13  sustained a stab wound in his left forearm.

14       Regarding a previous record, this inmate does

15  have an escalating pattern of criminal conduct that led

16  up to this life crime.  And based on his prior record,

17  he has failed previous grants of probation.  He has

18  failed to profit from society's previous attempts to

19  correct his criminality.  And these attempts do include

20  adult probation.

21       And his prior criminality does include an arrest

22  in 1978 in Garden Grove from drunk driving where he

23  received probation.  And then in 1981, he was arrested

24  by the Orange Police Department for assault where he

25  **ISEDRO ROMERO      D-07204      DECISION PAGE 3      3/7/07**

1  received probation.

2      And regarding that assault, in the recent

3  psychological evaluation, it does state that even though

4  the inmate denies this, it states that he had threatened

5  his ex-girlfriend with a knife.  But again, the inmate

6  does deny that happening.

7      But all this led up to that night or the early

8  morning hours of January 23rd where this inmate who was

9  in the habit of walking around with a knife on him,

10 ended up pulling that knife out and murdering Mr. Gomez.

11     Regarding this inmate's institutional behavior,

12 we find that his misconduct while incarcerated include

13 two 128(a) counseling chronos, the last one being in

14 August of '93 for a positive skin test.

15     The psychological report dated June of 2005 and

16 authored by Dr. E. Lewis, L-E-W-I-S, this Panel finds it

17 somewhat inconclusive in that they do state that if

18 released to the outside community, Mr. Romero based

19 static factors for increased risk -- increased violence

20 potential when compared to the average member of the

21 general population, that he is at increased risk because

22 of the fact that he's a man, he's committed violence

23 before, he's single, and he has a history of alcohol

24 abuse.  But they go on to basically state that he's

25 **ISEDRO ROMERO    D-07204    DECISION PAGE 4    3/7/07**

1  likely to lower his risk for violence just by aging

2  alone.   The fact that he's over 40 and several other

3  things.

4       However, what's of great concern is that this

5  doctor does state that because of the established

6  actuarial and clinical risk factors in this case, Mr.

7  Romero will never pose as low a risk as the average

8  member of the general population.  And that according to

9  this particular psychologist, if Mr. Romero is released

10  back into the community, and if he were to remain free

11  of alcohol, he would pose a minimal risk of

12  dangerousness to others.

13       The minimal risk that he currently poses is

14  contingent upon Mr. Romero's commitment to lifelong

15  sobriety by continuing to attend Alcoholic's Anonymous

16  or participate in alternate alcohol recovery activities

17  in the United States or Mexico.  And that they go on to

18  state the foremost risk factor if released in the

19  community is again the potential for alcohol relapse.

20  And that there's a clear established link between Mr.

21  Romero's past consumption of alcohol and the commission

22  of violence.  Were he to resume drinking, his violence

23  potential significantly increases.

24       One of the alarming factor that this Panel sees

25  **ISEDRO ROMERO     D-07204      DECISION PAGE 5     3/7/07**

1   is that coupled with what the psychological evaluation

2   states that really focuses on your high risk should you

3   ever return to substance abuse, one of the things that's

4   of great concern was that during the hearing we did

5   note, this Panel did note that it did not appear to us

6   that your attendance in the substance abuse program was

7   of the utmost priority in your life.

8           You stated that you had other things to do and a

9   conflict in your schedule that prohibited you from

10  attending some of your AA meetings.  And especially when

11  I specifically asked you what happened because you only

12  attended once in the year 2000, twice in the year 2002,

13  nothing in '01, once in '03, and nothing in '04, '05,

14  and then you picked it back up.

15          So of great concern, sir, is that if this were

16  the top priority in your life, that would never happen.

17  You would fully understand that continued support in

18  keeping you sober is the number one goal in your life to

19  survive.

20          We do note that this inmate did submit some

21  parole plans in his last country of legal residence in

22  Mexico.  It was a 2005 letter, and the Panel does

23  understand it's difficult to get the letters current

24  especially after one year and then translated.  But he

25  **ISEDRO ROMERO      D-07204      DECISION PAGE 6      3/7/07**

1  did provide some documentation referring to his parents

2  and his father specifically in the farm land that he

3  does own and the support that he was offering.

4       However, we're not sure about acceptable

5  employment plans back in Mexico except that what the

6  inmate stated that he would go back to farming.

7  However, again, the caveat, what leaves questions in

8  this Panel's mind about this is what you had before when

9  you chose to live initially and come to the United

10  States and now you're going back to that.

11       And the same thing with there's some discomfort

12  in this Panel knowing that what you had admitted that

13  the culture that you grew up with the fact that your

14  father was a heavy drinker and may be an alcoholic and

15  that the culture that's surrounding and the way you grew

16  up was that everybody drinks.

17       So it is of grave concern that you would be

18  returning back to that same culture of drinking when you

19  admitted that when you drink and you get drunk you do

20  get violent.  Okay.

21       Well, we do note that the District Attorney's

22  Office of Orange County, the representative was present

23  and stated their opposition to parole at this time.

24  What did I do with that letter?  We also note that we

25  **ISEDRO ROMERO     D-07204     DECISION PAGE 7     3/7/07**

1  had a response to the 3042 notices that the city of

2  Anaheim Police Department also stated in writing their

3  opposition to parole at this time.

4        The Panel makes the following findings:  That the

5  prisoner does need to continue with all types of

6  documented self-help in order to face, discuss,

7  understand, and cope with stress in a nondestructive

8  manner.  Until progress is made, the prisoner continues

9  to be unpredictable and a threat to others.

10       And sir, it's not just stress.  It's really do

11 whatever you need to do to get a better understanding

12 and to be able to communicate with a future Panel as to

13 what brought you to make the decisions that you did that

14 evening.  There's a lot of questions and we ended up

15 leaving here with more questions than what we have

16 answers for.  And that to understand what functional

17 alcoholism is.  It appears that you have a very high

18 tolerance for a certain level of alcohol.  And we really

19 question whether or not, how inebriated you really were

20 during the life crime, okay.

21       So basically, sir, we're giving you another one

22 year denial.  And I highly recommend that you use that

23 time wisely to get additional self-help, to get a better

24 understanding of why you did the things you did.  We

25  **ISEDRO ROMERO     D-07204     DECISION PAGE 8     3/7/07**

1   recommend that you remain disciplinary free, and that if

2   available, you continue to upgrade vocationally and

3   educationally, and also participate in self-help.  And

4   update those support letters, okay?

5         That concludes the reading of -- the hearing.

6   Any comments, Commissioner.

7         **DEPUTY COMMISSIONER HERRON:**  No, Ma'am.

8         **PRESIDING COMMISSIONER ENG:**  Okay, the time is

9   2:25, thank you.

10                        --o0o--

11

12

13

14

15

16

17

18

19

20

21  PAROLE DENIED ONE YEAR

22  THIS DECISION WILL BE FINAL ON:_____**JUL 0 5 2007**_____

23  YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

24  DATE, THE DECISION IS MODIFIED.

25  ISEDRO ROMERO     D-07204     DECISION PAGE 9     3/7/07

*Capitol Electronic Reporting*

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, SANDRA TILLMAN, as the Official Transcriber,

hereby certify that the attached proceedings:

| | | |
|---|---|---|
| In the matter of the Life | ) | CDC Number:    D-07204 |
| Term Parole Consideration | ) | |
| Hearing of: | ) | |
| | ) | |
| ISEDRO ROMERO | ) | |
| | ) | |

SAN QUENTIN STATE PRISON

SAN QUENTIN, CALIFORNIA

MARCH 7, 2007

12:14 P.M.

were held as herein appears.  Further, this transcript

is a true, complete, and accurate record, to the best of

my ability, of the recorded material provided for

transcription.

Sandra Tillman
April 25, 2007
Capitol Electronic Reporting

EXHIBIT "B"

96

1          SANTA ANA, CALIFORNIA – THURSDAY, JULY 8, 1982

2                      MORNING SESSION

3               (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN

4    COURT IN THE PRESENCE OF THE JURY:)

5          MR. GOETHALS:  WITH THE COURT'S PERMISSION, WE HAVE

6    AGREED TO INTERRUPT THE PRESENT WITNESS FOR ANOTHER WITNESS

7    TO TESTIFY VERY BRIEFLY.

8          THE COURT:  THAT'S FINE.  CALL THAT WITNESS.

9          MR. GOETHALS:  PEOPLE CALL DR. ROBERT RICHARDS.

10                    ROBERT GEORGE RICHARDS,

11   CALLED AS A WITNESS BY THE PEOPLE, WAS DULY SWORN AND

12   TESTIFIED AS FOLLOWS:

13         THE CLERK:  DO YOU SOLEMNLY SWEAR THAT THE TESTIMONY

14   YOU ARE ABOUT TO GIVE IN THE CASE NOW PENDING BEFORE THIS

15   COURT SHALL BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT

16   THE TRUTH SO HELP YOU GOD?

17         THE WITNESS:  I DO.

18         THE CLERK:  STATE YOUR FULL NAME AND SPELL YOUR

19   LAST NAME.

20         THE WITNESS:  ROBERT GEORGE RICHARDS,

21   R-I-C-H-A-R-D-S.

22                    DIRECT EXAMINATION

23         Q    BY MR. GOETHALS:  YOU'RE A MEDICAL DOCTOR;

24   IS THAT CORRECT, SIR?

25         A    YES.

26         Q    HOW LONG HAVE YOU BEEN AN M.D.?

97

1        A      SINCE 1948.

2        Q      WOULD YOU DESCRIBE YOUR MEDICAL BACKGROUND AND

3    EXPERIENCE?

4        A      FOUR YEARS OF MEDICAL SCHOOL, FOUR YEARS

5    OF RESIDENCY, AND MY PRACTICE IS LIMITED TO PATHOLOGY.

6               I'M LICENSED IN THE STATE OF CALIFORNIA AND

7    I'M CERTIFIED IN CLINICAL ANATOMIC AND FORENSIC --

8        MR. KIES: I WILL STIPULATE TO HIS QUALIFICATIONS.

9        THE COURT:  ACCEPTABLE?

10       MR. GOETHALS:  YES.

11       THE COURT: YOU WILL CONSIDER DR. RICHARDS AN EXPERT

12   IN ALL AREAS IN WHICH HE TESTIFIES.

13              ASK YOUR NEXT QUESTION.

14       Q      BY MR. GOETHALS:  WORKING AS A PATHOLOGIST,

15   ARE YOU CURRENTLY UNDER CONTRACT WITH THE COUNTY OF

16   ORANGE TO DO AUTOPSIES?

17       A      YES, I'VE BEEN DOING THAT FOR 25 YEARS.

18       Q      DIRECTING YOUR ATTENTION TO JANUARY 30, 1982

19   AT APPROXIMATELY 11:15 IN THE MORNING, DID YOU HAVE OCCASION

20   TO PERFORM AN AUTOPSY ON A DECEASED IDENTIFIED AS JOSE

21   GOMEZ?

22       A      YES, I DID.

23       Q      WHERE DID YOU PERFORM THAT AUTOPSY?

24       A      AT THE NEW FACILITY OVER HERE.

25       Q      THE ONE ADJACENT TO THE SHERIFF'S OFFICE AND

26   JAIL?

98

1        A    YES.

2        MR. GOETHALS:  MAY I APPROACH THE WITNESS, YOUR

3    HONOR?

4        THE COURT: YES.  WE MAY AS WELL DISPENSE WITH THE

5    REQUEST TO APPROACH THE WITNESS, CLERK, AND THE BOARD,

6    SINCE NOBODY COMPLIES WITH IT ANYWAY -- LITTLE HUMOR,

7    VERY LITTLE.

8        MR. KIES: MAY WE APPROACH?  I BELIEVE WE HAVE A

9    STIPULATION, YOUR HONOR.

10        THE COURT: FRAME IT.

11        MR. KIES:  THAT THE -- IT WOULD BE STIPULATED THAT

12    IF A RELATIVE -- WELL, THE BASIC STIPULATION IS, YOUR HONOR,

13    IS THAT JOSE GOMEZ THAT DR. RICHARDS DID THE AUTOPSY ON

14    IS THE SAME JOSE GOMEZ WHO WAS IDENTIFIED AS BEING IN THE

15    FIGHTING ON JANUARY 22, 1982 OUTSIDE OF 431 KODIAK.

16        THE COURT:  AND THAT, OF COURSE, HE WAS A  LIVE

17    HUMAN BEING PRIOR TO DR. RICHARDS' OBSERVING HIM DURING

18    THE AUTOPSY?

19        MR. KIES:  THAT'S CORRECT.

20        THE COURT:  SO STIPULATED?

21        MR. GOETHALS:  YES, YOUR HONOR.

22        THE COURT:  THAT STIPULATION IS ENTERED.

23        LADIES AND GENTLEMEN, THAT FACT IS

24    CONCLUSIVELY PROVED, THAT IT IS THE SAME INDIVIDUAL.

25        Q    BY MR. GOETHALS:  DR. RICHARDS, DURING THE

26    COURSE OF YOUR AUTOPSY ON JOSE GOMEZ, DID YOU FIND ANY

99

1   WOUNDS ON HIS BODY?

2          A       THERE WAS A FATAL STAB WOUND IN THE LEFT

3   CHEST THAT PENETRATED THE HEART.

4                  THERE WAS A STAB WOUND IN THE RIGHT CHEST

5   THAT DID NOT PENETRATE BEYOND THE BONE OF THE CHEST.

6                  THERE WAS A STAB WOUND IN THE HIP, RIGHT

7   HIP, THAT WAS ABOUT TWO AND A HALF INCHES DEEP.

8                  AND THERE WAS A VERY SUPERFICIAL SLICE TO

9   THE LEFT UPPER ARM.

10         Q       OF THE FOUR WOUNDS THAT YOU MENTIONED, FROM

11  WHAT YOU'VE MENTIONED, I WOULD ASSUME THAT IT WAS THE LEFT

12  CHEST WOUND THAT WAS THE MOST SERIOUS; IS THAT CORRECT?

13         A       THAT WAS THE FATAL ONE, YES.

14         Q       COULD YOU EXPLAIN TO THE JURY WHY THAT

15  PARTICULAR WOUND WAS A FATAL WOUND?

16         A       IT PENETRATED THE HEART.

17         Q       SO IT PUNCTURED THE HEART?

18         A       YES.

19         Q       HOW DID THAT CAUSE DEATH?

20         A       COULD BE LOSS OF BLOOD, PRIMARILY.

21                 THE BLEEDING INTO THE PERICARDIAC SAC --

22  THE HEART IS IN THE SAC AND FILLING THAT SAC WITH BLOOD

23  WOULD CERTAINLY MAKE IT A VERY POOR PUMP.  THAT IS, IT

24  WOULD NOT BE ABLE TO EXPAND AND TO TAKE BLOOD IN OR PUMP

25  BLOOD OUT EFFECTIVELY.

26         Q       FROM WHAT YOU'VE SAID, AND FROM ANY BASIC

100

1  UNDERSTANDING, I WOULD ASSUME IT'S A FAIRLY SERIOUS WOUND

2  AS SOON AS IT'S ADMINISTERED OR INFLICTED; IS THAT TRUE?

3          A     YES, IT'S FATAL FOR ALL INTENTS AND

4  PURPOSES.

5          Q     IS IT POSSIBLE THAT A PERSON WHO HAS BEEN

6  STABBED IN THE MANNER THAT YOU FOUND THAT OCCURRED TO

7  JOSE GOMEZ, IS IT POSSIBLE THAT SUCH A PERSON COULD REMAIN

8  UPRIGHT AND WALK AROUND FOR SOME PERIOD OF TIME AFTER

9  RECEIVING THAT TYPE OF WOUND?

10          A     IT'S POSSIBLE, YES.

11                I'VE SEEN CASES THAT WERE UP AND ACTIVE FOR

12  POSSIBLY TEN SECONDS, 12 SECONDS.

13          Q     WHEN YOU DID THE AUTOPSY ON JOSE GOMEZ DID

14  YOU SEE ANY INDICATION OF ANY RECENT MEDICAL TREATMENT OR

15  SURGERY?

16          A     YES.  THERE WAS QUITE A BIT.

17          Q     COULD YOU DISTINGUISH BETWEEN YOUR AUTOPSY,

18  THE SURGICAL INCISIONS, FROM WHAT YOU DESCRIBED AS THE

19  STAB WOUNDS?

20          A     YES.

21          Q     WAS THERE ANYTHING IN PARTICULAR THAT ALLOWED

22  YOU TO TELL ONE FROM THE OTHER?

23          A     MOST OF THE SURGERIES WERE SUTURED OR

24  CONTAINED DRAINS, YOU KNOW, THAT YOU WOULD ANTICIPATE THEN

25  WERE FOR THE BENEFIT OF THE INDIVIDUAL AND WERE SURGICALLY

26  INDUCED.

1    Q    SO THE FOUR WOUNDS YOU'VE TALKED ABOUT WITH

2  US WERE STAB WOUNDS RATHER THAN SURGICAL INCISIONS; IS

3  THAT RIGHT?

4    A    THAT'S RIGHT.

5    MR. GOETHALS:  THANK YOU.  I DON'T HAVE ANY

6  FURTHER QUESTIONS.   -- OH, EXCUSE ME, YOUR HONOR.

7  WE HAVE ENTERED INTO ANOTHER STIPULATION, I BELIEVE.

8         AND, THAT IS, DURING THE COURSE OF

9  DR. RICHARDS' AUTOPSY, BLOOD WAS REMOVED FROM THE DECEASED

10  JOSE GOMEZ, AND THAT IT WAS SUBSEQUENTLY EXAMINED BY A

11  PERSON QUALIFIED TO DO THAT, THAT THE BLOOD ALCOHOL LEVEL

12  WAS FOUND TO BE .12;

13         ADDITIONALLY SCREENED FOR DRUGS AND NO DRUGS

14  FOUND IN MR. GOMEZ'S SYSTEM.

15    THE COURT:  SO STIPULATED?

16    MR. KIES:  YES, YOUR HONOR.

17         COULD I HAVE A DISCUSSION WITH THE

18  DISTRICT ATTORNEY FOR ONE BRIEF MOMENT?

19    THE COURT:  YES.  GO AHEAD.

20         (DISCUSSION BETWEEN COUNSEL, OFF THE RECORD.)

21    MR. GOETHALS:  YOUR HONOR, COULD I APPROACH THE

22  WITNESS AND ASK HIM A QUESTION, JUST BETWEEN THE TWO OF US,

23  FOR THE PURPOSE OF CLARIFYING THE STIPULATION?

24    MR. KIES:  AND --

25    THE COURT:  YES.

26    MR. KIES:  -- THAT'S AT MY REQUEST.

102

1          (DISCUSSION BETWEEN THE DISTRICT ATTORNEY AND

2     THE WITNESS, OFF THE RECORD.)

3          MR. GOETHALS:  THANK YOU, YOUR HONOR.

4               (DISCUSSION BETWEEN COUNSEL, OFF THE RECORD.)

5          MR. GOETHALS:  YOUR HONOR, I'D LIKE TO ALTER THE

6     STIPULATION SLIGHTLY, IF I COULD.

7               THE STIPULATION WOULD BE AS FOLLOWS:

8               BLOOD WAS DRAWN FROM JOSE GOMEZ WHEN HE WAS

9     TAKEN TO THE HOSPITAL BY THE PARAMEDICS SHORTLY AFTER THE

10    TIME HE WAS STABBED, AND THAT BLOOD WAS ANALYZED AND FOUND

11    TO CONTAIN .12 PERCENT ALCOHOL AND NO DRUGS.

12         MR. KIES: SO STIPULATED.

13         THE COURT : THAT STIPULATION IS ENTERED AND IT IS

14    CONCLUSIVELY PROVED.

15         MR. GOETHALS:  THANK YOU, YOUR HONOR.  NO FURTHER

16    QUESTIONS.

17         THE COURT: YOU MAY CROSS-EXAMINE.

18              CROSS-EXAMINATION

19    Q     BY MR. KIES:  WERE YOU ABLE TO TELL WHETHER

20    THE STAB WOUND ON THE HIP WAS INFLICTED FIRST, AS OPPOSED

21    TO THE STAB WOUNDS IN THE CHEST AREA, OR VICE VERSA?

22    A     NO, I WOULDN'T BE ABLE TO TELL THAT.

23    Q     NOW, YOU'VE LIMITED THE ACTIVE PERIOD THAT

24    YOU BELIEVE IT'S POSSIBLE FOR A PERSON RECEIVING SUCH A

25    WOUND TO TEN OR 12 SECONDS.

26              WOULD YOU BELIEVE IT POSSIBLE FOR SUCH A

103

1  PERSON TO, IN A SENSE, REMAIN IN COMBAT; IN OTHER WORDS,

2  MOVE TO DEFEND SOMEONE FOR, LET'S SAY, A PERIOD OF HALF A

3  MINUTE?

4      A    I THINK THE BEST WAY TO ANSWER THAT IS THAT

5  A YEAR AGO I USED TO FEEL THAT IF YOU HAD A HEART INJURY

6  YOU FELL LIKE A STONE, NO MORE ACTIVITY.

7           HOWEVER, DURING THAT PERIOD OF TIME CERTAIN

8  CASES HAVE OCCURRED THAT HAD TIME DURATION, THAT IS, FATAL

9  HEART INJURY STAB WOUNDS, GUNSHOT, THAT HAD AS MUCH AS

10 10 OR 12 SECONDS.  THEREFORE, I FEEL IT'S REASONABLE TO

11 ASSUME THAT ON AN OCCASION THIS CAN OCCUR.

12           I DON'T RECALL EVER HAVING ONE, YOU KNOW, FOR

13 30 SECONDS.

14      Q    WOULD THE AGE AND THE HEALTH OF THE PERSON

15 RECEIVING THE WOUND BE A FACTOR IN DETERMINING HOW SUCH A

16 PERSON COULD REMAIN ACTIVE?

17      A    YES, AND POSSIBLY WILL WOULD ALSO BE A

18 FACTOR.

19      Q    SO IF THE INJURED PERSON WITH AN INJURY IN

20 THE HEART HAD BEEN STIMULATED, LET'S SAY, VERY STRONGLY

21 STIMULATED IN COMBAT OF SOME SORT, IT WOULD BE MORE LIKELY

22 THAT THAT PERSON COULD REMAIN ACTIVE FOR A LONGER PERIOD?

23      A    IT'S POSSIBLE.

24      Q    WERE YOU ABLE TO DETERMINE WHETHER THERE WAS

25 ANY OTHER PRE-EXISTING BRUISING ON THE BODY OF MR. GOMEZ?

26      MR. GOETHALS:  I'D OBJECT.  IT'S VAGUE AS TO WHAT

104

1   CONSTITUTES PRE-EXISTING.

2           THE COURT:  SUSTAINED.

3           Q     BY MR. KIES:  WELL, CALL IT BRUISING CAUSED

4   BY STRIKING OF SOME SORT, OTHER THAN BRUISING CAUSED BY

5   HOSPITAL PROCEDURES, MEDICAL PROCEDURES.

6           A     THERE WAS A BRUISE ON THE UPPER LIP AND A

7   CRUSTING, HEALING TYPE OF PROCESS ON THE LOWER LIP.

8           Q     DID YOU NOTICE ANY OTHER, LET'S SAY, MINOR

9   ABRASIONS OR CUTS?

10          A     I'D HAVE TO REFRESH MY MEMORY.

11          Q     PLEASE DO, DOCTOR, OTHER THAN WHAT MAY HAVE

12  BEEN CAUSED BY MEDICAL PROCEDURES.

13          A     I HAVE NO RECORDS.  PERHAPS THE PHOTOGRAPHS

14  MIGHT SHOW MORE.

15          Q     NOW, IF WITNESSES INDICATED THAT THEY SAW

16  VERY LITTLE BLOOD ON THE OUTSIDE OF THE BODY OF THIS

17  MR. GOMEZ, AT LEAST INITIALLY WHILE HE WAS STILL, LET'S

18  SAY, MOVING, WOULD THAT INDICATE TO YOU THAT POSSIBLY

19  BLOOD PRESSURE WAS BEING MAINTAINED IN MR. GOMEZ'S SYSTEM

20  BY EITHER A SLOWER LEAKAGE THROUGH THE HEART OR BY THE

21  HEART STABBING -- I FORGET THE EXACT WORD YOU USE FOR THE

22  HEART STABBING -- WOULD THAT MAINTAIN PRESSURE FOR A PERIOD

23  OF TIME?

24          A     IT WOULD -- THERE WOULDN'T BE ANYTHING IN THE

25  PROCESS THAT WOULD GO ON THAT WOULD AID OR ABET BLOOD

26  PRESSURE.

105

1    THE STAB WOUND EXTENDED FROM THE -- RIGHT

2  THROUGH THE SEPTUM INTO THE LEFT HEART, SO THE PRESSURE

3  THAT YOU'RE REALLY WORKING UNDER WOULD BE NORMAL BLOOD

4  PRESSURE, THAT IS, YOU KNOW, SAY 120 OVER 80 OR SOMETHING

5  OF THAT SORT, AND THAT'S EXPRESSED IN MILLIMETERS OF

6  MERCURY.

7    IT'S A GOOD HEAD OF PRESSURE SO THAT THAT

8  BLOOD UNDER THAT PRESSURE WOULD BE LEAKING OUT.

9    OF COURSE, FIRST IT WOULD FILL UP THE SAC

10  WHICH PROBABLY WOULDN'T TAKE A VERY LONG PERIOD OF TIME.

11  I THINK THE ONLY REASON THAT YOU PROBABLY WOULDN'T GET

12  BLOOD SHOWN RIGHT AWAY WOULD BE THAT A STAB WOUND WOULD

13  CLOSE, TEND TO APPROXIMATE THE EDGES, AND MIGHT RETAIN THE

14  BLOOD INSIDE FOR A PERIOD OF TIME.

15    Q    WELL, THE BASIC CAUSE OF DEATH IS THAT

16  ULTIMATELY THE BLOOD CIRCULATION SYSTEM RUNS OUT OF BLOOD;

17  IS THAT CORRECT?

18    A    YES. IT'S THE BLEEDING, LOSS OF CIRCULATING

19  VOLUME AND, AS I MENTIONED BEFORE, IT WOULD ALSO -- EXCUSE

20  ME -- ALSO BE THE LOSS OF FUNCTION TO THE HEART BY FILLING

21  THE PERICARDIAL SAC WITH BLOOD;

22    IN OTHER WORDS, IT'S LIKE YOUR ARMS.  YOU

23  HAVE PRETTY STRONG FLEXERS BUT WEAKER EXTENDERS, SO THAT

24  THE HEART HAS VERY GOOD CONTRACTING MUSCLE, BUT IT DOESN'T

25  HAVE ANYTHING TO EXPAND IT.

26    THAT'S DONE BY GRAVITY SO AS THE HEART SAC

106

1    FILLS UP IT WOULD PUSH THE HEART MORE AND MORE, IT WOULD

2    CONTRACT LESS, IT WOULD CONTRACT POORER.

3                LET'S SAY THE TRAUMA TO THE HEART ITSELF

4    THAT CAUSES THE HEART TO STOP; IN OTHER WORDS, THE HEART,

5    IN A SENSE, KEEPS ON BEATING BUT IN A WEAKER MANNER.

6                THE CONDUCTION SYSTEM COULD BE INVOLVED AND,

7    AS SUCH, THERE MIGHT BE A FACTOR.

8                THE STAB WOUND WENT THROUGH THE SEPTUM AND

9    THE SEPTUM IS WHERE THE CONDUCTION SYSTEM FLOWS, IN OTHER

10   WORDS, THE ELECTRICAL  IMPULSE TO THE HEART WOULD BE IN

11   THAT REGION.

12       Q    BUT IF THAT OCCURRED YOU WOULD EXPECT THAT

13   THE DECEASED WOULD IMMEDIATELY FALL ON HIS FACE IF THE

14   HEART STOPPED IMMEDIATELY?

15       A    YES, I WOULD.

16   MR. KIES:  ALL RIGHT. I HAVE NOTHING FURTHER.

17   THE COURT:  ANY REDIRECT?

18   MR. GOETHALS:  YES, YOUR HONOR.

19                REDIRECT EXAMINATION

20       Q    BY MR. GOETHALS:  DOCTOR, YOU SAY IN RESPONSE

21   TO COUNSEL'S QUESTION, I THINK THAT AT ONE TIME IN YOUR

22   MEDICAL CAREER YOU FELT THAT IF SOMEONE RECEIVED A FATAL

23   HEART WOUND THEY SHOULD FALL LIKE A STONE; IS THAT RIGHT?

24       A    YES.

25       Q    DURING THE COURSE OF YOUR CAREER, HAVE YOU

26   SEEN THINGS OR HAD DISCUSSIONS WITH PEOPLE CONCERNING PEOPLE

107

1    WHO ARE DECEASED THAT YOU PERFORMED AUTOPSIES THAT HAVE

2    CAUSED YOU TO CHANGE THAT OPINION?

3            A      YES.

4            Q      CAN YOU GIVE AN EXAMPLE OF THE TYPE OF THING

5    THAT YOU HAVE EXPERIENCED THAT'S CAUSED YOU TO CHANGE YOUR

6    OPINION?

7            A      WELL, THERE WAS A PAWN SHOP HOLD-UP AND THE

8    OWNER SHOT THE ROBBER AT THE DOOR AND, OF COURSE, THE

9    ROBBER SHOT THE OWNER.  HE FELL DOWN BEHIND THE CABINET.

10           AND THE ASSAILANT MADE IT A DISTANCE OF

11   10 OR 12 FEET FROM THE DOOR TO THE CABINET AND WAS, YOU

12   KNOW, TRYING TO FINISH OFF THE OWNER WHEN HE DIED, WHICH

13   AT THAT TIME I FELT WAS, YOU KNOW, IMPOSSIBLE PRACTICALLY.

14           AND THEN THERE WAS ANOTHER INSTANCE WHERE IT

15   WAS WITNESSED THAT THIS MAN WAS SHOT IN THE MIDDLE OF THE

16   BLOCK AND HE RAN THE BALANCE OF THE BLOCK, ACROSS THE

17   STREET, AND COLLAPSED IN A PARKING LOT, WHICH WAS A DISTANCE

18   OF MORE THAN A HUNDRED YARDS.  SO HE MUST HAVE BEEN A VERY

19   GOOD RUNNER AND THAT WOULD BE, YOU KNOW, 10, 12 SECONDS,

20   PROBABLY, WHICH WOULD BE THE MAXIMUM TIME THAT I'M REALLY

21   AWARE OF.

22           Q      AND HAD BOTH OF THOSE PEOPLE THAT YOU'RE

23   TALKING ABOUT RECEIVED WOUNDS DIRECTLY TO THE HEART?

24           A      THEY WERE BOTH WOUNDS TO  THE HEART.

25           Q      THE TYPE THAT YOU HAD PREVIOUSLY EXPECTED A

26   PERSON TO FALL LIKE A STONE?

108

1    A    THAT'S CORRECT.

2    Q    IN THIS CASE WHEN YOU DID THE AUTOPSY ON

3    JOSE GOMEZ, COULD YOU CHARACTERIZE FOR THE JURY WHAT HIS

4    HEALTH WAS EXCEPT FOR THE STAB WOUNDS; IN OTHER WORDS, DID

5    YOU FIND THAT HE HAD ANY OTHER MEDICAL PROBLEM OR WAS HE

6    IN GOOD HEALTH?

7    A    HE WAS IN GOOD HEALTH.

8    MR. GOETHALS:  THANK YOU.  I DON'T HAVE ANY

9    FURTHER QUESTIONS.

10    THE COURT:  RECROSS?

11                    RECROSS-EXAMINATION

12    Q    BY MR. KIES:  DR. RICHARDS, THERE IS A

13    SUBSTANTIAL DIFFERENCE BETWEEN A WOUND CAUSED BY A BULLET

14    AS OPPOSED TO A WOUND CAUSED BY A SHARP KNIFE; IS THAT

15    CORRECT?

16    A    I THINK YOU CAN IDENTIFY THE DIFFERENCE.

17    I DON'T UNDERSTAND WHAT --

18    Q    WELL, A BULLET CAUSES SEVERE TRAUMA NOT ONLY

19    AS FAR AS THE HOLE GOING IN, BUT IT ALSO, TO A WIDER AREA,

20    BESIDES THE, CALL IT THE CIRCUMFERENCE OF THE BULLET,

21    BECAUSE OF COMPACTION OF THE MEMBRANES?

22    A    YES.

23    Q    NOW, FOR EXAMPLE, IN THIS PARTICULAR CASE

24    WE HAVE A KNIFE WOUND; IS THAT CORRECT?

25    A    YES.

26    Q    FROM LOOKING AT THE WOUND, I BELIEVE IT --

109

1    WAS IT YOUR MEDICAL DECISION THAT THIS WAS A SHARP KNIFE?

2          A     YES.

3          Q     ALL RIGHT.

4                AND THUS THE WOUND WAS A VERY, ONE, A VERY

5    NARROW WOUND AS FAR AS WIDTH?

6          A     YES.

7          Q     AND A VERY CLEAN WOUND AS FAR AS THE AREA?

8    OR, LET'S SAY, A VERY SMALL WOUND AS FAR AS THE AREA IN

9    WHICH IT CAUSED IMMEDIATE DAMAGE?

10         A     COMPARED TO A BULLET, YES.

11         Q     IN FACT, A BULLET WOULD HAVE CAUSED A TRAUMA

12   TO THAT PARTICULAR AREA, LET'S SAY, AS FAR AS AREA GOES,

13   A HUNDREDFOLD WORSE?

14         A     I DON'T KNOW IF I CAN GO THAT FAR.

15               OF COURSE, THE INJURY THAT THE BULLET WOULD

16   PRODUCE WOULD DEPEND ON THE VELOCITY AND THE TYPE OF SLUG.

17               I THINK THE ONLY THING THAT THEY WOULD SHARE,

18   THAT IS, THE SLOW, SMALL SLUG OR A FAST, LARGER SLUG, WOULD

19   BE WHAT APPEARS TO BE AN ERUPTION.

20               WELL, IT'S LIKE WHEN YOU POP A BALLOON OR A

21   BALLOON FULL OF WATER, YOU HAVE THE MOVEMENT OF THE BULLET

22   AND THEN YOU HAVE THE EXPANSIVE MOVEMENT OF THE FLUID AS

23   WELL THAT PRODUCES A GREATER TEARING.

24         Q     AND THIS DOES NOT OCCUR WHEN YOU HAVE A SHARP

25   KNIFE INVOLVED?

26         A     THAT'S TRUE.

110

1      Q      WERE YOU ABLE TO DETERMINE THE MEASUREMENTS

2   OF THE WOUND AT THE ENTRY POINT IN THE HEART?

3      A      MAY I?

4      Q      YES, PLEASE.

5      A      THE REPORT HAS NO MEASUREMENT.

6             AS I RECALL, THEY WERE ABOUT A HALF AN INCH.

7   THEY WERE SMALL.

8      Q      HALF AN INCH IN LENGTH, FOR EXAMPLE?

9      A      YES.

10     Q      WHATEVER  YOU WANT TO CALL IT, LIKE, SAY, A

11  SIXTEENTH OF AN INCH IN WIDTH?  IN OTHER WORDS, WHAT I'M

12  TRYING TO DIFFERENTIATE, WHAT IS BETWEEN LIKEA CIRCULAR

13  WOUND AND LIKE A VERY FLAT TYPE WOUND.

14            NOW, IT WOULD HAVE BEEN A VERY FLAT TYPE WOUND?

15     A      YES, IT WOULD.

16     Q      NOW, THE HEART IS ALL MUSCLE AND THERE WOULD

17  BE A TENDENCY FOR THE HEART TO CLOSE AROUND A WOUND ONCE

18  THIS OBJECT, LET'S SAY THE KNIFE, WAS WITHDRAWN?

19     A      IN THE CONTRACTING PHASE, YES, IT WOULD.

20     Q      AS THE HEART CONTRACTS, IT WOULD DEFINITELY

21  TEND TO CLOSE OFF THAT WOUND TO THE BEST OF ITS ABILITY?

22     A      YES.

23     Q      FOR EXAMPLE, THERE WOULD BE A MAJOR DIFFERENCE

24  BETWEEN A WOUND IN THE HEART IN THAT RESPECT, OR A WOUND IN

25  THE ARTERY IN WHICH THE ARTERY DOES NOT HAVE THE SAME

26  MUSCULAR STRUCTURE AS THE HEART DOES?

111

1          A       THAT'S TRUE.

2          Q       NOW, WHEN GIVING EXAMPLES, HAVE YOU HAD ANY

3    EXPERIENCE WITH PERSONS WHO HAVE BEEN STABBED IN THE HEART

4    AND HAVE REMAINED ACTIVE?

5          A       WE HAD ONE HERE RECENTLY WHERE THE VICTIM WAS

6    STABBED IN THE HEART IN THE MIDDLE OF THE STREET, LEFT

7    TURN LANE, AND HE WALKED ACROSS THE BALANCE OF THE STREET

8    AND COLLAPSED ON THE SIDE.

9          Q       AND DO YOU HAVE A RECOLLECTION AS TO HOW

10   LONG THAT PERSON REMAINED ACTIVE?

11         A       NO.  NO, IT WOULD BE JUST THE TIME IT WOULD

12   TAKE TO CROSS HALF THE STREET.

13         Q       AND IS THAT THE ONLY EXAMPLE THAT YOU

14   PERSONALLY KNOW OF OR HAVE READ ABOUT WHERE A PERSON HAS

15   MAINTAINED HIMSELF ACTIVE FOR A PERIOD OF TIME WITH A STAB

16   WOUND IN THE HEART?

17         A       THAT'S THE ONLY ONE I CAN RECALL OFFHAND.

18         Q       IF YOU WERE INFORMED BY AN ALLEGED EYEWITNESS

19   THAT THE VICTIM -- STRIKE THAT -- NOT VICTIM -- THAT THE

20   INJURED PERSON WITH THE STAB WOUND, MAINTAINED HIMSELF

21   ACTIVE TO THE POINT OF ACTUALLY GOING TO THE DEFENSE OF

22   ANOTHER PERSON FOR A RELATIVELY SHORT PERIOD OF TIME,

23   BUT A PERIOD OF TIME AND THEN WALKED ACROSS THE STREET,

24   WOULD YOU CONSIDER THAT AN EXCEPTION TO YOUR BASIC EARLIER

25   PREMISE, THAT IS, THAT A PERSON FALLS LIKE A STONE ONCE

26   STABBED?

112

1        A    I'VE ALREADY SAID THAT I MODIFIED THAT WITH

2    EXPERIENCE AND THAT THAT EXPERIENCE WOULD EXTEND TO, YOU

3    KNOW, 10, 12 SECONDS, MAYBE 15 SECONDS.

4             EXPERIENCE DOESN'T SAY IT CAN GO BEYOND THAT,

5    BUT I SEE NO REASON WHY IT COULDN'T GO BEYOND THAT IF THE

6    WOUND WERE SUCH AND THE HEALTH OF THE INDIVIDUAL WAS SUCH

7    AND THE WILL WERE SUCH THAT THE INDIVIDUAL COULD USE THAT

8    LAST EFFORT.

9             MR. KIES:  ALL RIGHT.  FAIR ENOUGH.  THANK YOU VERY

10   MUCH, DOCTOR.

11            THE COURT:  MR. GOETHALS?

12            MR. GOETHALS:  COUPLE MORE, YOUR HONOR.  SORRY.

13                   FURTHER REDIRECT EXAMINATION

14       Q    BY MR. GOETHALS:  DOCTOR, IN DESCRIBING THE

15   WOUND THAT YOU SAW IN THE CHEST AREA, WOULD YOU SAY THAT

16   THOSE WOUNDS AS YOU SAW THEM, AND AS YOU'VE DESCRIBED THEM,

17   AND AS YOU RECALL THEM, WERE CONSISTENT WITH A THRUSTING

18   TYPE MOTION INTO THE CHEST WITH A KNIFE?

19       A    YES.

20       Q    A QUICK THRUSTING AND THEN PULLING THE KNIFE

21   RIGHT OUT, THAT TYPE OF WOUND, RIGHT?

22       A    YES.

23       Q    RATHER THAN STICKING THE KNIFE IN AND TWISTING

24   IT AROUND OR ANYTHING LIKE THAT; IS THAT CORRECT?

25       A    WELL, THEY WOULD BE JUST DIRECT STAB WOUNDS,

26   THAT IS, THE ONE TO THE LEFT CHEST, THE FATAL ONE, THERE WAS

113

1  NOTHING IN THE WAY OF TWISTING OR TURNING. THE ONE TO THE

2  RIGHT CHEST IS SO SUPERFICIAL THAT THERE'S VERY LITTLE

3  DIFFERENCE BETWEEN THE SKIN AND THE BREASTPLATE, MAYBE A

4  HALF INCH, SO THERE REALLY WOULDN'T BE ANY INDICATION OR

5  POSSIBLE INDICATION OF TWISTING OR TURNING ON THAT.

6          THE ONE IN THE HIP STOPPED AT THE BONE.  SO,

7  AGAIN, THERE WASN'T ANY INDICATION THERE OF ANY TWISTING OR

8  TURNING.

9          Q    JUST SO WE'RE ALL CLEAR ON ONE AREA, YOU

10  JUST HAD A DISCUSSION WITH MR. KIES ABOUT BULLET WOUNDS

11  VERSUS STAB WOUNDS, RIGHT, AND THE DIFFERENCE IN HOW THEY

12  MIGHT AFFECT SOMEONE, RIGHT?

13          A    YES.

14          Q    WOULD YOU EXPECT THE PERSON WITH THE TYPE

15  OF STAB WOUND THAT YOU SAW IN THIS CASE TO BE ABLE TO REMAIN

16  ACTIVE LONGER OR SHORTER THAN A PERSON WHO, SAY, WAS SHOT

17  IN THE SAME PLACE WITH A .38?  CAN YOU SAY?

18          A    POSSIBLY LONGER FOR THE REASONS OUTLINED,

19  THAT THE WOUND WOULD BE NARROWER, WOULD BE A BETTER

20  OPPORTUNITY TO CLOSE THE WOUND ANATOMICALLY, WHEREAS A HOLE,

21  AND USUALLY A BULLET WOUND, WILL HAVE SOME DEGREE OF

22  TEARING.  THE HEART WOULD NOT BE ABLE TO CLOSE INJURIES

23  LIKE THAT AS WELL AS A STAB WOUND, SO THEY COULD BE

24  ACTIVE LONGER.

25          Q    SO WHEN YOU DESCRIBED THE PREVIOUS EXAMPLES

26  YOU COULD OF THE PAWN SHOP ROBBER SHOT IN THE HEART OR THE

114

1   OTHER MAN WHO WAS SHOT IN THE HEART AND THEN RAN A HUNDRED

2   YARDS BEFORE HE COLLAPSED.  IS THERE ANY REASON WHY A

3   STAB WOUND VICTIM WOULD NOT FALL WITHIN THOSE TYPE OF

4   SITUATIONS?

5          DO YOU UNDERSTAND THAT QUESTION?

6       A   I'M NOT SURE I DO.

7       Q   LET ME CLARIFY, IF I CAN.

8          YOU USE THOSE TWO EXAMPLES AS EXAMPLES THAT

9   CAUSED YOU TO CHANGE YOUR OPINION AS TO WHETHER OR NOT

10  SOMEONE WITH A HEART INJURY WOULD FALL RIGHT OVER LIKE A

11  STONE, RIGHT?

12      A   YES.

13      Q   DO YOU FEEL THAT THOSE EXAMPLES ARE

14  INAPPLICABLE TO YOUR OPINION CONCERNING SOMEONE WHO WAS

15  STABBED IN THE HEART?

16      A   THEY'RE APPLICABLE ONLY IN THAT IT IS

17  POSSIBLE FOR SOMEONE WITH A HEART INJURY TO REMAIN UPRIGHT

18  AND ACTIVE FOR A PERIOD OF TIME, A SHORT PERIOD OF TIME

19  AFTER THE INJURY OCCURS.

20      Q   AND FROM WHAT YOU JUST SAID, YOU WOULD

21  EXPECT A PERSON WITH A STAB WOUND AS OPPOSED TO A GUNSHOT

22  WOUND, TO BE ABLE TO REMAIN UP AND ACTIVE FOR AT LEAST

23  AS LONG, AND MAYBE A LITTLE LONGER?

24      A   THAT'S CORRECT.

25      MR. GOETHALS:  THANK YOU.  I DON'T HAVE ANY

26  FURTHER QUESTIONS.

115

1       THE COURT: MR. KIES.

2       MR. KIES:  NO, I DON'T HAVE ANYTHING FURTHER.

3       THE COURT: THANK YOU, DOCTOR.  YOU'RE EXCUSED.

4   HAVE A GOOD DAY.

5               NEXT WITNESS.

6       MR. GOETHALS:  PEOPLE RECALL GLORIA GOMEZ.

7           (WHEREUPON BIANCA MONTOYA, OFFICIAL COURT

8   INTERPRETER, HAVING BEEN PREVIOUSLY DULY SWORN,  AND WHO

9   HAD BEEN SEATED NEXT TO THE DEFENDANT THROUGHOUT THE

10  PROCEEDINGS, CAME FORWARD TO INTERPRET THE PROCEEDINGS

11  FOR THE WITNESS.)

12              GLORIA DE ROSAS GOMEZ SANCHEZ,

13  RECALLED AS A WITNESS BY THE PEOPLE, HAVING BEEN PREVIOUSLY

14  DULY SWORN, WAS EXAMINED AND TESTIFIED, THROUGH THE

15  INTERPRETER, AS FOLLOWS:

16      THE COURT:  THE WITNESS IS STILL UNDER OATH.

17          YOU MAY INQUIRE.

18          DIRECT EXAMINATION (CONTINUED)

19      Q    BY MR. GOETHALS:  MS. GOMEZ, I THINK WE

20  STOPPED YESTERDAY AT ABOUT THE TIME THAT YOU SAW THE

21  CRUZ BROTHERS LEAVE THE AREA ON KODIAK IN A YELLOW CAR.

22          DO YOU REMEMBER THAT CAR, MA'AM?

23      A    YES.

24      Q    DID YOU SEE APPROXIMATELY HOW MANY PEOPLE

25  LEFT THE AREA IN THAT YELLOW CAR?

26      A    FOUR.

EXHIBIT "B"

96

1        SANTA ANA, CALIFORNIA - THURSDAY, JULY 8, 1982

2                    MORNING SESSION

3            (THE FOLLOWING PROCEEDINGS WERE HAD IN OPEN

4    COURT IN THE PRESENCE OF THE JURY:)

5        MR. GOETHALS:  WITH THE COURT'S PERMISSION, WE HAVE

6    AGREED TO INTERRUPT THE PRESENT WITNESS FOR ANOTHER WITNESS

7    TO TESTIFY VERY BRIEFLY.

8        THE COURT:  THAT'S FINE.  CALL THAT WITNESS.

9        MR. GOETHALS:  PEOPLE CALL DR. ROBERT RICHARDS.

10               ROBERT GEORGE RICHARDS,

11   CALLED AS A WITNESS BY THE PEOPLE, WAS DULY SWORN AND

12   TESTIFIED AS FOLLOWS:

13       THE CLERK:  DO YOU SOLEMNLY SWEAR THAT THE TESTIMONY

14   YOU ARE ABOUT TO GIVE IN THE CASE NOW PENDING BEFORE THIS

15   COURT SHALL BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT

16   THE TRUTH SO HELP YOU GOD?

17       THE WITNESS:  I DO.

18       THE CLERK:  STATE YOUR FULL NAME AND SPELL YOUR

19   LAST NAME.

20       THE WITNESS:  ROBERT GEORGE RICHARDS,

21   R-I-C-H-A-R-D-S.

22               DIRECT EXAMINATION

23       Q    BY MR. GOETHALS:  YOU'RE A MEDICAL DOCTOR;

24   IS THAT CORRECT, SIR?

25       A    YES.

26       Q    HOW LONG HAVE YOU BEEN AN M.D.?

97

1          A      SINCE 1948.

2          Q      WOULD YOU DESCRIBE YOUR MEDICAL BACKGROUND AND

3      EXPERIENCE?

4          A      FOUR YEARS OF MEDICAL SCHOOL, FOUR YEARS

5      OF RESIDENCY, AND MY PRACTICE IS LIMITED TO PATHOLOGY.

6                 I'M LICENSED IN THE STATE OF CALIFORNIA AND

7      I'M CERTIFIED IN CLINICAL ANATOMIC AND FORENSIC --

8          MR. KIES: I WILL STIPULATE TO HIS QUALIFICATIONS.

9          THE COURT:  ACCEPTABLE?

10         MR. GOETHALS:  YES.

11         THE COURT: YOU WILL CONSIDER DR. RICHARDS AN EXPERT

12     IN ALL AREAS IN WHICH HE TESTIFIES.

13                ASK YOUR NEXT QUESTION.

14         Q      BY MR. GOETHALS:  WORKING AS A PATHOLOGIST,

15     ARE YOU CURRENTLY UNDER CONTRACT WITH THE COUNTY OF

16     ORANGE TO DO AUTOPSIES?

17         A      YES, I'VE BEEN DOING THAT FOR 25 YEARS.

18         Q      DIRECTING YOUR ATTENTION TO JANUARY 30, 1982

19     AT APPROXIMATELY 11:15 IN THE MORNING, DID YOU HAVE OCCASION

20     TO PERFORM AN AUTOPSY ON A DECEASED IDENTIFIED AS JOSE

21     GOMEZ?

22         A      YES, I DID.

23         Q      WHERE DID YOU PERFORM THAT AUTOPSY?

24         A      AT THE NEW FACILITY OVER HERE.

25         Q      THE ONE ADJACENT TO THE SHERIFF'S OFFICE AND

26     JAIL?

98

1          A     YES.

2          MR. GOETHALS:  MAY I APPROACH THE WITNESS, YOUR

3    HONOR?

4          THE COURT: YES.  WE MAY AS WELL DISPENSE WITH THE

5    REQUEST TO APPROACH THE WITNESS, CLERK, AND THE BOARD,

6    SINCE NOBODY COMPLIES WITH IT ANYWAY -- LITTLE HUMOR,

7    VERY LITTLE.

8          MR. KIES: MAY WE APPROACH?  I BELIEVE WE HAVE A

9    STIPULATION, YOUR HONOR.

10         THE COURT: FRAME IT.

11         MR. KIES:  THAT THE -- IT WOULD BE STIPULATED THAT

12   IF A RELATIVE -- WELL, THE BASIC STIPULATION IS, YOUR HONOR,

13   IS THAT JOSE GOMEZ THAT DR. RICHARDS DID THE AUTOPSY ON

14   IS THE SAME JOSE GOMEZ WHO WAS IDENTIFIED AS BEING IN THE

15   FIGHTING ON JANUARY 22, 1982 OUTSIDE OF 431 KODIAK.

16         THE COURT:  AND THAT, OF COURSE, HE WAS A  LIVE

17   HUMAN BEING PRIOR TO DR. RICHARDS' OBSERVING HIM DURING

18   THE AUTOPSY?

19         MR. KIES:  THAT'S CORRECT.

20         THE COURT:  SO STIPULATED?

21         MR. GOETHALS:  YES, YOUR HONOR.

22         THE COURT:  THAT STIPULATION IS ENTERED.

23         LADIES AND GENTLEMEN, THAT FACT IS

24   CONCLUSIVELY PROVED, THAT IT IS THE SAME INDIVIDUAL.

25         Q     BY MR. GOETHALS:  DR. RICHARDS, DURING THE

26   COURSE OF YOUR AUTOPSY ON JOSE GOMEZ, DID YOU FIND ANY

99

1    WOUNDS ON HIS BODY?

2         A    THERE WAS A FATAL STAB WOUND IN THE LEFT

3    CHEST THAT PENETRATED THE HEART.

4              THERE WAS A STAB WOUND IN THE RIGHT CHEST

5    THAT DID NOT PENETRATE BEYOND THE BONE OF THE CHEST.

6              THERE WAS A STAB WOUND IN THE HIP, RIGHT

7    HIP, THAT WAS ABOUT TWO AND A HALF INCHES DEEP.

8              AND THERE WAS A VERY SUPERFICIAL SLICE TO

9    THE LEFT UPPER ARM.

10        Q    OF THE FOUR WOUNDS THAT YOU MENTIONED, FROM

11   WHAT YOU'VE MENTIONED, I WOULD ASSUME THAT IT WAS THE LEFT

12   CHEST WOUND THAT WAS THE MOST SERIOUS; IS THAT CORRECT?

13        A    THAT WAS THE FATAL ONE, YES.

14        Q    COULD YOU EXPLAIN TO THE JURY WHY THAT

15   PARTICULAR WOUND WAS A FATAL WOUND?

16        A    IT PENETRATED THE HEART.

17        Q    SO IT PUNCTURED THE HEART?

18        A    YES.

19        Q    HOW DID THAT CAUSE DEATH?

20        A    COULD BE LOSS OF BLOOD, PRIMARILY.

21             THE BLEEDING INTO THE PERICARDIAC SAC --

22   THE HEART IS IN THE SAC AND FILLING THAT SAC WITH BLOOD

23   WOULD CERTAINLY MAKE IT A VERY POOR PUMP.  THAT IS, IT

24   WOULD NOT BE ABLE TO EXPAND AND TO TAKE BLOOD IN OR PUMP

25   BLOOD OUT EFFECTIVELY.

26        Q    FROM WHAT YOU'VE SAID, AND FROM ANY BASIC

100

1    UNDERSTANDING, I WOULD ASSUME IT'S A FAIRLY SERIOUS WOUND

2    AS SOON AS IT'S ADMINISTERED OR INFLICTED; IS THAT TRUE?

3          A      YES, IT'S FATAL FOR ALL INTENTS AND

4    PURPOSES.

5          Q      IS IT POSSIBLE THAT A PERSON WHO HAS BEEN

6    STABBED IN THE MANNER THAT YOU FOUND THAT OCCURRED TO

7    JOSE GOMEZ, IS IT POSSIBLE THAT SUCH A PERSON COULD REMAIN

8    UPRIGHT AND WALK AROUND FOR SOME PERIOD OF TIME AFTER

9    RECEIVING THAT TYPE OF WOUND?

10         A      IT'S POSSIBLE, YES.

11               I'VE SEEN CASES THAT WERE UP AND ACTIVE FOR

12   POSSIBLY TEN SECONDS, 12 SECONDS.

13         Q      WHEN YOU DID THE AUTOPSY ON JOSE GOMEZ DID

14   YOU SEE ANY INDICATION OF ANY RECENT MEDICAL TREATMENT OR

15   SURGERY?

16         A      YES.  THERE WAS QUITE A BIT.

17         Q      COULD YOU DISTINGUISH BETWEEN YOUR AUTOPSY,

18   THE SURGICAL INCISIONS, FROM WHAT YOU DESCRIBED AS THE

19   STAB WOUNDS?

20         A      YES.

21         Q      WAS THERE ANYTHING IN PARTICULAR THAT ALLOWED

22   YOU TO TELL ONE FROM THE OTHER?

23         A      MOST OF THE SURGERIES WERE SUTURED OR

24   CONTAINED DRAINS, YOU KNOW, THAT YOU WOULD ANTICIPATE THEN

25   WERE FOR THE BENEFIT OF THE INDIVIDUAL AND WERE SURGICALLY

26   INDUCED.

101

1    Q    SO THE FOUR WOUNDS YOU'VE TALKED ABOUT WITH

2    US WERE STAB WOUNDS RATHER THAN SURGICAL INCISIONS; IS

3    THAT RIGHT?

4    A    THAT'S RIGHT.

5    MR. GOETHALS:  THANK YOU.  I DON'T HAVE ANY

6    FURTHER QUESTIONS.   -- OH, EXCUSE ME, YOUR HONOR.

7    WE HAVE ENTERED INTO ANOTHER STIPULATION, I BELIEVE.

8          AND, THAT IS, DURING THE COURSE OF

9    DR. RICHARDS' AUTOPSY, BLOOD WAS REMOVED FROM THE DECEASED

10   JOSE GOMEZ, AND THAT IT WAS SUBSEQUENTLY EXAMINED BY A

11   PERSON QUALIFIED TO DO THAT, THAT THE BLOOD ALCOHOL LEVEL

12   WAS FOUND TO BE .12;

13          ADDITIONALLY SCREENED FOR DRUGS AND NO DRUGS

14   FOUND IN MR. GOMEZ'S SYSTEM.

15   THE COURT:  SO STIPULATED?

16   MR. KIES:  YES, YOUR HONOR.

17          COULD I HAVE A DISCUSSION WITH THE

18   DISTRICT ATTORNEY FOR ONE BRIEF MOMENT?

19   THE COURT:  YES.  GO AHEAD.

20          (DISCUSSION BETWEEN COUNSEL, OFF THE RECORD.)

21   MR. GOETHALS:  YOUR HONOR, COULD I APPROACH THE

22   WITNESS AND ASK HIM A QUESTION, JUST BETWEEN THE TWO OF US,

23   FOR THE PURPOSE OF CLARIFYING THE STIPULATION?

24   MR. KIES:  AND --

25   THE COURT:  YES.

26   MR. KIES:  -- THAT'S AT MY REQUEST.

102

1           (DISCUSSION BETWEEN THE DISTRICT ATTORNEY AND

2     THE WITNESS, OFF THE RECORD.)

3           MR. GOETHALS:  THANK YOU, YOUR HONOR.

4                 (DISCUSSION BETWEEN COUNSEL, OFF THE RECORD.)

5           MR. GOETHALS:  YOUR HONOR, I'D LIKE TO ALTER THE

6     STIPULATION SLIGHTLY, IF I COULD.

7                 THE STIPULATION WOULD BE AS FOLLOWS:

8                 BLOOD WAS DRAWN FROM JOSE GOMEZ WHEN HE WAS

9     TAKEN TO THE HOSPITAL BY THE PARAMEDICS SHORTLY AFTER THE

10    TIME HE WAS STABBED, AND THAT BLOOD WAS ANALYZED AND FOUND

11    TO CONTAIN .12 PERCENT ALCOHOL AND NO DRUGS.

12          MR. KIES: SO STIPULATED.

13          THE COURT : THAT STIPULATION IS ENTERED AND IT IS

14    CONCLUSIVELY PROVED.

15          MR. GOETHALS:  THANK YOU, YOUR HONOR.  NO FURTHER

16    QUESTIONS.

17          THE COURT: YOU MAY CROSS-EXAMINE.

18                    CROSS-EXAMINATION

19          Q     BY MR. KIES:  WERE YOU ABLE TO TELL WHETHER

20    THE STAB WOUND ON THE HIP WAS INFLICTED FIRST, AS OPPOSED

21    TO THE STAB WOUNDS IN THE CHEST AREA, OR VICE VERSA?

22          A     NO, I WOULDN'T BE ABLE TO TELL THAT.

23          Q     NOW, YOU'VE LIMITED THE ACTIVE PERIOD THAT

24    YOU BELIEVE IT'S POSSIBLE FOR A PERSON RECEIVING SUCH A

25    WOUND TO TEN OR 12 SECONDS.

26                WOULD YOU BELIEVE IT POSSIBLE FOR SUCH A

103

1  PERSON TO, IN A SENSE, REMAIN IN COMBAT; IN OTHER WORDS,

2  MOVE TO DEFEND SOMEONE FOR, LET'S SAY, A PERIOD OF HALF A

3  MINUTE?

4      A    I THINK THE BEST WAY TO ANSWER THAT IS THAT

5  A YEAR AGO I USED TO FEEL THAT IF YOU HAD A HEART INJURY

6  YOU FELL LIKE A STONE, NO MORE ACTIVITY.

7          HOWEVER, DURING THAT PERIOD OF TIME CERTAIN

8  CASES HAVE OCCURRED THAT HAD TIME DURATION, THAT IS, FATAL

9  HEART INJURY STAB WOUNDS, GUNSHOT, THAT HAD AS MUCH AS

10  10 OR 12 SECONDS.  THEREFORE, I FEEL IT'S REASONABLE TO

11  ASSUME THAT ON AN OCCASION THIS CAN OCCUR.

12          I DON'T RECALL EVER HAVING ONE, YOU KNOW, FOR

13  30 SECONDS.

14      Q    WOULD THE AGE AND THE HEALTH OF THE PERSON

15  RECEIVING THE WOUND BE A FACTOR IN DETERMINING HOW SUCH A

16  PERSON COULD REMAIN ACTIVE?

17      A    YES, AND POSSIBLY WILL WOULD ALSO BE A

18  FACTOR.

19      Q    SO IF THE INJURED PERSON WITH AN INJURY IN

20  THE HEART HAD BEEN STIMULATED, LET'S SAY, VERY STRONGLY

21  STIMULATED IN COMBAT OF SOME SORT, IT WOULD BE MORE LIKELY

22  THAT THAT PERSON COULD REMAIN ACTIVE FOR A LONGER PERIOD?

23      A    IT'S POSSIBLE.

24      Q    WERE YOU ABLE TO DETERMINE WHETHER THERE WAS

25  ANY OTHER PRE-EXISTING BRUISING ON THE BODY OF MR. GOMEZ?

26          MR. GOETHALS:  I'D OBJECT.  IT'S VAGUE AS TO WHAT

104

1    CONSTITUTES PRE-EXISTING.

2         THE COURT:  SUSTAINED.

3         Q    BY MR. KIES:  WELL, CALL IT BRUISING CAUSED

4    BY STRIKING OF SOME SORT, OTHER THAN BRUISING CAUSED BY

5    HOSPITAL PROCEDURES, MEDICAL PROCEDURES.

6         A    THERE WAS A BRUISE ON THE UPPER LIP AND A

7    CRUSTING, HEALING TYPE OF PROCESS ON THE LOWER LIP.

8         Q    DID YOU NOTICE ANY OTHER, LET'S SAY, MINOR

9    ABRASIONS OR CUTS?

10        A    I'D HAVE TO REFRESH MY MEMORY.

11        Q    PLEASE DO, DOCTOR, OTHER THAN WHAT MAY HAVE

12   BEEN CAUSED BY MEDICAL PROCEDURES.

13        A    I HAVE NO RECORDS.  PERHAPS THE PHOTOGRAPHS

14   MIGHT SHOW MORE.

15        Q    NOW, IF WITNESSES INDICATED THAT THEY SAW

16   VERY LITTLE BLOOD ON THE OUTSIDE OF THE BODY OF THIS

17   MR. GOMEZ, AT LEAST INITIALLY WHILE HE WAS STILL, LET'S

18   SAY, MOVING, WOULD THAT INDICATE TO YOU THAT POSSIBLY

19   BLOOD PRESSURE WAS BEING MAINTAINED IN MR. GOMEZ'S SYSTEM

20   BY EITHER A SLOWER LEAKAGE THROUGH THE HEART OR BY THE

21   HEART STABBING -- I FORGET THE EXACT WORD YOU USE FOR THE

22   HEART STABBING -- WOULD THAT MAINTAIN PRESSURE FOR A PERIOD

23   OF TIME?

24        A    IT WOULD -- THERE WOULDN'T BE ANYTHING IN THE

25   PROCESS THAT WOULD GO ON THAT WOULD AID OR ABET BLOOD

26   PRESSURE.

105

1    THE STAB WOUND EXTENDED FROM THE -- RIGHT

2  THROUGH THE SEPTUM INTO THE LEFT HEART, SO THE PRESSURE

3  THAT YOU'RE REALLY WORKING UNDER WOULD BE NORMAL BLOOD

4  PRESSURE, THAT IS, YOU KNOW, SAY 120 OVER 80 OR SOMETHING

5  OF THAT SORT, AND THAT'S EXPRESSED IN MILLIMETERS OF

6  MERCURY.

7    IT'S A GOOD HEAD OF PRESSURE SO THAT THAT

8  BLOOD UNDER THAT PRESSURE WOULD BE LEAKING OUT.

9    OF COURSE, FIRST IT WOULD FILL UP THE SAC

10  WHICH PROBABLY WOULDN'T TAKE A VERY LONG PERIOD OF TIME.

11  I THINK THE ONLY REASON THAT YOU PROBABLY WOULDN'T GET

12  BLOOD SHOWN RIGHT AWAY WOULD BE THAT A STAB WOUND WOULD

13  CLOSE, TEND TO APPROXIMATE THE EDGES, AND MIGHT RETAIN THE

14  BLOOD INSIDE FOR A PERIOD OF TIME.

15    Q    WELL, THE BASIC CAUSE OF DEATH IS THAT

16  ULTIMATELY THE BLOOD CIRCULATION SYSTEM RUNS OUT OF BLOOD;

17  IS THAT CORRECT?

18    A    YES. IT'S THE BLEEDING, LOSS OF CIRCULATING

19  VOLUME AND, AS I MENTIONED BEFORE, IT WOULD ALSO -- EXCUSE

20  ME -- ALSO BE THE LOSS OF FUNCTION TO THE HEART BY FILLING

21  THE PERICARDIAL SAC WITH BLOOD;

22    IN OTHER WORDS, IT'S LIKE YOUR ARMS.  YOU

23  HAVE PRETTY STRONG FLEXERS BUT WEAKER EXTENDERS, SO THAT

24  THE HEART HAS VERY GOOD CONTRACTING MUSCLE, BUT IT DOESN'T

25  HAVE ANYTHING TO EXPAND IT.

26    THAT'S DONE BY GRAVITY SO AS THE HEART SAC

1   FILLS UP IT WOULD PUSH THE HEART MORE AND MORE, IT WOULD

2   CONTRACT LESS, IT WOULD CONTRACT POORER.

3          LET'S SAY THE TRAUMA TO THE HEART ITSELF

4   THAT CAUSES THE HEART TO STOP; IN OTHER WORDS, THE HEART,

5   IN A SENSE, KEEPS ON BEATING BUT IN A WEAKER MANNER.

6          THE CONDUCTION SYSTEM COULD BE INVOLVED AND,

7   AS SUCH, THERE MIGHT BE A FACTOR.

8          THE STAB WOUND WENT THROUGH THE SEPTUM AND

9   THE SEPTUM IS WHERE THE CONDUCTION SYSTEM FLOWS, IN OTHER

10  WORDS, THE ELECTRICAL  IMPULSE TO THE HEART WOULD BE IN

11  THAT REGION.

12     Q    BUT IF THAT OCCURRED YOU WOULD EXPECT THAT

13  THE DECEASED WOULD IMMEDIATELY FALL ON HIS FACE IF THE

14  HEART STOPPED IMMEDIATELY?

15     A    YES, I WOULD.

16  MR. KIES:  ALL RIGHT. I HAVE NOTHING FURTHER.

17  THE COURT:  ANY REDIRECT?

18  MR. GOETHALS:  YES, YOUR HONOR.

19              REDIRECT EXAMINATION

20     Q    BY MR. GOETHALS:  DOCTOR, YOU SAY IN RESPONSE

21  TO COUNSEL'S QUESTION, I THINK THAT AT ONE TIME IN YOUR

22  MEDICAL CAREER YOU FELT THAT IF SOMEONE RECEIVED A FATAL

23  HEART WOUND THEY SHOULD FALL LIKE A STONE; IS THAT RIGHT?

24     A    YES.

25     Q    DURING THE COURSE OF YOUR CAREER, HAVE YOU

26  SEEN THINGS OR HAD DISCUSSIONS WITH PEOPLE CONCERNING PEOPLE

1   WHO ARE DECEASED THAT YOU PERFORMED AUTOPSIES THAT HAVE

2   CAUSED YOU TO CHANGE THAT OPINION?

3           A     YES.

4           Q     CAN YOU GIVE AN EXAMPLE OF THE TYPE OF THING

5   THAT YOU HAVE EXPERIENCED THAT'S CAUSED YOU TO CHANGE YOUR

6   OPINION?

7           A     WELL, THERE WAS A PAWN SHOP HOLD-UP AND THE

8   OWNER SHOT THE ROBBER AT THE DOOR AND, OF COURSE, THE

9   ROBBER SHOT THE OWNER.  HE FELL DOWN BEHIND THE CABINET.

10          AND THE ASSAILANT MADE IT A DISTANCE OF

11  10 OR 12 FEET FROM THE DOOR TO THE CABINET AND WAS, YOU

12  KNOW, TRYING TO FINISH OFF THE OWNER WHEN HE DIED, WHICH

13  AT THAT TIME I FELT WAS, YOU KNOW, IMPOSSIBLE PRACTICALLY.

14          AND THEN THERE WAS ANOTHER INSTANCE WHERE IT

15  WAS WITNESSED THAT THIS MAN WAS SHOT IN THE MIDDLE OF THE

16  BLOCK AND HE RAN THE BALANCE OF THE BLOCK, ACROSS THE

17  STREET, AND COLLAPSED IN A PARKING LOT, WHICH WAS A DISTANCE

18  OF MORE THAN A HUNDRED YARDS.  SO HE MUST HAVE BEEN A VERY

19  GOOD RUNNER AND THAT WOULD BE, YOU KNOW, 10, 12 SECONDS,

20  PROBABLY, WHICH WOULD BE THE MAXIMUM TIME THAT I'M REALLY

21  AWARE OF.

22          Q     AND HAD BOTH OF THOSE PEOPLE THAT YOU'RE

23  TALKING ABOUT RECEIVED WOUNDS DIRECTLY TO THE HEART?

24          A     THEY WERE BOTH WOUNDS TO  THE HEART.

25          Q     THE TYPE THAT YOU HAD PREVIOUSLY EXPECTED A

26  PERSON TO FALL LIKE A STONE?

108

1       A     THAT'S CORRECT.

2       Q     IN THIS CASE WHEN YOU DID THE AUTOPSY ON

3   JOSE GOMEZ, COULD YOU CHARACTERIZE FOR THE JURY WHAT HIS

4   HEALTH WAS EXCEPT FOR THE STAB WOUNDS; IN OTHER WORDS, DID

5   YOU FIND THAT HE HAD ANY OTHER MEDICAL PROBLEM OR WAS HE

6   IN GOOD HEALTH?

7       A     HE WAS IN GOOD HEALTH.

8       MR. GOETHALS:  THANK YOU.  I DON'T HAVE ANY

9   FURTHER QUESTIONS.

10      THE COURT:  RECROSS?

11                  RECROSS-EXAMINATION

12      Q     BY MR. KIES:  DR. RICHARDS, THERE IS A

13  SUBSTANTIAL DIFFERENCE BETWEEN A WOUND CAUSED BY A BULLET

14  AS OPPOSED TO A WOUND CAUSED BY A SHARP KNIFE; IS THAT

15  CORRECT?

16      A     I THINK YOU CAN IDENTIFY THE DIFFERENCE.

17  I DON'T UNDERSTAND WHAT --

18      Q     WELL, A BULLET CAUSES SEVERE TRAUMA NOT ONLY

19  AS FAR AS THE HOLE GOING IN, BUT IT ALSO, TO A WIDER AREA,

20  BESIDES THE, CALL IT THE CIRCUMFERENCE OF THE BULLET,

21  BECAUSE OF COMPACTION OF THE MEMBRANES?

22      A     YES.

23      Q     NOW, FOR EXAMPLE, IN THIS PARTICULAR CASE

24  WE HAVE A KNIFE WOUND; IS THAT CORRECT?

25      A     YES.

26      Q     FROM LOOKING AT THE WOUND, I BELIEVE IT --

109

1   WAS IT YOUR MEDICAL DECISION THAT THIS WAS A SHARP KNIFE?

2        A     YES.

3        Q     ALL RIGHT.

4              AND THUS THE WOUND WAS A VERY, ONE, A VERY

5   NARROW WOUND AS FAR AS WIDTH?

6        A     YES.

7        Q     AND A VERY CLEAN WOUND AS FAR AS THE AREA?

8   OR, LET'S SAY, A VERY SMALL WOUND AS FAR AS THE AREA IN

9   WHICH IT CAUSED IMMEDIATE DAMAGE?

10       A     COMPARED TO A BULLET, YES.

11       Q     IN FACT, A BULLET WOULD HAVE CAUSED A TRAUMA

12  TO THAT PARTICULAR AREA, LET'S SAY, AS FAR AS AREA GOES,

13  A HUNDREDFOLD WORSE?

14       A     I DON'T KNOW IF I CAN GO THAT FAR.

15             OF COURSE, THE INJURY THAT THE BULLET WOULD

16  PRODUCE WOULD DEPEND ON THE VELOCITY AND THE TYPE OF SLUG.

17             I THINK THE ONLY THING THAT THEY WOULD SHARE,

18  THAT IS, THE SLOW, SMALL SLUG OR A FAST, LARGER SLUG, WOULD

19  BE WHAT APPEARS TO BE AN ERUPTION.

20             WELL, IT'S LIKE WHEN YOU POP A BALLOON OR A

21  BALLOON FULL OF WATER, YOU HAVE THE MOVEMENT OF THE BULLET

22  AND THEN YOU HAVE THE EXPANSIVE MOVEMENT OF THE FLUID AS

23  WELL THAT PRODUCES A GREATER TEARING.

24       Q     AND THIS DOES NOT OCCUR WHEN YOU HAVE A SHARP

25  KNIFE INVOLVED?

26       A     THAT'S TRUE.

110

1        Q     WERE YOU ABLE TO DETERMINE THE MEASUREMENTS

2   OF THE WOUND AT THE ENTRY POINT IN THE HEART?

3        A     MAY I?

4        Q     YES, PLEASE.

5        A     THE REPORT HAS NO MEASUREMENT.

6             AS I RECALL, THEY WERE ABOUT A HALF AN INCH.

7   THEY WERE SMALL.

8        Q     HALF AN INCH IN LENGTH, FOR EXAMPLE?

9        A     YES.

10       Q     WHATEVER  YOU WANT TO CALL IT, LIKE, SAY, A

11  SIXTEENTH OF AN INCH IN WIDTH?  IN OTHER WORDS, WHAT I'M

12  TRYING TO DIFFERENTIATE, WHAT IS BETWEEN LIKEA CIRCULAR

13  WOUND AND LIKE A VERY FLAT TYPE WOUND.

14            NOW, IT WOULD HAVE BEEN A VERY FLAT TYPE WOUND?

15      A     YES, IT WOULD.

16       Q     NOW, THE HEART IS ALL MUSCLE AND THERE WOULD

17  BE A TENDENCY FOR THE HEART TO CLOSE AROUND A WOUND ONCE

18  THIS OBJECT, LET'S SAY THE KNIFE, WAS WITHDRAWN?

19        A     IN THE CONTRACTING PHASE, YES, IT WOULD.

20       Q     AS THE HEART CONTRACTS, IT WOULD DEFINITELY

21  TEND TO CLOSE OFF THAT WOUND TO THE BEST OF ITS ABILITY?

22        A     YES.

23       Q     FOR EXAMPLE, THERE WOULD BE A MAJOR DIFFERENCE

24  BETWEEN A WOUND IN THE HEART IN THAT RESPECT, OR A WOUND IN

25  THE ARTERY IN WHICH THE ARTERY DOES NOT HAVE THE SAME

26  MUSCULAR STRUCTURE AS THE HEART DOES?

111

1          A     THAT'S TRUE.

2          Q     NOW, WHEN GIVING EXAMPLES, HAVE YOU HAD ANY

3    EXPERIENCE WITH PERSONS WHO HAVE BEEN STABBED IN THE HEART

4    AND HAVE REMAINED ACTIVE?

5          A     WE HAD ONE HERE RECENTLY WHERE THE VICTIM WAS

6    STABBED IN THE HEART IN THE MIDDLE OF THE STREET, LEFT

7    TURN LANE, AND HE WALKED ACROSS THE BALANCE OF THE STREET

8    AND COLLAPSED ON THE SIDE.

9          Q     AND DO YOU HAVE A RECOLLECTION AS TO HOW

10   LONG THAT PERSON REMAINED ACTIVE?

11         A     NO.  NO, IT WOULD BE JUST THE TIME IT WOULD

12   TAKE TO CROSS HALF THE STREET.

13         Q     AND IS THAT THE ONLY EXAMPLE THAT YOU

14   PERSONALLY KNOW OF OR HAVE READ ABOUT WHERE A PERSON HAS

15   MAINTAINED HIMSELF ACTIVE FOR A PERIOD OF TIME WITH A STAB

16   WOUND IN THE HEART?

17         A     THAT'S THE ONLY ONE I CAN RECALL OFFHAND.

18         Q     IF YOU WERE INFORMED BY AN ALLEGED EYEWITNESS

19   THAT THE VICTIM -- STRIKE THAT -- NOT VICTIM -- THAT THE

20   INJURED PERSON WITH THE STAB WOUND, MAINTAINED HIMSELF

21   ACTIVE TO THE POINT OF ACTUALLY GOING TO THE DEFENSE OF

22   ANOTHER PERSON FOR A RELATIVELY SHORT PERIOD OF TIME,

23   BUT A PERIOD OF TIME AND THEN WALKED ACROSS THE STREET,

24   WOULD YOU CONSIDER THAT AN EXCEPTION TO YOUR BASIC EARLIER

25   PREMISE, THAT IS, THAT A PERSON FALLS LIKE A STONE ONCE

26   STABBED?

112

1          A      I'VE ALREADY SAID THAT I MODIFIED THAT WITH

2   EXPERIENCE AND THAT THAT EXPERIENCE WOULD EXTEND TO, YOU

3   KNOW, 10, 12 SECONDS, MAYBE 15 SECONDS.

4                 EXPERIENCE DOESN'T SAY IT CAN GO BEYOND THAT,

5   BUT I SEE NO REASON WHY IT COULDN'T GO BEYOND THAT IF THE

6   WOUND WERE SUCH AND THE HEALTH OF THE INDIVIDUAL WAS SUCH

7   AND THE WILL WERE SUCH THAT THE INDIVIDUAL COULD USE THAT

8   LAST EFFORT.

9                 MR. KIES:  ALL RIGHT.  FAIR ENOUGH.  THANK YOU VERY

10  MUCH, DOCTOR.

11                THE COURT:  MR. GOETHALS?

12                MR. GOETHALS:  COUPLE MORE, YOUR HONOR.  SORRY.

13                     FURTHER REDIRECT EXAMINATION

14         Q      BY MR. GOETHALS:  DOCTOR, IN DESCRIBING THE

15  WOUND THAT YOU SAW IN THE CHEST AREA, WOULD YOU SAY THAT

16  THOSE WOUNDS AS YOU SAW THEM, AND AS YOU'VE DESCRIBED THEM,

17  AND AS YOU RECALL THEM, WERE CONSISTENT WITH A THRUSTING

18  TYPE MOTION INTO THE CHEST WITH A KNIFE?

19         A      YES.

20         Q      A QUICK THRUSTING AND THEN PULLING THE KNIFE

21  RIGHT OUT, THAT TYPE OF WOUND, RIGHT?

22         A      YES.

23         Q      RATHER THAN STICKING THE KNIFE IN AND TWISTING

24  IT AROUND OR ANYTHING LIKE THAT; IS THAT CORRECT?

25         A      WELL, THEY WOULD BE JUST DIRECT STAB WOUNDS,

26  THAT IS, THE ONE TO THE LEFT CHEST, THE FATAL ONE, THERE WAS

113

NOTHING IN THE WAY OF TWISTING OR TURNING. THE ONE TO THE

RIGHT CHEST IS SO SUPERFICIAL THAT THERE'S VERY LITTLE

DIFFERENCE BETWEEN THE SKIN AND THE BREASTPLATE, MAYBE A

HALF INCH, SO THERE REALLY WOULDN'T BE ANY INDICATION OR

POSSIBLE INDICATION OF TWISTING OR TURNING ON THAT.

THE ONE IN THE HIP STOPPED AT THE BONE.  SO,

AGAIN, THERE WASN'T ANY INDICATION THERE OF ANY TWISTING OR

TURNING.

Q     JUST SO WE'RE ALL CLEAR ON ONE AREA, YOU

JUST HAD A DISCUSSION WITH MR. KIES ABOUT BULLET WOUNDS

VERSUS STAB WOUNDS, RIGHT, AND THE DIFFERENCE IN HOW THEY

MIGHT AFFECT SOMEONE, RIGHT?

A     YES.

Q     WOULD YOU EXPECT THE PERSON WITH THE TYPE

OF STAB WOUND THAT YOU SAW IN THIS CASE TO BE ABLE TO REMAIN

ACTIVE LONGER OR SHORTER THAN A PERSON WHO, SAY, WAS SHOT

IN THE SAME PLACE WITH A .38?  CAN YOU SAY?

A     POSSIBLY LONGER FOR THE REASONS OUTLINED,

THAT THE WOUND WOULD BE NARROWER, WOULD BE A BETTER

OPPORTUNITY TO CLOSE THE WOUND ANATOMICALLY, WHEREAS A HOLE,

AND USUALLY A BULLET WOUND, WILL HAVE SOME DEGREE OF

TEARING.  THE HEART WOULD NOT BE ABLE TO CLOSE INJURIES

LIKE THAT AS WELL AS A STAB WOUND, SO THEY COULD BE

ACTIVE LONGER.

Q     SO WHEN YOU DESCRIBED THE PREVIOUS EXAMPLES

YOU COULD OF THE PAWN SHOP ROBBER SHOT IN THE HEART OR THE

114

1   OTHER MAN WHO WAS SHOT IN THE HEART AND THEN RAN A HUNDRED

2   YARDS BEFORE HE COLLAPSED.  IS THERE ANY REASON WHY A

3   STAB WOUND VICTIM WOULD NOT FALL WITHIN THOSE TYPE OF

4   SITUATIONS?

5              DO YOU UNDERSTAND THAT QUESTION?

6        A    I'M NOT SURE I DO.

7        Q    LET ME CLARIFY, IF I CAN.

8              YOU USE THOSE TWO EXAMPLES AS EXAMPLES THAT

9   CAUSED YOU TO CHANGE YOUR OPINION AS TO WHETHER OR NOT

10  SOMEONE WITH A HEART INJURY WOULD FALL RIGHT OVER LIKE A

11  STONE, RIGHT?

12       A    YES.

13       Q    DO YOU FEEL THAT THOSE EXAMPLES ARE

14  INAPPLICABLE TO YOUR OPINION CONCERNING SOMEONE WHO WAS

15  STABBED IN THE HEART?

16       A    THEY'RE APPLICABLE ONLY IN THAT IT IS

17  POSSIBLE FOR SOMEONE WITH A HEART INJURY TO REMAIN UPRIGHT

18  AND ACTIVE FOR A PERIOD OF TIME, A SHORT PERIOD OF TIME

19  AFTER THE INJURY OCCURS.

20       Q    AND FROM WHAT YOU JUST SAID, YOU WOULD

21  EXPECT A PERSON WITH A STAB WOUND AS OPPOSED TO A GUNSHOT

22  WOUND, TO BE ABLE TO REMAIN UP AND ACTIVE FOR AT LEAST

23  AS LONG, AND MAYBE A LITTLE LONGER?

24       A    THAT'S CORRECT.

25       MR. GOETHALS:  THANK YOU.  I DON'T HAVE ANY

26  FURTHER QUESTIONS.

115

1          THE COURT: MR. KIES.

2          MR. KIES:  NO, I DON'T HAVE ANYTHING FURTHER.

3          THE COURT : THANK YOU, DOCTOR.  YOU'RE EXCUSED.

4     HAVE A GOOD DAY.

5               NEXT WITNESS.

6          MR. GOETHALS:  PEOPLE RECALL GLORIA GOMEZ.

7               (WHEREUPON BIANCA MONTOYA, OFFICIAL COURT

8     INTERPRETER, HAVING BEEN PREVIOUSLY DULY SWORN,  AND WHO

9     HAD BEEN SEATED NEXT TO THE DEFENDANT THROUGHOUT THE

10    PROCEEDINGS, CAME FORWARD TO INTERPRET THE PROCEEDINGS

11    FOR THE WITNESS.)

12               GLORIA DE ROSAS GOMEZ SANCHEZ,

13    RECALLED AS A WITNESS BY THE PEOPLE, HAVING BEEN PREVIOUSLY

14    DULY SWORN, WAS EXAMINED AND TESTIFIED, THROUGH THE

15    INTERPRETER, AS FOLLOWS:

16         THE COURT:  THE WITNESS IS STILL UNDER OATH.

17               YOU MAY INQUIRE.

18               DIRECT EXAMINATION (CONTINUED)

19         Q     BY MR. GOETHALS:  MS. GOMEZ, I THINK WE

20    STOPPED YESTERDAY AT ABOUT THE TIME THAT YOU SAW THE

21    CRUZ BROTHERS LEAVE THE AREA ON KODIAK IN A YELLOW CAR.

22               DO YOU REMEMBER THAT CAR, MA'AM?

23         A     YES.

24         Q     DID YOU SEE APPROXIMATELY HOW MANY PEOPLE

25    LEFT THE AREA IN THAT YELLOW CAR?

26         A     FOUR.

EXHIBIT "C"

Romero, Isidro  D-07204
June, 2005

## PSYCHOLOGICAL EVALUATION
## FOR THE BOARD OF PRISON TERMS
## SUMMER 2005 LIFER HEARING
## SAN QUENTIN STATE PRISON

1. Identifying Information:  Isidro Romero is a 52 year-old native Mexican male who is serving a 16 year to life sentence for the 1982 murder of Jose Gomez. He has been denied parole nine times thus far. For a thorough review of background information see the previous psychological evaluations of September, 2004 and June, 2002.

This report is based on a 2 ½ hour interview occurring on June 23, 2005. The medical records and central file were reviewed for 3.0 hours.

Please note that the request for this current evaluation was due to objections raised by the inmate's attorney to the risk assessment section of the previous psychological evaluation of December, 2004. The objection pertained to a statement in the 12/04 evaluation, that Mr. Romero was statistically more likely to commit violence again when compared to the average member of the non-prison population for the reasons that "he is a man; he has a history of violence; he is single and he has a history of alcohol abuse."

### CLINICAL ASSESSMENT

XII.  Current Mental Status
    A.  Mental Status evaluation:

Mr. Romero presented as a short, slim but physically strong Latino male with neatly groomed, graying hair and brown eyes. His physical movement was fluid and natural while he wore standard prison issue clothing. He spoke accented English of sufficient fluency to the task at hand. His speech was of normal flow while content was logical and sequential with no evidence of thought disturbance. Mr. Romero was very polite and humble in his demeanor, while he related to the interviewer in a non-defensive and particularly forth right manner. He was cooperative and engaged throughout, making good eye contact and spontaneously disclosing of personal information when appropriate. Mr. Romero's mood was good with congruent and broad affect. There were no signs of psychosis nor evidence of homicidal or suicidal ideation, intent or plan. Mr. Romero was oriented to person, place, time and reason for the interview. There was no evidence of psycho-neurological deficits. Mr. Romero denied symptoms of mental illness.

    B.  Clinical Diagnosis and Level of Functioning:

        Axis I:   Alcohol Abuse in full institutional remission
        Axis II:  None
        Axis III: None acute
        Axis IV:  Stressors: Incarceration with Life Term
        Axis V:   Global Assessment of Functioning (GAF) = 85

Romero, Isidro  D-07204
June, 2005

    C. <u>Treatment Activities:</u>  None.  Mr. Romero absent of psychiatric illness.

XIII:  <u>Review of Life Crime:</u>
    A.  Inmates version and view of offense and attitude toward victim; assessment of causative factors.

Mr. Romero recalled the evening of the crime, " I was in a bar with some friends..we were invited to a party in Anaheim..the guys I was with in the car went out to the house...Sergio went...and Fausto came out and they started to fight..alot of people came out of the house... I do not know why they were fighting but I found out later that Sergio and his brother had 2 girl friends in the house and they came to pick them up but Fausto objected and they started to fight..I was in the yard and he (the victim) came out and confronted me, he was holding a knife and I said ""hold on"" because our fathers were friends – I don't want to fight...I walked backwards and went 50 feet from the house...my mistake was crossing the street because there were cars..I had my back to the cars..someone came up behind me and hit me in the neck...I drop to the ground on one knee, it was totally dark.  He (the victim) came over and tried to stab me in the head...I put one arm up and he cut my arm...something happened like this, I don't know how I got the knife out...don't recall.  Gomez (the victim) came to attack a second time..I think I was afraid..as he came, I ducked and shoved the knife at Gomez and thought I stabbed him in the stomach but it was in his chest.  After that, Gomez turned and walked away and me and my friends went to the hospital.  I did not intend to kill him..I tried to stop him..I was not that worried about him because he walked away..I thought he was not that injured...**[Reaction to the death of victim?]** I was arrested for the stabbing..he (the victim) was in the hospital..My wife visited me in jail and I find out I stabbed him in the chest...She said maybe he would die – it was terrible. **[What was terrible?]** I didn't want him to die, he's a human being, he's a man.  There were no problems, why did this have to happen?..We (he and the victim) had nothing to do with the conflict (between Fausto and Mr. Romero's friends) but he died and I went to prison." **[How do you feel about what you did?]** I had to pay for it..what I did...I took a life and I did that..I can't bring him (the victim) back..I feel bad about the crime I committed.  I hurt his family.  I hurt my own family.  Society does not want me back..I have no right to kill a human being..I have no right to do that." **[How do you understand that you killed the victim that evening?]** "When I get drunk I get violent, now I know that.  I'm an alcoholic, I was an alcoholic but now all these years – I won't do it (drink) again.  Alcohol was a problem for me so I stay away from that... in here (prison) I don't drink..I don't want to do that. **[How do you know that you can stay away permanently from alcohol if you were paroled?]** I go to AA every week since 1988.  I had to accept that I am a alcoholic. I heard a lot of stories of going back (returning to alcohol)..when I heard it I realize I can't drink because the people who go back, all their problems from before come back with drinking.  If I have a problem in my life, I don't go to bar to drink, instead I can talk to people now..better to talk to friend or family for help or advice...I have no desire to drink. I don't wish to do it..I don't want problems so I stay away from booze." **[How do you understand that you became a problem drinker?]** I saw my father drink when I was a boy...Iwanted to be like my father...I think because I saw him drinking I wanted to do it.  Drinking was normal in my culture..everybody drink all the time...people got

Romero, Isidro  D-07204
June, 2005

drunk. It was normal. **[If you are deported to Mexico how are you going to get support to stay sober there?]** I want to be more involved in AA if I get out...there are AA meetings in the city 15 miles from my village.. I want to do more service...I can drive there, it's not far. I only want to work on my family farm, make enough to eat and sell for my family. I want simple life, to work and be with my family. **[Will family members in Mexico respect and support your choice to abstain from alcohol?]** Yes, they know I don't drink..they don't bother me, they leave it alone."

Mr. Romero appears to feel genuine remorse and takes full responsibility for the murder. He does not evidence any signs of resentment or self pity for receiving a life sentence and spending the past 23 years in prison.

B.  Relevance of mental condition to life crime/criminal behavior.

Mr. Romero was intoxicated at the time of the crime. His blood alcohol level was 0.16. In another incident prior to the instant offense and also under the influence of alcohol, he threatened an ex-girlfriend with a knife. He was also arrested for drunk driving.

XIV:  Assessment of Dangerousness:
     Risk for violence cannot be predicted with any certainty but statistics and research in the area of risk analysis have identified factors that make a particular individual more likely to commit future acts of violence than the average member of the non-prison population.

    A.  Within controlled setting:
     Mr. Romero has remained discipline free and violence free for the entire time of his 23 year incarceration.. Therefore he is of minimal risk when compared to the general prison population.

    B.  If released to the outside community:
     Mr. Romero has statistically based static factors for increased violence potential when compared to the average member of the general population. These factors still stand: 1) He is a man. 2) He has committed violence before. 3) He is single. 4) He has a history of alcohol abuse.

Factors that are likely to lower his risk for violence still stand as well. These are: 1) No history of childhood sociopathy. 2) Increased education. 3) Violence risk drops after age forty. 4) He has no motivation for violence and does not endorse any violent ideation, intent or plans. 5) He has remained alcohol free for 15 years and clearly understands that he cannot ever drink alcohol. 6) He has never used illegal narcotics. 7) There is no evidence of paranoia of a psychotic nature or as a result of a personality disorder.

Not withstanding the presence of immutable risk factors in that Mr. Romero is male and has a history of alcohol abuse and violence, it seems that in his consistent efforts over the many years that he has been in prison he seems to have rehabilitated himself while

3

Romero, Isidro D-07204
June, 2005

concurrently reducing his risk potential to as minimal a level as is possible. However because of the established actuarial and clinical risk factors in his case, Mr. Romero will never pose as low a risk as the average member of the general population. At present, in this examiner's judgment, were Mr. Romero released back into the community and to remain alcohol free, he would pose minimal risk of dangerousness to others  The minimal risk that he currently poses is contingent upon Mr. Romero's commitment to life-long sobriety by continuing to attend Alcoholics Anonymous or participate in alternate alcohol recovery activities in the United States or Mexico. Mr. Romero is has bought into AA; and by all appearances is an active and enthusiastic member of the AA community. He seems to have internalized the tools that AA taught him so that will always know he is an alcoholic and must never drink. Achieving life-long sobriety hinges on continuos AA involvement that typically includes performing charitable activities and going to AA meetings no matter how much time has passed since the last drink.

   C.  Significant risk factors/precursors to violence:
         The foremost risk factor if released into the community is the potential for alcoholic relapse. There is a clearly established link between Mr. Romero's past consumption of alcohol and the commission of violence. Were he to resume drinking his violence potential significantly increases.  Therefore it is imperative that Mr. Romero if released,he continuos to participate regularly in relapse prevention activities  If he is granted parole and deported back to Mexico, there are AA meetings available there, making it realistic for him to maintain his minimal risk status so as to he is not a danger to the people there..

Counter balancing the risk for relapse are the additional protective factors:  Mr. Romero's apparent strong commitment to stay sober and that he seems to fully accept that he is an alcoholic and must never drink.  That he shows he is invested in recovery activities and the sober community evidenced by his 15 year active involvement in Alcoholics Anonymous.  That he also clearly demonstrates that he understands the link between his drinking and likely subsequent violent behavior.  That he knows if he drinks he will likely cause himself serious problems. That he also shows no signs of impending relapse such as the presence of cravings for  alcohol.  That Mr. Romero now possesses coping skills to effectively handle his problems, wherein in the past, when confronted with difficulties he coped by drinking, avoiding his  problems and making them even worse. Another factor militating against relapse is that he is firmly established in a busy lifestyle including regular and meaningful contact with others.  It is commonly known that inactivity and isolation from others can make alcoholics vulnerable to distorted thinking and rationalizations that lead to relapse.  This makes him less vulnerable to return to alcohol.  Finally, Mr. Romero has achieved 15 years of uninterrupted sobriety.  That he has not relapsed for such a length of time makes it more probable that he will not relapse in the future.

XV.  Clinician Observations/Comments/Recommendation:

Per the previous evaluations reviewed for this report, Mr. Romero, if released, he plans to live with his brother in Los Angeles and work in his brother's landscaping business,

4

Romero, Isidro  D-07204
June, 2005

which his brother has confirmed as an ongoing option.  Because Mr. Romero is an illegal alien in the U.S., he may be deported to Mexico upon release.  Mr. Romero's family owns arable land in Mexico where he plans to farm support himself.  He maintains that he has significant family in Mexico.  Mr. Romero claims that he has a letter now, verifying that the land exists, which the Parole Board previously requested of him.  Mr. Romero is prosocial and without mental illness.  He is flexible and seems to have the capacity to adapt relatively easily to changing situations.  This bodes well for successful re-entry into free scoiety were he paroled.  He possesses the assets of sociability and has the capacity to emotionally and attach to others making him less of risk and more likely to quickly gain the support and positve regard of members of the community he may live in people enhancing his chances to continue the meaningful and productive life style he established while in prison.  Mr. Romero impressed this examiner and distinguished himself from the more typical inmate due to the genuineness and candor that he projected throughout all the entire interview.  He responded openly and completely to the questions and concerns presented him.  He also demonstrated an unusual maturity wherein he seems to have already fully prepared himself and accepted that he may be denied parole again and more likel than not will spend the rest of his life in prison.  He shows that he feels that the punishment he has been given is deserved because he took someone's life.  Unlike the majority of lifers he showed no signs of self-pity, resentment or bitterness about being locked up indefinitely,even when he expressed that by having gone to prison the greatest loss of his life was losing his family and feeling powerless to provide them with anything more than a phone call, letter or short visits on an infrequent basis.  He indicated that if he is to live the rest of his life in prison, he will simply continue his established life of advancing his knowledge and skills, being of service to others and continue to practice his faith.  All of these things collectively appear to keep him positive and confident that no matter what happens he will continueto make a life for himself that is meaningful, productive, as happy as is possible and of help to others.

There are no psychiatric reasons to retain him.  Mr. Romero poses minimal risk to the community on the condition that he continue his alcohol recovery activities.  Mr. Romero is man will likely earn the respect and positive regard of others in any community he may live.

*Elizabeth R. Lewis, PhD*
Elizabeth R. Lewis, Ph.D.
Contract Psychologist
San Quentin State Prison

5

EXHIBIT "D"

SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF ORANGE

# MINUTE ORDER

**Case Number   M-11411 X A**

**People Vs Romero, Isidro**

┌─ Report Request Criteria ─────────────────┐
1. Docket Date Range      : Date filter
2. Sequnce Number Range : Sequence filter
3. Docket Category          : Category filter
└──────────────────────────────────────────┘

| Docket Dt | Seq | Text |
|---|---|---|
| 8/10/2007 | 1 | **Hearing held on 08/10/2007 at 09:00 AM in Department C5 for Chambers Work.** |
| | 2 | Officiating Judge: Richard M. King, Judge |
| | 3 | Clerk: K. Barnstein |
| | 4 | No Court Reporter present at proceedings. |
| | 5 | No appearances |
| | 6 | Court read and considered Petition for Writ of Habeas Corpus. |
| | 7 | Petition for Writ of Habeas Corpus is denied for the reasons stated in the order denying writ filed 07/06/2007. |
| | 8 | Writ denied for the reasons set forth in the Order Denying Habeas Corpus |
| | 9 | Order Denying Habeas Corpus signed and filed. |
| | 10 | Copies of this minute order and signed order mailed to Isidro Romero CDC # D-07204 3-N-06 San Quentin State Prison San Quentin, CA 94964. |
| | 11 | Copies of this minute order and signed order forwarded to Orange County District Attorney's Office. |



**FILED**
ORANGE COUNTY SUPERIOR COURT

AUG 1 0 2007

ALAN SLATER, Executive Officer/Clerk
*K. Barnstein*
BY K. BARNSTEIN

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF ORANGE

| | |
|---|---|
| IN RE ISIDRO ROMERO,<br>Petitioner, | ) CASE NO. M-11411 (C-54812)<br>) ORDER DENYING<br>) HABEAS CORPUS<br>)<br>)<br>)<br>) |
| ON HABEAS CORPUS, | ) |

TO THE PEOPLE OF THE STATE OF CALIFORNIA AND TO DEFENDANT, AND HIS
COUNSEL OF RECORD:

Petitioner is serving an indeterminate prison term of 16 years to life with the
possibility of parole, based on his 1985 conviction for second degree murder with a
knife use enhancement.  Having been found unsuitable for parole on at least ten prior
occasions, he now challenges the current (3/7/07) decision of the Board of Parole
Hearings (the Board) on habeas corpus.[1]

### Circumstances of the Commitment Offense

The circumstances of the offense which were read into the record at the 3/7/07
hearing show that in 1982, petitioner's friend (Cruz) had appeared at a party (uninvited)
and attempted without success, to persuade his girlfriend to leave.  Cruz left and

---

1  The current petition refers to the Board of Parole Hearings' failure to comply with this court's
4/13/07 order requiring the Board to provide him with a proper record of his 2006 parole denial hearing.
(Orange County Superior Court Case #M-10932).  However, because the issue of the Board's
compliance with this court's prior order is not before this court in this proceeding, it will not be addressed
herein.

returned hours later accompanied by several others, including petitioner. When the girlfriend still refused to leave, a fight erupted which escalated into a brawl, during which petitioner stabbed the victim (Gomez) who later died from multiple wounds. Several others were also injured, including defendant, who sustained a stab wound to the arm for which he obtained hospital treatment. At the parole suitability hearing petitioner admitted the offense, admitted being armed with a knife, but claimed to have committed the offense only after having been attacked at knifepoint by the victim. He also admitted having been drunk at the time, having consumed at least two or three six-packs. His blood alcohol level was .16%.

Petitioner's disciplinary history in prison was exemplary, consisting only of a minor "128" in 1986. He has worked in vocational dry cleaning for years. He admits to being an alcoholic, has attended AA since 1988 and stated his intention to continue attending AA if released. However, the record showed that his AA attendance from 2000 through 2005 was minimal, although he resumed regular attendance in 2006. Because he is an illegal alien, he will likely be deported to Mexico and plans to work on his parents' farm. However, it has not been definitively determined if AA or comparable programs are available where he plans to live. The most recent psychological assessment was favorable.

### The Board's Decision

The 3/7/07 decision found petitioner unsuitable for parole on the ground that he would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. The decision was based on the following grounds:

1) <u>The commitment offense</u> – It was carried out in a very cruel, cold and callous manner, in that petitioner and his friends crashed a party, engaged in a fight where petitioner stabbed the host, who was unarmed. It was carried out in a manner which demonstrated a very callous disregard for human suffering in that the victim was stabbed multiple times, after which petitioner and his friends fled. Witnesses saw petitioner grab the victim by the hair, pull him forward and stab him in the chest. The motive was extremely trivial in relation to the offense.

2) <u>Prior criminal history/social history</u> – Petitioner had a history of alcohol abuse and a prior criminal history. His prior record included convictions for drunk driving

(1978) and assault (1981). In the latter offense, he threatened a girlfriend with a knife. In both prior offenses, he received probation, but failed to profit from society's previous attempts to correct his criminality. The Board found an escalating pattern of criminal conduct which culminated in the commitment offense. Further, although the 2005 psychological report was generally favorable, the Board viewed it as inconclusive because, although it stated that petitioner would pose a minimal risk to society if he abstained from alcohol consumption, it also stated that petitioner's risk would increase significantly if he were to resume drinking.

3) <u>Parole Plans</u> – As an illegal alien, petitioner will probably be deported, and plans to live and work on his parents' farm in Puebla, Mexico. Although the Board acknowledged this to be a valid offer of employment and residence, it pointed out that because petitioner had admitted having been raised in a culture of alcohol abuse, it expressed concern that his plan to return to this environment would make it difficult to maintain sobriety after his release.

4) <u>Self Help</u> – The Board found that more self-help was needed so that petitioner will learn to face, discuss understand and cope with stress in a nondestructive manner, and to understand the reasons for the commitment offense. The Board expressed skepticism about petitioner's version of the commitment offense, and criticized his failure to regularly attend AA from 2000 through 2005, when it should have been apparent that substance abuse prevention was a top priority based on its connection to the commitment offense.

5) <u>Opposition from the People</u> – The Orange County District Attorney and the Anaheim Police Department indicated their opposition to petitioner's release.

### Contentions on Habeas Corpus

1) Petitioner claims that the decision finding him unsuitable for parole was unsupported by the evidence, and that the Board's continued reliance on the immutable circumstances of the commitment offense and his prior criminal history violates due process.

2) Petitioner claims that the decision was arbitrary and capricious, in that it was pre-determined, thereby violating his due process rights.

### Standard of Review

Pen.C. § 3041(b), which provides that the Board of Prison Terms shall set a release date, also allows it to decline to do so if it determines that the commitment offense, or the timing and gravity of current and past offenses, is such that public

3

safety considerations require a longer period of incarceration. The California Supreme Court has construed Pen.C. § 3041(b) to mean that the Board must grant parole unless it determines that public safety requires a lengthier period of incarceration and may decline to set a parole date if it concludes on relevant grounds, with support in the evidence, that the grant of a parole date is premature for reasons of public safety. ((*In re Rosenkrantz*, (2002) 29 Cal.4th 616, at 654; *In re Dannenberg* (2005) 34 C4th 1061 at page 1071)

In arriving at its decision, the Board must consider "the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release." (Title 15 Cal. Code of Regulations § 2402(b))

Once it has considered all relevant factors, the Board's discretion in determining parole suitability is extremely broad and almost unlimited, but not absolute. (*In re Dannenberg* (2005) 34 C4th 1061 at 1082; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 655; In re Powell (1988) 45 Cal.3d 894, 902) The Board's decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. However, the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Board. If the decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is *some* evidence in the record that supports the decision. (*In re Rosenkrantz*, (2002) 29 Cal.4th 616, at 677.) The Board has very broad discretion to identify and weigh the factors relevant to predicting "by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts." (*In re Fuentes* (2005)135 Cal.App.4th 152, at 160)

4



### Application of Standard of Review

Petitioner claims that the Board's finding of unsuitability is unsupported by the record because there is no evidence that the offense was carried out in a very cruel, callous manner. He argues that because the offense was the result of a fight between himself and the victim, it did not exceed the minimum elements of second degree murder. (Citing Rosenkrantz and Dannenberg, supra)   Comparing his offense to those described in recent Court of Appeal decisions in which individuals have been found suitable for parole, he claims that his commitment offense is far less egregious. (Citing *In re Lee* (2006) 143 CA4th 1400; *In re Elkins* (2006)144 Cal.App.4th 475; *In re Scott* (2005) 133 Cal.App.4th 573 and other recent cases) For this reason, he asserts that the Board's decision is without evidentiary support.

It is unnecessary for this court to determine whether petitioner's commitment offense alone would have supported the Board's decision herein, because the unsuitability determination herein was not limited solely to the commitment offense, but was instead based on additional factors which are supported by the evidence.

The transcript of the 3/7/07 parole suitability hearing indicates that the Board of Parole Hearings addressed the factors required by law and provided an individualized consideration of these factors as they related to petitioner. Therefore, his claim that the result was pre-determined, arbitrary and capricious is unfounded.

A major reason for the Board's conclusion that petitioner still represents a threat to public safety involved its concern that petitioner had not shown that he would abstain from alcohol abuse if released. Petitioner was admittedly drunk at the time of the offense, and an admitted alcoholic who began drinking at age 15. His alcohol abuse also contributed to his prior criminal record. The 2005 psychological assessment stated petitioner's Axis 1 Diagnosis as "Alcohol Abuse in full institutional remission" and identified his foremost risk factor as the potential for alcohol relapse. The report's conclusion that petitioner posed a minimal risk to the community if released was expressly conditioned upon his continued abstention from alcohol use and his continued involvement with alcohol recovery activities.

The factors relied on by the Board in denying parole (i.e., petitioner's

5

commitment offense, criminal history, social history, parole plans and self-help issues) are connected to his alcoholism. Because his threat to society if released is directly related to his permanent abstention from alcohol use, the Board's conclusion that he would still pose a threat to society if released, based the aforementioned deficiencies in this area (including but not limited to his failure to regularly attend AA from 2000 through 2005), is supported by the record. Consequently, the denial of parole is supported by "some evidence" and was not an abuse of discretion. (In re Rosenkrantz (2002) 29 Cal.4th 616)

### Disposition

For the foregoing reasons, petitioner has failed to establish a prima facie case for relief, and the petition for writ of habeas corpus is therefore denied. (People v. Romero (1994) 8 Cal.4th 728, 737; In re Clark (1993) 5 Cal.4th 750, 769, fn. 9.)

DATED: _8/10/07_

_____
JUDGE OF THE SUPERIOR COURT

R. M. KING